## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| AMERICA WEST BANK MEMBERS, <br><br> Plaintiff, <br><br> v. <br><br> THE STATE OF UTAH, acting through the UTAH DEPARTMENT OF FINANCIAL INSTITUTIONS, and G. EDWARD LEARY, an individual, <br><br> Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS** <br><br> Case No. 2:16-cv-326-CW-EJF <br><br> Judge Clark Waddoups |

## INTRODUCTION

Plaintiff America West Bank Members, L.C. (AWBM) filed this action against the State of Utah, Utah Department of Financial Institutions (UDIF), and UDIF Commissioner G. Edward Leary (collectively, Defendants) challenging the UDIF's seizure of a bank wholly owned by AWBM. (*See generally* Am. Compl., ECF No. 2-1.) Defendants have moved the court to dismiss all of AWBM's claims on several grounds, including statutes of limitation, qualified immunity, and failure to state a claim. (*See* Mot. to Dismiss, ECF No. 10.) AWBM opposed the motion, (*see* Opp'n, ECF No. 16), and Defendants replied in support, (*see* Reply, ECF No. 21).

On January 25, 2017, the court held a hearing on the motion and allowed supplemental briefing as the parties' deemed necessary. (*See* ECF No. 25.) Shortly thereafter, the court requested supplemental briefing addressing the effect of *White v. Pauly*, 137 S. Ct. 548 (2017) (per curiam), and *Garcia v. Escalante*, 678 F. App'x 649 (10th Cir. 2017) (unpublished), on the court's analysis of Commissioner Leary's qualified immunity defense. (ECF No. 26.) The parties

submitted supplemental briefing on qualified immunity, and the court took the motion under advisement. (*See* ECF Nos. 25-28.)

Upon consideration of the original and supplemental briefing, the parties' oral arguments, the case record, and relevant legal authorities, the court GRANTS IN PART and DENIES IN PART Defendants' Motion to Dismiss, (ECF No. 10). As further detailed in the analysis that follows, the court finds that AWBM's federal and state constitutional claims are timely and relate back to AWBM's prior state court action, but that its contract claims are untimely and must be dismissed. In addition, the court concludes that Commissioner Leary is not entitled to qualified immunity at this stage in the proceedings. Finally, the court allows AWBM to amend its complaint to clarify whether it is asserting a physical taking or regulatory taking, or both.

In sum, the court DISMISSES the First and Second Claims for Relief (i.e., the contract claims), but allows the remaining claims to proceed at this time.

## BACKGROUND

AWBM previously sued these Defendants[1] in state court for the bank seizure at issue. (Am. Compl. ¶ 6.) On April 30, 2012, the state district court dismissed the case in its entirety for lack of sufficient factual allegations under Utah Rule of Civil Procedure 12(b)(6). (*See id.* at ¶ 7; *Am. W. Bank Members, L.C. v. State*, 2014 UT 49, ¶ 1, 342 P.3d 224, 227.) The Utah Supreme Court affirmed the district court's dismissal of AWBM's claims on the same grounds, with an important clarification. *See Am. W. Bank*, 2014 UT 49, ¶¶ 1, 36. The district court appeared to have dismissed AWBM's due process claims with prejudice, which the Utah Supreme Court

---

[1] AWBM had also sued UDFI's supervisor of banks, Tom Bay. But AWBM failed to file an appropriate notice of claim against Mr. Bay, as required by the Utah Governmental Immunity Act, so the state court dismissed all claims against Mr. Bay pursuant to rule 12(b)(1) of the Utah Rules of Civil Procedure. *Am. W. Bank Members, L.C. v. State*, 2014 UT 49, ¶¶ 3–4, 342 P.3d 224, 227.

found constituted error. *Id.* at ¶¶ 4 n.4, 8, 37, 44. The Utah Supreme Court directed the district court to dismiss the due process claims *without* prejudice. *Id.* at ¶¶ 37, 44.

In its decision, the Utah Supreme Court briefly recounted the background behind the bank's seizure in 2009 and the subsequent proceedings, which this court repeats for convenience and then supplements with further factual background:

> America West Bank (Bank) is wholly owned by its members, AWBM. On May 1, 2009, UDFI filed a petition in district court for an order approving the seizure of the Bank. That same day, the district court granted the petition without the presence or participation of AWBM. UDFI then appointed the Federal Deposit Insurance Corporation (FDIC) as receiver of the Bank. The FDIC announced publicly it had been appointed receiver of the Bank and immediately began winding down the affairs of the Bank and liquidating its assets.
>
> On June 28, 2011, AWBM filed a complaint in district court against the State of Utah; UDFI; the commissioner of UDFI, Mr. G. Edward Leary . . . . AWBM also filed a notice of claim against Mr. Leary, as required by the Utah Governmental Immunity Act (Immunity Act). AWBM alleged various claims, including common law tort, breach of contract, breach of the covenant of good faith and fair dealing, constitutional takings, and due process violations. Liquidation of the Bank's assets was ongoing when AWBM filed its complaint. The State filed a motion to dismiss the complaint based on rules 12(b)(1) and 12(b)(6) of the Utah Rules of Civil Procedure.

*Id.* at ¶¶ 2–3 (footnote omitted).

As noted, the district court dismissed AWBM's case in April 2012, and the Utah Supreme Court affirmed the dismissal on grounds that AWBM had not alleged sufficient factual allegations in the complaint, clarifying that all claims should be dismissed without prejudice. *Id.* at ¶¶ 36, 44. On December 3, 2014, the Utah Supreme Court remitted its decision to the district court. (Am. Compl. ¶ 9; Mot. Ex. 8, p. 3, ECF No. 10-8 (Dist. Ct. Dkt.).)

On December 1, 2015, AWBM refiled its action against Defendants in the state district court. (*See* ECF No. 4.) AWBM amended its complaint in March 2016 to include due process claims under 42 U.S.C. § 1983 and served it on the Defendants at that time. (*See id.*; Opp'n at 8;

Notice of Removal ¶¶ 2-3, ECF No. 2.) Defendants removed the action to this court in April

2016, invoking this court's original jurisdiction over the federal due process claim. (*See* Notice

of Removal, ECF No. 2.)

The Amended Complaint alleges causes of action for breach of contract and the covenant

of good faith and fair dealing; violation of procedural and substantive due process under the

Fourteenth Amendment and the Utah Constitution; and violation of the Takings Clause of the

Utah Constitution. (Am. Compl. at pp. 17-33.) The Amended Complaint greatly expands on the

general allegations in the first state court action. (*Compare* Am. Compl., ECF No. 2-1 *with* ECF

No. 10-7.) The court highlights some of the allegations in the Amended Complaint that guide its

analysis, accepting, as it must at this stage, all well-pleaded factual allegations as true and

viewing them in the light most favorable to AWBM. *See Sanchez v. United States Dep't of*

*Energy*, 870 F.3d 1185, 1199 (10th Cir. 2017) ("We accept as true all well-pleaded factual

allegations in the complaint and view them in the light most favorable to [the plaintiff].").

In 2000, the UDFI chartered America West Bank (the Bank), which was wholly owned

by AWBM. (Am. Compl. ¶¶ 11, 16.) The Bank had early success and positive regulatory

reviews. (*Id.* at ¶¶ 17-19.) In 2007, the Bank was poised to implement an "innovative" and

"revolutionary . . . member banking concept" that would give the Bank "the ability to distribute

earnings to member owners . . . while avoiding the corporate level tax of a Bank" and "provide

member banking benefits similar to those used by credit unions to build member loyalty." (*Id.* at

¶¶ 20-24.) In late 2007, the Federal Reserve approved the Bank's implementation of this concept,

which the Bank expected would "raise significant additional capital in the short term and lead to

the competitive advantage of the Bank over the long-term." (*Id.* at ¶¶ 22, 25-26.)

In 2008, however, the regulatory atmosphere changed. (*See id.* at ¶ 27.) The FDIC and UDFI became more "aggressive and hostile" and took "unreasonable positions not previously taken in evaluating the Bank," with officials indicating that the change was "political." (*Id.* at ¶¶ 29-30.) A former FDIC examiner, Brent Savage, apparently told a Bank member that the FDIC had changed its mind about the innovative member banking concept and had directed that the Bank be shut down. (*See id.* at ¶¶ 31, 46-49.)

During 2008 and 2009, the Bank attempted to defend its position by showing the "willingness of owners to contribute additional capital, a very engaged board, the Bank's profitability, and willingness to respond to recommendations from regulators." (*Id.* at ¶¶ 32-34.) But although the Bank's performance had improved in 2007, as noted in the FDIC's Material Loss Review, and the Bank was well-rated in peer reports, the Bank's regulatory ratings declined in 2008 and 2009 owing to the new examination process by the UDFI and FDIC. (*Id.* at ¶¶ 26-28.) During this time, regulators changed their analysis of the Bank and its assets from an "ongoing concern" to an immediate liquidation with accompanying mark downs. (*Id.* at ¶¶ 39-40, 43.) The Bank disputed this methodology and the regulators' characterizations of the Bank's capital, assets, and liquidity, and signed a call report following these examinations "under protest." (*Id.* at ¶¶ 44-45, 78.) Regulators encouraged the Bank to continue to raise capital, resulting in significant capital infusions during 2008. (*Id.* at ¶¶ 55-62.) But the Bank was unable to secure Troubled Asset Relief Program (TARP) funds in 2008 due to its low rating by regulators. (*Id.* at ¶¶ 64-66.) In September 2008, the FDIC sent the Bank a Cease and Desist Order, and in January 2009 the Bank entered into an agreement with the Federal Reserve Bank of San Francisco. (*See* Mot. Exs. 4 & 5, ECF Nos. 10-4 & 10-5.)

On May 1, 2009, UDFI Commissioner Leary[2] filed an ex parte verified petition for an order granting possession of the Bank on the basis that the Bank did not meet minimum capital requirements. (Am. Compl. ¶¶ 67, 97.) The district court granted the petition and appointed the FDIC as receiver of the Bank that day. (*Id.* at ¶¶ 106, 108.) No representative from the Bank was notified of or present at the hearing. (*Id.* at ¶ 106.) The FDIC immediately and publicly announced the seizure of the Bank, and began liquidating the Bank's assets. (*Id.* at ¶ 109.) Commissioner Leary and an attorney for the state told a representative of the Bank not to resist the FDIC's actions because the FDIC could "make it much worse" for the Bank. (*Id.* at 112.) The case in which the petition was filed remains under seal. (*Id.* at ¶ 98.)

AWBM contends that Commissioner Leary knew or should have known that the Bank met minimum capital requirements and that the statutory bases for the seizure were not fulfilled. (*See id.* at ¶¶ 76-77, 81.) The UDFI had a report indicating that the Bank did not meet minimum capital requirements, but AWBM asserts that Commissioner Leary should have known the report was based on a methodology to which the Bank protested. (*See id.* at ¶¶ 78-79.) AWBM asserts that this methodology was incorrect and would have shown most, if not all, other financial institutions as failing to meet minimum capital requirements as well. (*Id.* at ¶¶ 80-81.) AWBM contends that Commissioner Leary facilitated the FDIC's attempt to create a basis to seize the Bank and that the incorrect methodology was not imposed to protect the public, but rather to manufacture a justification for the Bank's seizure. (*Id.* at ¶¶ 82, 91, 96, 99.) Indeed, AWBM alleges that when the district court asked Commissioner Leary how much capital infusion would be required to meet the minimum capital requirements, Commissioner Leary told the judge that

---

[2] G. Edward Leary has been the UDFI Commissioner since 1992. (*See* Mot. at 4; Commissioner, Utah Dep't of Fin. Insts., https://dfi.utah.gov/about-us/commissioner/ (last visited Feb. 5, 2018); Am. Compl. ¶ 156.)

he did not know. (*Id.* at ¶ 100.) But AWBM contends Commissioner Leary should have known how much capital was needed based on his own reports and should have known the Bank could raise capital quickly if allowed to do so. (*See id.* at ¶¶ 101-04.)

An officer at Cache Valley Bank, which had a role in administering the liquidated assets on behalf of the FDIC, told a Bank representative that the assets seized were valuable and that the FDIC did not lose money on the liquidation. (*See id.* at ¶¶ 115-16.) Subsequent transactions apparently showed the assets resold for a "healthy profit" and realized at least as much value as projected by the Bank. (*Id.* at ¶¶ 117-19.)

## LEGAL STANDARD

To survive dismissal under Federal Rule of Civil Procedure 12(b)(6),[3] "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The court must "accept the well-pled factual allegations in the complaint as true, resolve all reasonable inferences in the plaintiff's favor, and ask whether it is plausible that the plaintiff is entitled to relief." *Diversey v. Schmidly*, 738 F.3d 1196, 1199 (10th Cir. 2013) (internal quotation marks and citations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). The "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "Even so, '[g]ranting [a] motion to dismiss is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading

---

[3] Defendants also seek dismissal of the contract claims under Rule 12(b)(1), but because the court finds those claims untimely under the relevant statute of limitations, the court does not address the challenge.

but also to protect the interests of justice.'" *Dias v. City & Cty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (alterations in original) (quoting *Duran v. Carris,* 238 F.3d 1268, 1270 (10th Cir. 2001)). "Thus, 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'" *Id.* (quoting *Twombly*, 550 U.S. at 556).

In addition, where a motion to dismiss is based on an affirmative defense raised in an answer, such as qualified immunity, it "is more accurately described as a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) rather than a motion for failure to state a claim under Rule 12(b)(6)." *Brown v. Montoya*, 662 F.3d 1152, 1160 n.4 (10th Cir. 2011). The standards under both rules are the same. *Id.*

Finally, in evaluating the sufficiency and plausibility of the pleadings, the court may consider documents incorporated by reference and other matters of which the court may take judicial notice, including court dockets. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Mayfield v. Bethards*, 826 F.3d 1252, 1256 (10th Cir. 2016) (noting that, on a motion to dismiss, the court "is limited to the Complaint and any documents it incorporates"); *Kerber v. Qwest Grp. Life Ins. Plan*, 647 F.3d 950, 959 (10th Cir. 2011) (noting that exhibits and documents incorporated into complaint may be considered, as long as the parties do not dispute their veracity).

**ANALYSIS**

### I.   Statutes of Limitations

*A.   Section 1983 claim*

The parties do not dispute that Utah's four-year residual statute of limitations applies to AWBM's § 1983 claim. *See Brock v. Herbert*, 435 F. App'x 759, 762 (10th Cir. 2011) (unpublished)[4] (holding district court correctly applied the four year statute of limitations to § 1983 claims) (citing *Fratus v. DeLand*, 49 F.3d 673, 675 (10th Cir. 1995)). Because the Bank seizure occurred on May 1, 2009, the period for AWBM to bring a § 1983 claim lapsed on May 1, 2013, while its first action was on appeal. The Utah Supreme Court's remittitur, issued on December 3, 2014, affirmed the dismissal of all claims without prejudice. Then, on December 1, 2015, AWBM filed this case.

Because the second filing occurred within one year of the dismissal of its prior case not on the merits, and because the § 1983 statute of limitations ran while the first action was pending, the § 1983 claim appears to be timely under the Utah savings statute.

State law governs the appropriate limitations periods and accompanying tolling issues. *Fratus*, 49 F.3d at 675. Utah Code Ann. § 78B-2-111(1) states:

> If any action is timely filed and the judgment for the plaintiff is reversed, or if the plaintiff fails in the action or upon a cause of action otherwise than upon the merits, and the time limited either by law or contract for commencing the action has expired, the plaintiff . . . may commence a new action within one year after the reversal or failure.

This savings provision provides a limited exception to the usual statutes of limitations: "If a party files its action *before* the expiration of the statute of limitations, but the action is dismissed for any reason other 'than upon the merits' *after* the expiration of the applicable limitations

---

[4] This and all other unpublished decisions are not precedential, but are cited for their persuasive value. *See* Fed. R. App. 32.1; 10th Cir. App. R. 32.1.

period, the party may refile its claim as a 'new action' within one year of the previous dismissal." *Norton v. Hess*, 2016 UT App 108, ¶ 9, 374 P.3d 49, 52. AWBM's first action was dismissed without prejudice for failure to state sufficient allegations supporting the claims, not on the merits. The statute of limitations for the § 1983 claim expired while the first action was on appeal. AWBM initiated its current action within a year of the Utah Supreme Court's remittitur. Thus, the § 1983 claim is timely under the Utah savings statute.

Defendants do not challenge this reasoning, but instead argue that because AWBM did not plead a § 1983 claim in its prior action, it cannot plead the claim now. AWBM included the parallel state cause of action for violation of due process in the first action, however, so it argues that the § 1983 claim relates back to the prior complaint under Rule 15(c) of the Federal and Utah Rules of Civil Procedure. Defendants respond by arguing that the relation back rule cannot apply between cases, but only within the same case, per *Marsh v. Soares*, 223 F.3d 1217, 1219 (10th Cir. 2000).

*Marsh* held that a successive habeas petition under § 2254, filed after a previous petition was dismissed without prejudice for failure to exhaust state remedies, does not relate back to the earlier petition because the second petition was a separate filing rather than a supplemental pleading. *Id.* at 1219–20. Generally speaking, the Tenth Circuit holds that "the doctrine of relation back 'applies to an amendment to a pleading in the *same* action,'" rather than a separately filed action. *Barnes v. United States*, 776 F.3d 1134, 1143 (10th Cir. 2015).

But in Utah, at least, exceptions allow for the relation back of pleadings in circumstances where it is not prejudicial. *2010-1 RADC/CADC Venture, LLC v. Dos Lagos, LLC*, 2017 UT 29, ¶ 19, 408 P.3d 313, 318 (discussing the general rule that relation back does not apply where a new party is added or substituted, but acknowledging an exception for technical defects and

cases where relation back is not prejudicial). In a common example, Utah courts allow plaintiffs to refile new actions that add new parties where the new party had actual notice of the original pleading and an identity of interest with the previously-named party. *E.g.*, *Hebertson v. Bank One, Utah, N.A.*, 1999 UT App 342, ¶¶ 17–19 995 P.2d 7, 12–13, *superseded on other grounds by statute*, *see Norton*, 2016 UT App 108, ¶ 9 n.4. The *Hebertson* court permitted a plaintiff's addition of new parties in an action refiled within the savings period because the new parties had sufficient identity of interest with the previous parties and notice of the proceedings. 1999 UT App 342, ¶¶ 16, 19. In its analysis, the court analogized to the "closely related context" under rule 15(c) that an amended pleading "will relate back to the original filing if it 'merely restates in a different form the cause of action originally pleaded.'" *Id.* at ¶ 18 (quoting 51 Am. Jur. 2d *Limitation of Actions* § 234, at 787 (1970)). The court observed "the prevailing view is that the prior and refiled actions need only be substantially the same." *Hebertson*, 1999 UT App 342, ¶ 18.

In this second action, the same parties are present (besides Mr. Bay) and the same claims are pled stemming from the same factual conduct and occurrence (the Bank seizure) as in the prior action. Once AWBM appealed the dismissal of its first action, it had no mechanism by which to amend its original pleading. The Utah Supreme Court dismissed AWBM's claims without prejudice, presumably to allow AWBM to re-plead them. AWBM has now added the federal counterpart to its previously-pled state due process claims. Since the filing of the first action in 2011, Defendants have had actual notice that AWBM is asserting a due process violation due to the seizure of the Bank. Defendants do not claim any prejudice by the addition of a § 1983 claim that is parallel to the state due process claim and based on the same conduct and occurrence at issue in the first action. *See Dos Lagos*, 2017 UT 29, ¶ 19 n.6 (noting that "the

key inquiry [for relation back] centers on whether the amendment will prejudice the nonmoving party"); *cf. Gary Porter Const. v. Fox Const., Inc.*, 2004 UT App 354, ¶ 38, 101 P.3d 371, 381–82 (discussing the newly-added-party rule, and holding that "despite changes in how the relation back doctrine has been articulated, Utah courts have consistently applied the test developed under the common law: whether no prejudice would result because the added party had actual or constructive notice that it would have been a proper party to the original pleading").

"[W]hat is crucial is that at an adequately early stage of the litigation, the . . . party was 'sufficiently on notice of the facts and claims that gave rise to the proposed amendment.'" *Id.* at ¶ 35 (quoting 3 James Wm. Moore, *Moore's Federal Practice* § 15.19[1] (3d ed. 2001) ("The purpose of the statute of limitations is to prevent stale claims and the rationale of allowing an amendment to relate back is that once a party is notified of litigation involving a specific factual occurrence, the party has received the notice and protection that the statute of limitations requires.")). Thus, the core of the relation back doctrine in Utah is notice and lack of prejudice to the relevant party, such that the statute of limitations is not manipulated or defeated. In discussing the comparable federal rule, the Tenth Circuit concurs:

> Relation back is intimately connected with the policy of the statute of limitations. As the Supreme Court has stated, the purpose of relation back is to balance the interests of the defendant protected by the statute of limitations with the preference expressed in the Federal Rules of Civil Procedure in general, and Rule 15 in particular, for resolving disputes on their merits. Though a potential defendant has a strong interest in repose, repose should not be a windfall for a defendant who possesses sufficient notice of impending claims. The rationale of Rule 15(c) is that a party who has been notified of litigation concerning a particular occurrence has been given all the notice that statutes of limitations were intended to provide. The same general standard of notice applies regardless of whether a litigant seeks to add defendants, plaintiffs, or claims.

*McClelland v. Deluxe Fin. Servs., Inc.,* 431 F. App'x 718, 723–24 (10th Cir. 2011) (unpublished) (internal quotation marks and citations omitted). Considering these principles, the procedural

distinction between a renewed action and an amendment within an action appears inconsequential where the relevant party, present in both proceedings, has actual notice and is not prejudiced.

Upon the Utah Supreme Court's dismissal of AWBM's action without prejudice, AWBM renewed its action against essentially the same defendants, asserting the same claims, and adding a parallel federal claim. In these circumstances, the court finds the intertwined workings of the statute of limitations, savings statute, and relation back doctrine permit AWBM to assert a § 1983 claim in this action. The § 1983 claim, which arises from the same factual circumstances previously identified and corresponds to the state constitutional claim previously asserted, is timely under the Utah savings clause and relation back doctrine.

### B. State constitutional claims

Defendants next contend that AWBM's state due process claims are barred by the two-year statute of limitations for causes of action against the state and its employees "for injury to the personal rights of another if not otherwise provided by state or federal law." Utah Code Ann. § 78B-2-304(3). Because the first action was filed on June 28, 2011, but the state constitutional claims lapsed two years after the Bank's seizure, i.e., on May 1, 2011, Defendants claim the state constitutional claims were filed too late.

AWBM counters that the catch-all four-year statute of limitations in Utah Code Ann. § 78B-2-307(3) "for relief not otherwise provided for by law" constitutes the applicable limitation period, which had not lapsed by the filing of the first action. AWBM also asserts that its first action was filed in compliance with the notice requirements and limitations in the Utah

Governmental Immunity Act (Immunity Act), which excuses any lateness in filing beyond the two-year period. Defendants do not dispute this assertion.[5]

In March 2011, however, the Utah Supreme Court ruled the Immunity Act was inapplicable to state constitutional claims in *Jensen v. Cunningham*, 250 P.3d 465, 479 (Utah 2011). AWBM argues it should not be penalized for complying with the law relevant at the time of the constitutional violation, *see Larson v. Snow Coll.*, 189 F. Supp. 2d 1286, 1294 (D. Utah 2000) (observing that state civil rights claims are covered by the Immunity Act's limitations provisions), and for furthering the notice objectives of the Immunity Act. Defendants contend AWBM should have known the Immunity Act did not apply because *Jensen* did not articulate any new law, for prior cases had held that governmental immunity cannot apply to state constitutional violations. *See, e.g.*, *Bott v. DeLand*, 922 P.2d 732, 736 (Utah 1996) ("[G]overnmental immunity cannot apply where a claimant alleges that the state or a state employee violated his constitutional rights."), *overruled on other grounds by Spackman ex rel. Spackman v. Bd. of Educ.*, 2000 UT 87, ¶ 20 n.5, 16 P.3d 533; *but see Tiscareno v. Anderson*, 421 F. App'x 842, 843 (10th Cir. 2011) (unpublished) (vacating earlier decision at 639 F.3d 1016 dismissing plaintiff's state constitutional claim under the Immunity Act due to *Jensen*'s holding "without qualification or reservation" that the Immunity Act did not apply to state constitutional claims).

The parties have not directed the court to any controlling case that clarifies which statute of limitations applies to violations of due process under Utah law, and the court finds the current

---

[5] Neither the Amended Compliant nor the parties' briefing provides dates for when AWBM sent a notice of claim to the appropriate government agency or when the claim was denied or constructively denied. But because the burden of proof is on the party asserting the affirmative defense, *Larson v. Snow Coll.*, 189 F. Supp. 2d 1286, 1292 (D. Utah 2000), and Defendants do not carry their burden of proving otherwise, the court will credit AWBM's statement that it complied with the Immunity Act when it filed the first action in June 2011.

case law is woefully lacking on the subject. Looking to the analog claim, the Supreme Court has characterized § 1983 claims as a personal injury claims, *Wilson v. Garcia*, 471 U.S. 261, 278 (1985), *partially superseded by statute as stated in Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 377–83 (2004), and both the Tenth Circuit and Utah Supreme Court have confirmed that the four-year residual statute of limitations for personal injury actions applies to § 1983 claims, rather than the two-year statute of limitations, even after the Utah legislature amended the two-year limitations statute to target § 1983 claims. *See, e.g.*, *Mismash v. Murray City*, 730 F.2d 1366, 1367 (10th Cir. 1984) (concluding that Utah's residual four-year statute of limitations applied to § 1983 claims); *Maddocks v. Salt Lake City Corp.*, 740 P.2d 1337, 1339 (Utah 1987) (same); *Arnold v. Duchesne Cnty.*, 26 F.3d 982, 989 (10th Cir. 1994) (holding a legislative amendment to capture § 1983 claims within the two-year statute of limitations was invalid and instead applying the residual four-year statute of limitations); *Larson*, 189 F. Supp. 2d at 1298 (concluding that another amendment in 1997 to the two-year limitations statute—to the language it still carries today—did not apply to § 1983 claims and continuing to apply the four-year residual statute for personal injury actions). If the court were to analogize a violation of due process under the Utah Constitution to a personal injury claim, then the four-year residual limitations statute would appear to apply. But the two-year limitations language for actions against the state "for injury to the personal rights of another" also appears applicable on its face. *See* Utah Code Ann. § 78B-2-304(3); *Larson*, 189 F. Supp. 2d at 1294 (concluding that the language in the two-year statute of limitations purported to capture civil rights violations brought against the state, but noting that state civil rights claims were covered by the Immunity Act). And if state law contains more than one personal injury statute of limitation, the Supreme Court has

said the state's "residual" limitations period provides the "most analogous" statute for borrowing purposes. *Owens v. Okure*, 488 U.S. 235, 250 (1989).

In this instance, the court need not resolve the issue of which limitations period applies because AWBM undisputedly complied with the limitations provisions in the Immunity Act, which it believed controlled the state constitutional claims and which courts had applied to Utah constitutional claims prior to *Jensen*. Even if *Jensen* merely reiterated existing principles, the question of whether the Immunity Act applied was sufficiently unsettled that courts in this district and the Tenth Circuit had applied the Immunity Act to state constitutional claims and dismissed them on that basis. *See Brock*, 435 F. App'x at 761 (noting that, after *Jensen*, "we now know the district court erred in dismissing the state law constitutional claims based on Plaintiffs' failure to file a notice of claim"); *Tiscareno v. Anderson*, 639 F.3d 1016, 1025 (10th Cir. 2011) (dismissing state constitutional claims for failure to file a notice of claim under the Immunity Act) (vacated in part and revised on rehearing in 421 F. App'x 842). In addition, the parties and the state district court apparently believed the Immunity Act applied because all claims against Mr. Bay, a defendant in the first action, were dismissed when AWBM conceded that it had failed to properly file a notice of claim against him. *See Am. W. Bank*, 2014 UT 49, ¶ 4 n.3. Defendants cannot benefit from this concession and then later disavow the Immunity Act's ostensible application.

To avoid the substantial injustice that would occur if the court held the applicable statute of limitations to be the two-year statute—though AWBM and other courts applied law that appeared relevant and controlling at the time—the court will toll the limitations period to run from the date of *Jensen*'s issuing. The Utah Supreme Court has held that where parties have "relied on an erroneous interpretation" of a statute of limitations, the statute may be tolled to

account for individuals who delayed filing their causes of action based on the misunderstanding. *Medved v. Glenn*, 2005 UT 77, ¶ 16, 125 P.3d 913, 917 ("Consequently, for those individuals who may have delayed filing their causes of action due to the erroneous interpretation of *Seale*, the statute of limitations on their claims will begin to run as of the date of this opinion."). Therefore, even if the two-year statute of limitations in Utah Code Ann. § 78B-2-304(3) applied to state claims for violation of due process, the limitations period should be tolled until March 29, 2011, when *Jensen* was decided. AWBM's state due process claims, which were first brought on June 28, 2011, are therefore timely.

In sum, the court finds that AWBM's state due process claims are not barred by any statute of limitations.

### C. Contract claims

Defendants assert a final statute of limitations bar as to the contract claims. Based on the history of this action, and following *Ewing v. State, Dep't of Transp.*, 2010 UT App 158, 235 P.3d 776, the court concludes that AWBM's contract claims are now untimely.

The statute of limitations for a written contract claim is six years. Utah Code Ann. § 78B-2-309(2).[6] Thus, AWBM must have filed its contract claims on or before May 1, 2015. The first action was filed within this time frame, but dismissed without prejudice upon the Utah Supreme Court's remittitur on December 3, 2014. Though the statute had not run by this point, it had run by December 2015, when AWBM filed this action in state court.

Because the statute of limitations expired after the dismissal of the first action but before the filing of this action, the savings statute cannot be invoked to preserve the contract claims. In

---

[6] AWBM claims in its Opposition that it has asserted a verbal contract claim, as well as a written contract claim. (Opp'n at 24, ECF No. 16.) Upon review of the Amended Complaint, however, the court finds it cannot be read to state a claim for verbal contract in any sense of the term.

order to invoke the saving statute's one-year grace period for refiling, three conditions must be met: "(1) the original complaint must have been filed within the statute of limitations; (2) it must have failed on nonsubstantive grounds; and (3) the applicable statute of limitations must have expired." *Ewing*, 2010 UT App 158, ¶ 7. Though the first two conditions are met here, AWBM cannot meet the third. The statute of limitations for the contract claims had not expired when the Utah Supreme Court affirmed the dismissal of the first action, and did not expire until several months thereafter, on May 1, 2015. AWBM did not refile its case until after the statute had run. Thus, the savings statute cannot be invoked. *See Ewing*, 2010 UT App 158, ¶ 19 (holding the savings statute was not invoked where the court had dismissed the Ewings' first action without prejudice prior to the expiration of the statute of limitations and the Ewings refiled after the statute expired).

Because the parties did not move the district court in the first action to amend its judgment to a dismissal without prejudice until June 2016, (*see* ECF No. 21-1), AWBM argues that the case was not actually dismissed until that time. But AWBM's own actions belie this argument. AWBM renewed its action on December 1, 2015, two days before the one-year grace period would lapse from the Utah Supreme Court's remittitur on December 3, 2014. It did not serve the Defendants immediately, but took time to amend its complaint and then serve them. Both parties and the district court appear to have proceeded as if the Utah Supreme Court's remittitur was effective in dismissing the claims without prejudice (despite the direction that the district court enter an amended judgment, *see Am. W. Bank*, 2014 UT 49, ¶ 44). Because the court cannot allow a clerical error or oversight to defeat a statute of limitations, the court treats the remittitur date as effective in dismissing the claims. AWBM cites the court to *Callahan v. Sheaffer*, 877 P.2d 1259, 1262 (Utah Ct. App. 1994), but it is not to the contrary. In *Sheaffer*, the

plaintiff failed to serve her complaint within the required 120-day period, but the court did not act to dismiss the complaint, which it did on its own initiative, until a couple months after the 120-day period had lapsed. *See id.* The Utah Court of Appeals found that "[b]ecause the possibility existed that [plaintiff's] cause of action might have been preserved even after she failed to serve the summons within the prescribed 120 days"—for example, if she had filed motion for extension and shown excusable neglect—the action remained "alive" until the court "affirmatively dismissed it" later. *Id.* Here, there is no possibility that AWBM could have preserved or extended its first action after the Utah Supreme Court affirmed the dismissal of all of its claims. The Utah Supreme Court corrected the dismissal, but all that was left after its decision was to amend the judgment to a dismissal without prejudice. No other action could be taken at that time to keep the action alive. Thus, *Sheaffer*'s logic supports the result here.

In the circumstances, the court concludes AWBM's contract claims are untimely and must be dismissed.

## II.     Qualified Immunity

Defendants next contend that Commissioner Leary, sued in his individual capacity, is entitled to qualified immunity from AWBM's § 1983 due process claim because there is no clearly established right to notice and a hearing prior to the seizure of a bank, per *Columbian Fin. Corp. v. Stork*, 811 F.3d 390 (10th Cir. 2016) (*Columbian Fin. I*), and *Fahey v. Mallonee*, 332 U.S. 245 (1947). Defendants contend, moreover, that AWBM cannot identify a case where the courts have found a due process violation in circumstances similar to those here. AWBM counters that the Supreme Court clearly laid out the principles permitting bank seizures without a prior hearing in *Fuentes v. Shevin*, 407 U.S. 67, 90 (1972), and argues that the allegations of the complaint plausibly demonstrate that Commissioner Leary knowingly failed to comply with

those principles. AWBM also cites *Browder v. City of Albuquerque*, 787 F.3d 1076 (10th Cir. 2015), and *Brown v. Weis*, 871 P.2d 552 (Utah Ct. App. 1994), as cases that clearly establish the Due Process Clause protects individuals from arbitrary and capricious administrative action, and that Commissioner Leary should have known he could be subject to liability where he acted arbitrarily in seizing a bank.

"Qualified immunity is a defense that shields 'governmental officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pyle v. Woods*, 874 F.3d 1257, 1262 (10th Cir. 2017) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Callahan*, 555 U.S. at 231. Thus, qualified immunity "is both a defense to liability and a limited 'entitlement not to stand trial or face the other burdens of litigation.'" *Estate of Redd ex rel. Redd v. Love*, 848 F.3d 899, 906 (10th Cir. 2017) (quoting *Iqbal*, 556 U.S. at 672).

To overcome a motion to dismiss based on qualified immunity, AWBM must allege facts plausibly showing a violation of a clearly established constitutional right. *See Columbian Fin. I*, 811 F.3d at 396. The court has discretion to decide which part of this two-step analysis to address first depending on the factual circumstances of the case. *Callahan*, 555 U.S. at 236. AWBM has the burden to show Commissioner Leary is not entitled to qualified immunity. *Pyle*, 874 F.3d at 1262.

"Although qualified immunity defenses are typically resolved at the summary judgment stage, district courts may grant motions to dismiss on the basis of qualified immunity." *Thomas*

*v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014). "Asserting a qualified immunity defense via a Rule 12(b)(6) motion, however, subjects the defendant to a more challenging standard of review than would apply on summary judgment." *Id.* (quoting *Peterson v. Jensen*, 371 F.3d 1199, 1201 (10th Cir. 2004)). At the motion to dismiss stage, "it is the defendant's conduct *as alleged in the complaint* that is scrutinized for 'objective legal reasonableness.'" *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996) (quoting *Harlow*, 457 U.S. at 819).

The court proceeds first to the issue of whether a due process right was clearly established in this context. After consideration of Supreme Court and Tenth Circuit precedent and Utah law, the court determines it was clearly established at the relevant time that Commissioner Leary was required to have a rational, non-conclusory basis under the state authorizing statute in order to seize the Bank without pre-seizure notice or a hearing. Turning to the violation prong, the court finds AWBM has plausibly pleaded non-conclusory allegations that the Commissioner violated its due process rights by failing to follow the narrowly-drawn seizure statute where he had no reasonable, non-arbitrary justification for seizing the Bank. Thus, the court concludes that, at this stage, Commissioner Leary is not entitled to qualified immunity.

## A. Clearly established

A constitutional right is clearly established where, at the time of the relevant conduct, "'every reasonable official would have understood that what he is doing violates' the constitutional right at issue." *Pyle*, 874 F.3d at 1263 (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). "A reasonable official possesses this understanding if 'courts have previously ruled that materially similar conduct was unconstitutional, or if a general constitutional rule already identified in the decisional law applies with obvious clarity to the specific conduct at issue.'" *Pyle*, 874 F.3d at 1263 (quoting *Buck v. City of Albuquerque*, 549 F.3d 1269, 1290 (10th Cir.

2008)). "To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent." *Dist. of Columbia v. Wesby*, No. 15-1485, ___ S. Ct. ___, 2018 WL 491521, at *11 (Jan. 22, 2018). Plaintiff must point to Supreme Court or Tenth Circuit precedent, or show that the alleged right is clearly established from the case law in other circuits. *Pyle*, 874 F.3d at 1263. Although "[a] prior case need not have identical facts," *Patel v. Hall*, 849 F.3d 970, 980 (10th Cir. 2017), "an officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in his shoes would have understood that he was violating it," *T.D. v. Patton*, 868 F.3d 1209, 1220 (10th Cir. 2017) (internal quotation marks omitted) (quoting *City & Cty. of San Francisco v. Sheehan*, ___ U.S. ___, 135 S. Ct. 1765, 1774 (2015)). "Because the prior case must involve materially similar conduct or apply with obvious clarity, qualified immunity generally protects all public officials except those who are 'plainly incompetent or those who knowingly violate the law." *Lowe v. Raemisch*, 864 F.3d 1205, 1208 (10th Cir. 2017) (quoting *Pauly*, 137 S. Ct. at 551).

Courts should not define clearly established law "at a high level of generality." *Pauly*, 137 S. Ct. at 552 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). Instead, "the clearly established law must be 'particularized' to the facts of the case." *Pauly*, 137 S. Ct. at 552 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Pompeo v. Bd. of Regents of the Univ. of New Mexico*, 852 F.3d 973, 981 (10th Cir. 2017) (quoting *Mimics, Inc. v. Vill. of Angel Fire*, 394 F.3d 836, 842 (10th Cir. 2005)). "A rule is too general if the unlawfulness of the officer's conduct 'does not follow immediately from the conclusion that [the rule] was firmly established.'" *Wesby*, ___ S. Ct. ___, 2018 WL 491521, at

*11 (alteration in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). "Of course, there can be the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Wesby*, ___ S. Ct. ___, 2018 WL 491521, at *11 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam)).[7]

Under the Fourteenth Amendment, state officials may not deprive a person of their property without due process of law. U.S. Const. amend. XIV; *see Ward v. Anderson*, 494 F.3d 929, 932 n.3 (10th Cir. 2007) ("[T]he Fourteenth Amendment imposes a due process requirement on state officials."). "The Supreme Court has interpreted this language as guaranteeing not only certain procedures when a deprivation of an enumerated right takes place (procedural due process), but also as guaranteeing certain deprivations won't take place without a sufficient justification (substantive due process)." *Browder*, 787 F.3d at 1078. AWBM alleges violations of both procedural and substantive due process here.

While the right to due process of law before deprivation of property is "quite clearly established . . . not every due process violation involves a clearly established right." *Columbian Fin. I*, 811 F.3d at 396 (internal quotation marks omitted). AWBM "must show its desired process was clearly established given the particular facts" of the case. *Id.*

In 1972, the Supreme Court clearly articulated the test for when government officials may seize property without a prior hearing:

---

[7] "A directly on-point case is not always necessary because 'general statements of the law are not inherently incapable of giving fair and clear warning' to government officials." *Starrett v. City of Lander*, 699 F. App'x 805, 807 (10th Cir. 2017) (unpublished) (quoting United States v. Lanier, 520 U.S. 259, 271 (1997)). But "[r]ecognition that a 'case presents a unique set of facts and circumstances' is an 'important indication' that the conduct at issue 'did not violate a clearly established right.'" *Id.* (quoting *Pauly*, 137 S. Ct. at 552).

1. The seizure "is directly necessary to secure an important governmental or general public interest."

2. There is a "special need for very prompt action."

3. The government "kept strict control over its monopoly on legitimate force; the person initiating the seizure has been a government official responsible for determining, under the standards of a narrowly drawn statute, that it was necessary and justified in the particular instance."

*Id.* at 398 (quoting *Fuentes,* 407 U.S. at 91–92). Bank failures are emblematic of an instance where government officials may seize property prior to notice or a hearing because of the "delicate nature of the institution and the impossibility of preserving credit during an investigation." *Fahey*, 332 U.S. at 253. In *Fahey*, the Supreme Court determined the federal banking statute regarding appointment of a conservator or receiver, which contains similar language to the relevant Utah statute, was "sufficiently explicit, against the background of custom, to be adequate for proper administration and for judicial review." *Id.* at 252–53. And in *Fuentes*, citing *Fahey*, the Supreme Court identified bank failures as one of those "extraordinary situations that justify postponing notice and opportunity for a hearing." *Fuentes*, 407 U.S. at 90–92. Thus, the Tenth Circuit has held that the opportunity for a pre-deprivation hearing or a prompt post-deprivation hearing in the context of a bank seizure was not clearly established because an official could reasonably understand the *Fuentes* factors to allow the seizure of bank assets without a prior hearing. *Columbian Fin. I*, 811 F.3d at 398–99; *see Franklin Sav. Ass'n v. Office of Thrift Supervision*, 35 F.3d 1466, 1472 (10th Cir. 1994) ("In the context of banking regulation, post-deprivation court review generally satisfies due process requirements.").

But *Fahey*, *Fuentes*, *Brown*, *Browder*, and the *Columbian Financial* precedents also preserve the due process requirement of a reasonable, non-arbitrary justification for governmental action under the terms of a narrowly-drawn statute. Though *Fahey* permitted the

postponement of process under an explicit and customary statutory scheme, the Supreme Court also noted that pre-hearing seizure is a "drastic" procedure and that governmental officials have "a heavy responsibility" to exercise this authority "with disinterestedness and restraint." *Id.* at 253–54. Because the plaintiff in *Fahey* had obtained an injunction to prevent an administrative hearing on the bank seizure there, the Court noted that "the making of a record" as to whether the causes for appointing a conservator were "well-founded" was "cut off" and that the trial court did not take evidence on the subject either. *Id.* at 254. The Court was forced to "assume that the supervising authorities would be able to sustain the statements of fact and to justify the conclusions in their charges for the purpose of determining the case without trial." *Id.*

*Fuentes* clearly established that governmental action in the bank failure context must be done by "a government official responsible for determining, under the standards of a narrowly drawn statute, that it was necessary and justified in the particular instance." 407 U.S. at 91–92. The Court explained that, fundamentally, "[t]he constitutional right to be heard is a basic aspect of the duty of government to follow a fair process of decisionmaking when it acts to deprive a person of his possessions." *Id.* at 80. The purpose remains to protect a person's "use and possession of property from arbitrary encroachment—to minimize substantively unfair or mistaken deprivations of property." *Id.* at 81. And the Court emphasized that "[s]ince the essential reason for the requirement of a prior hearing is to prevent unfair and mistaken deprivations of property . . . it is axiomatic that the hearing must provide a real test." *Id.* at 97. The *Fuentes* Court took issue with the conclusory process that Florida and Pennsylvania laws provided to authorize the summary seizure of a person's goods or chattel under a write of replevin:

> There is no requirement that the applicant make a convincing showing before the seizure that the goods are, in fact, 'wrongfully detained.' Rather, Florida law

automatically relies on the bare assertion of the party seeking the writ that he is entitled to one and allows a court clerk to issue the writ summarily. It requires only that the applicant file a complaint, initiating a court action for repossession and reciting in conclusory fashion that he is 'lawfully entitled to the possession' of the property, and that he file a security bond . . . .

*Id.* at 67, 73–74. The Court noted that situations justifying outright seizure without opportunity for a prior hearing "must be truly unusual" because due process "is not intended to promote efficiency or accommodate all possible interests: it is intended to protect the particular interests of the person whose possessions are about to be taken." *Id.* at 91 n.22.

*Fahey* and *Fuentes* thus provide clearly established law that governmental action to seize a bank must be necessary and justified in order to postpone due process guarantees. The Supreme Court expressly relies on "narrowly-drawn" banking statutes to ensure that governments keep "strict control over" their "monopoly on *legitimate* force." *Id.* at 91 (emphasis added). Here, where the context is an alleged failure to follow the narrowly-drawn state statute, "state law is of inevitable importance." *Kaufman v. Higgs*, 697 F.3d 1297, 1300 (10th Cir. 2012). The basic federal constitutional right of due process is clearly established by federal cases. But where "the precise scope of that right uniquely depends on the contours of a state's substantive . . . law" because Defendants rely on the state authorizing statute to undertake the Bank seizure, courts should rely on state court interpretations of that law. *Id.* at 1300–01.

In *Am. West Bank*, the Utah Supreme Court recited the *Fuentes* elements in viewing AWBM's state due process claims. 2014 UT 49, ¶ 39; *see also Bank of Ephraim v. Davis*, 581 P.2d 1001, 1005 (Utah 1978) (describing *Fuentes* as holding "any significant taking of property by the State is within the purview of the Due Process Clause"). Thus, at least one Utah court has applied the *Fuentes* elements to analyze the constitutionality of an outright seizure by the UDFI commissioner. In 1994, the Utah Court of Appeals found no due process violation occurred in

the UDFI's seizure of a loan and thrift institution, specifically following the three *Fuentes* requirements. *See Brown*, 871 P.2d at 566–68.[8] The appellate court noted that "Plaintiffs do not allege that the Commissioner failed to follow the provisions of the applicable statute . . . ." *Id.* at 566. The court concluded that the "summary seizure . . . fully conforms with the precepts of" *Fuentes* and other like cases, and again noted: "Most importantly, the Commissioner seems to have adhered to the strict statutory requirements and there has been no serious allegation to the contrary." *Id.* at 567. Later, the court reiterated, for a third time, that "[p]laintiffs have not alleged that the Commissioner failed to follow the statutory requirements." *Id.* at 568.

The Utah statute authorizing supervisory actions by the commissioner provides enumerated grounds for when the commissioner may seize a bank "without or without an administrative hearing" and states that the commissioner's action "may only be enjoined or set aside upon a finding, after notice and hearing, that the action is arbitrary, capricious, an abuse of discretion, or otherwise contrary to law." Utah Code Ann. §§ 7-2-1(1), (2), & (5). The statute also provides that "[t]he actions of the commissioner are subject to review of the court" and that the commissioner must, before or "within a reasonable time after taking possession of an institution," commence a court action "to provide the court supervisory jurisdiction to review the actions of the commissioner" as administrative actions, i.e., review for arbitrariness, capriciousness, fraud, or action that is contrary to law. *Id.* §§ 7-2-2(2), (3), & (4). Thus, the statute incorporates long-standing principles for administrative decisionmaking and judicial review thereof.

In *Browder*, the Tenth Circuit summarized the test for executive action under the Due Process Clause: courts review executive action for whether it "bears a 'reasonable justification in

---

[8] While Mr. Leary was commissioner of the UDFI by the time *Brown* was decided, the case challenged the conduct of his predecessor.

the service of a legitimate governmental objective' or if instead it might be 'characterized as arbitrary, or conscience shocking.'" 787 F.3d at 1078–79 (quoting *Cty. of Sacramento v. Lewis,* 523 U.S. 833, 846, 847 (1998)). *Browder* quotes the Oxford English Dictionary's definition of "arbitrary" actions—"those performed capriciously or at one's pleasure without good reason"— and traces the history of "efforts to tame arbitrary governmental action" back to the Magna Carta. 787 F.3d at 1080, 1079. Citing *Lewis*, a Supreme Court case from 1998, the Tenth Circuit distinguished cases "where forethought is feasible" from cases where "the legitimate governmental objective is so pressing that the luxury of forethought doesn't exist (e.g., responding to an emergency or dealing with a prison riot)," and noted that governmental action in the former instance may constitute a constitutional violation where the official is reckless or "deliberately indifferent to fundamental rights like . . . property." *Id.* at 1080. Though these principles are broad and context-specific, they are certainly not new. *See Lewis,* 523 U.S. at 845–51.

Finally, after the Tenth Circuit dismissed the claims against the individual FDIC commissioners in *Columbia Financial I*, it stated in an later appeal from the remaining official capacity claims that the FDIC's "ongoing refusal to provide a fair and impartial hearing" in the case could be considered an ongoing constitutional violation, and commented that "the fact that defendants afforded Columbian *some* form of a hearing does not alter our analysis because Columbian alleges that the previous hearing did not satisfy constitutional due process requirements." *Columbian Fin. Corp. v. Stork*, 702 F. App'x 717, 722 (10th Cir. 2017) (unpublished) (*Columbian Financial II*) (citing *Rezaq v. Nalley*, 677 F.3d 1001, 1010 (10th Cir. 2012) (notwithstanding a previous hearing, characterizing plaintiff's request for a new hearing "with adequate procedural protections" as "prospective relief")). The Tenth Circuit explained

that "[t]o hold otherwise would permit state actors to avoid an injunction requiring them to comply with federal due process standards simply by providing a sham hearing." *Id.* Though this case is quite recent, the concept that governmental action must have a non-arbitrary basis—i.e., that process cannot be a "sham"—is so basic that it needed no citation.

In sum, *Fahey* and *Fuentes* required official action to seize a bank be justified and non-arbitrary, and expounded on basic principles underlying due process in the context of summary seizures. And while *Brown* did not find a constitutional violation in the circumstances of that case, the Utah Court of Appeals explicitly distinguished the possibility of an official failing to follow the strict statutory requirements. The court finds this law, even if not "materially similar" or "particularized" to the facts presented here, at least applies with "obvious clarity." *Lowe*, 864 F.3d at 1210. "When the public official's conduct is egregious, even a general precedent would apply with obvious clarity." *Id.* at 1210. "After all, some things are so obviously unlawful that they don't require detailed explanation and sometimes the most obviously unlawful things happen so rarely that a case on point is itself an unusual thing." *Browder*, 787 F.3d at 1082.

The allegations in this case directly challenge Commissioner's Leary basis for seizing the bank through the ex parte hearing because the Commissioner allegedly failed to comply with the relevant narrowly-drawn statute. The Amended Complaint alleges a denial of due process in the seizing of the Bank due to political motive and without necessity or reasonable justification in service of legitimate government action. Though Commissioner Leary may have facially "complied" with the statutory requirements, AWBM alleges, he did so without a rational basis, making the administrative action arbitrary. AWBM alleges Commissioner acted out of an improper motive to shut down the bank rather than to protect the public interest.

The court finds that *Fahey*, *Fuentes*, and *Brown*, as well as the time-worn due process principles recited in *Lewis*, provided clearly established law such that every reasonable banking commissioner would have understood that he or she needed a reasonable justification grounded in the narrowly-drawn statutory scheme that permits outright seizure of a bank, otherwise the action could be considered an arbitrary deprivation of due process rights. Moreover, that basis could not simply repeat the statutory factors without any rational support, whether in the ex parte hearing or in the commissioner's own estimation. Administrative action has long been analyzed for arbitrariness, and the illegality of arbitrary governmental action is "beyond debate." *al–Kidd*, 563 U.S. at 741. These principles applied to any banking commissioners' action with obvious clarity.

### B. Constitutional or statutory violation

AWBM must also allege facts sufficient to show, assuming they are true, that Commissioner Leary's action to seize the Bank plausibly violated AWBM's due process rights. *See Robbins v. Oklahoma*, 519 F.3d 1242, 1249 (10th Cir. 2008). Though the FDIC had conducted negative examinations at the Bank and Commissioner Leary had a UDFI report indicating that the Bank did not meet minimum capital requirements, Commissioner Leary also allegedly knew that the methodology used to calculate the capital requirement was employed not on a reasonable or rational basis, but merely to provide grounds for the regulators to seize the bank. UDFI alleges that Commissioner Leary knew it could raise capital and that UDFI was cooperating with the FDIC's orders while also objecting to the regulators' methodology.

Defendants attach to their Motion the Commissioner's ex parte petition and the state district court's order approving the seizure, but both merely recite the statutory provisions the Commissioner identified as applicable to the seizure. Neither clearly contradicts the allegations

and, at this stage, the Amended Complaint contains sufficient non-conclusory allegations to support a reasonable inference that Commissioner Leary knowingly violated the law in acting to seize the Bank when he did. The court cannot conclude at this time that the statutory requirements were met on non-arbitrary grounds.[9]

"While qualified immunity was meant to protect officials performing discretionary duties, it should not present an insurmountable obstacle to plaintiffs seeking to vindicate their constitutional rights." *Lawmaster v. Ward*, 125 F.3d 1341, 1351 (10th Cir. 1997). On this record, the court finds AWBM may proceed with its § 1983 claim against Commissioner Leary because it was clearly established that he could not act without reasonable justification to seize the Bank under the guise of the state authorizing statute, and because the complaint contains sufficient allegations that he acted arbitrarily out of political pressure and motive, rather than legitimate governmental interest.[10] Commissioner Leary is not entitled to qualified immunity at this time.

### III.   Failure to State a Claim

#### A.   *State due process claims*

Defendants argue that AWBM's state due process claims fail to state a claim under *Spackman*, 2000 UT 87, 16 P.3d 533. In *Spackman*, the Utah Supreme Court held that a plaintiff may recover damages under the Utah Constitution if they can establish the following: (1) the provision violated is self-executing, (2) the plaintiff suffered a flagrant violation of their

---

[9] The court recognizes that its understanding of the case may change significantly after discovery. As the Tenth Circuit has noted in analyzing qualified immunity on a motion to dismiss: "It is possible that after discovery in this case we may see a different factual posture. Our task here is based on the allegations in the complaint. If the landscape changes after discovery, the government is entitled to seek summary judgment on qualified immunity." *Big Cats of Serenity Springs, Inc. v. Rhodes*, 843 F.3d 853, 868 n.6 (10th Cir. 2016). This sentiment holds true here.

[10] The court leaves open the question of whether this claim is more properly characterized as a violation of procedural due process or substantive due process. Development of the factual record will greatly assist in determining the answer.

constitutional rights; (3) existing remedies do not redress their injuries; and (4) equitable relief is inadequate to protect their rights or redress their injuries. *See id.* at ¶¶ 21–25. Defendants contend that their conduct in seizing the Bank was not "flagrant" and that because AWBM had a remedy of post-seizure judicial review, which it failed to pursue, it cannot now be heard to say that the existing remedy of equitable relief was inadequate. (*See* Mot. 6-8.)

Plaintiffs allege due process violations under Article I, Section 7 of the Utah Constitution (*See* Am. Compl. at pp. 19-28.) Section 7 states: "No person shall be deprived of life, liberty or property, without due process of law." Utah Const. art. I, § 7. The Utah Supreme Court has found Article I, Section 7 to be self-executing. *Spackman*, 2000 UT 87, ¶ 27. In addition, as noted by Defendants, the Utah Supreme Court has held that the "flagrant" analysis "closely parallels" the "clearly established" analysis that the court undertook above. *See id.* at ¶ 23. A flagrant constitutional violation "means that a defendant must have violated 'clearly established' constitutional rights 'of which a reasonable person would have known.'" *Id.* Because the court has concluded that precedent clearly establishes that Commissioner Leary's alleged conduct violates the federal constitution, the court finds that AWBM sufficiently alleges a "flagrant" due process violation under the Utah Constitution as well.

The question of whether existing remedies do not redress AWBM's injuries and whether equitable relief was and is wholly inadequate are decidedly less clear at this point. AWBM had a remedy of judicial review in the days following the seizure and the possibility of injunctive relief from that hearing. *See* Utah Code Ann. § 7-2-3 ("Whenever any institution or other person of which the commissioner has taken possession considers itself aggrieved by the taking, it may within 10 days after the taking apply to the court to enjoin further proceedings."). But AWBM alleges that it was threatened by UDFI officials not to engage with the post-seizure remedy.

AWBM also alleges that, in these circumstances, a post-seizure hearing could not undo the damage caused by the public announcement of the bank failure and that the uncertainty created by the seizure would all but ensure that within days or weeks the Commissioner would have a valid basis to seize the Bank, even though he failed to comply with the statutory requirements at the relevant time.

At this stage of the proceedings, where the court takes all well-pleaded allegations to be true and makes all reasonable inferences in AWBM's favor, sufficient allegations exist to conclude that existing remedies and equitable relief were inadequate to redress AWBM's injuries. Further factual development will greatly assist the court in resolving the state constitutional claims while avoiding premature dismissal. *See McCubbin v. Weber Cty.*, No. 1:15-cv-132, 2017 WL 3394593, at *23 (D. Utah Aug. 7, 2017) (unpublished) (declining to dismiss state constitutional claims on a motion to dismiss, even where a parallel § 1983 claim might redress the plaintiffs' injuries because "[f]urther discovery and litigation will sharpen the court's understanding of Plaintiffs' injuries and focus this inquiry considerably, while avoiding premature dismissal of Plaintiffs' claims under the state constitution"). Thus, the state constitutional claims survive a *Spackman* challenge at this time.

### B. Takings claim

Finally, Defendants assert that AWBM fails to state a claim for unconstitutional regulatory taking under Article I, Section 22 of the Utah Constitution because the Bank could not have a "reasonable investment-backed expectation" entitling it to compensation in the heavily-regulated banking industry. (*See* Mot. at 15-19.) AWBM counters that this seizure was both a physical and a regulatory taking, and that it has properly stated both types of claims because it

had a protectable property interest in the Bank until and unless the necessary prerequisites of the authorizing statute were fulfilled. (*See* Opp'n at 30-32.)

Article I, section 22 of the Utah Constitution states: "Private property shall not be taken or damaged for public use without just compensation." "This broad guarantee of just compensation 'is triggered when there is any substantial interference with private property which destroys or materially lessens its value, or by which the owner's rights to its use and enjoyment is in any substantial degree abridged or destroyed.'" *Am. W. Bank*, 2014 UT 49, ¶ 30 (quoting *Utah Dep't of Transp. v. Admiral Beverage Corp.*, 2011 UT 62, ¶ 22, 275 P.3d 208). A takings claim may be construed as a physical taking or a regulatory taking, and the "distinction is important, as the two takings have 'markedly different analytical formulas.'" *id.* at ¶ 31 (quoting *B.A.M. Dev., L.L.C. v. Salt Lake Cty.*, 2006 UT 2, ¶ 32, 128 P.3d 1161); *see id.* at ¶ 32 (describing the differences between the two types of compensable takings). Utah courts employ the federal distinction between a physical and regulatory taking. *Id.* at ¶ 31 ("Although the Utah Takings Clause provides greater protection than its federal counterpart, we have adopted the federal distinction between a physical and regulatory taking.")

Defendants point out that the allegations in the Amended Complaint do not clearly identify which type of takings claim AWBM asserts, despite the Utah Supreme Court's previous holding that AWBM must plead sufficient allegations such that the court can discern the type of taking it is alleging. *Id.* at ¶ 33. At the hearing on this motion, AWBM suggested that it is asserting both a physical and a regulatory taking and conceded that it would need to replead its takings claim to assert both types if permitted to do so.

Upon review of the Amended Complaint, the court finds it cannot adequately discern which type of takings claim AWBM alleges, particularly where AWBM argues that it is

asserting both types. (*See* Am. Compl. ¶¶ 220–43.) The court will allow AWBM to amend its pleading to specifically identify whether the taking alleged here constitutes a regulatory or physical taking, or both. If AWBM chooses to allege a physical invasion or permanent occupation of property, it should identify which specific property it asserts falls within the physical taking analysis and include allegations supporting a physical taking claim. If it chooses to assert a regulatory taking, it should identify the allegations that would support such a claim.

Because the Utah Supreme Court previously alerted AWBM to this issue in dismissing the first action, *see Am. W. Bank*, 2014 UT 49, ¶¶ 29–33, the court will not be inclined to allow further amendments to this claim absent good cause. The court permits this amendment without prejudice to Defendants renewing their dismissal arguments on the amended takings claim, if they so choose. Any renewed motion to dismiss must be limited to the amended takings claim, however.

## CONCLUSION

For the foregoing reasons, the court GRANTS IN PART and DENIES IN PART Defendants' Motion to Dismiss, (ECF No. 10). The court dismisses the First and Second Causes of Action (the contract claims) as untimely. The court also grants AWBM leave to amend its complaint only to replead its Sixth Cause of Action (the takings claim). AWBM may proceed with its Third, Fourth, and Fifth Causes of Action (the state due process and § 1983 claims) against Defendants as pled.

DATED this 5th day of February, 2018.

BY THE COURT:

_____
Clark Waddoups
United States District Judge