IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| AMERICA WEST BANK MEMBERS,<br><br>Plaintiff,<br><br>v.<br><br>THE STATE OF UTAH, acting through the UTAH DEPARTMENT OF FINANCIAL INSTITUTIONS, and G. EDWARD LEARY, an individual,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Case No. 2:16-cv-326<br><br>Judge Clark Waddoups |

## Introduction

Before the court is Plaintiff's Motion for Partial Summary Judgment, (ECF No. 45). As explained below, the court DENIES the Motion.

## Bank Regulation Background

The Utah Department of Financial Institutions (the Utah Department) is a "self-supported agency of state government." It is responsible for chartering, regulating, and examining state-chartered financial institutions. It currently regulates 21 banks, 30 credit unions, 15 industrial banks, and two trust companies. The Department's Commissioner is G. Edward Leary (Commissioner Leary).

The Federal Deposit Insurance Corporation (FDIC) is an agency created by Congress. Its stated mission is to "maintain stability and public confidence in the nation's financial system by," among other things "examining and supervising financial institutions for safety and soundness and consumer protection."

According to Commissioner Leary, both the Utah Department and the FDIC "regularly conduct examinations of banks to determine their safety and soundness." (Leary Decl. ¶ 3, ECF No. 50-6 at 3.) "The results of those examinations are summarized in Reports of Examination." (Leary Decl. ¶ 3, ECF No. 50-6 at 3.) The Reports of Examination contain a "Risk Management Composite" Rating. (*See* ECF No. 50-1 at 4; 50-2 at 4.) These ratings range from 1 to 5, with 1 having the least regulatory concern and 5 having the greatest concern. For example, the "rating definition" for a rating of "1" provides, in part, that "[f]inancial institutions in this group are sound in every respect . . . ."[1] In contrast, the "rating definition" for a rating of "5" provides, in part, that "[f]inancial institutions in this group exhibit extremely unsafe and unsound practices or conditions; exhibit a critically deficient performance; often contain inadequate risk management practices relative to the institution's size, complexity, and risk profile; and are of the greatest supervisory concern."[2]

### Undisputed Facts

"On or around May 1, 2000, America West Bank, (the Bank) was chartered by" the Utah Department. (*See* ECF No. 45 at 6; ECF No. 49 at 11 n. 2.) The Bank was authorized to operate in Utah. (*See* ECF No. 45 at 6; ECF No. 49 at 11 n. 2.) In 2005 and 2007 the Bank received Risk Management Composite ratings of "2." (ECF No. 50-1 at 4.)

In 2007 the Utah Department and the FDIC "conducted an examination of America West Bank," and the results were "summarized in [a] January 22, 2008" Report of Examination. (Leary Decl. ¶ 3, ECF No. 50-6 at 3.) The Report included a summary, which provided:

> The overall condition of America West Bank . . . has deteriorated significantly since the last examination and is now deficient. Adversely classified assets have increased dramatically as a result of excessive concentrations in commercial real

---

[1] https://www.fdic.gov/regulations/examinations/ratings/#4

[2] *Id.*

estate and a downturn in the local real estate market. Additionally, management
has continued to lend and grow the portfolio despite obvious signs of adverse
conditions in the real estate business cycle. The Allowance for Loans and Lease
Losses is inadequate and not reflective of a significant level or trend in
nonperforming loans and weakened real estate conditions. The level of capital is
deficient given the weakening asset quality and the hazard related to extreme
concentrations in real estate. Liquidity, sensitivity and earnings will be adversely
impacted if the deteriorating trends in asset quality continue. The Board and
Management's performance is deficient and lack of experience at key leadership
positions puts into question their capability to adequately adjust their operation to
a changed economic environment.

(ECF No. 50-1 at 4.) The January 22, 2008, Report of Examination assigned America West Bank

a Risk Management Composite rating of "4." (ECF No. 50-1 at 4.) The FDIC's rating definition

for this rating provides:

> Financial institutions in this group generally exhibit unsafe and unsound practices
> or conditions. There are serious financial or managerial deficiencies that result in
> unsatisfactory performance. The problems range from severe to critically
> deficient. The weaknesses and problems are not being satisfactorily addressed or
> resolved by the board of directors and management. Financial institutions in this
> group generally are not capable of withstanding business fluctuations. There may
> be significant noncompliance with laws and regulations. Risk management
> practices are generally unacceptable relative to the institution's size, complexity,
> and risk profile. Close supervisory attention is required, which means, in most
> cases, formal enforcement action is necessary to address the problems. Institutions
> in this group pose a risk to the deposit insurance fund. Failure is a distinct
> possibility if the problems and weaknesses are not satisfactorily addressed and
> resolved.[3]

On May 16, 2008, Commissioner Leary and George Doerr, the Deputy Regional Director

for the San Francisco Region of the FDIC, sent a letter to American West Bank's Board of

Directors with the January 22, 2008 Report of Examination attached. (Leary Decl. ¶ 3, ECF No.

50-6 at 3; ECF No. 50-13.) The letter provided, in part, that America West Bank had "been

formally designated a 'problem' institution and, as such, may be subjected to closer regulatory

supervision." (ECF No. 50-13 at 3.)

---

[3] https://www.fdic.gov/regulations/examinations/ratings/#4

"On or about September 3, 2008, the Bank stipulated and agreed to the issuance of a Cease and Desist order with the FDIC." (Leary Decl. ¶ 7, ECF No. 50-6 at 4.) The stipulation provided that America West Bank "consents and agrees to the issuance of an ORDER TO CEASE AND DESIST . . . by the FDIC." (ECF No. 50-14 at 2.) The Order to Cease and Desist provided, in part: "IT IS HEREBY ORDERED, that the Bank . . . cease and desist from" certain "unsafe and unsound practices." (ECF No. 50-16 at 2–3.)

"On September 25, 2008, the Bank stipulated to a . . . cease and desist order with" the Utah Department. (Leary Decl. ¶ 8, ECF No. 50-6 at 4.) The stipulation provided that America West Bank "consents and agrees to the issuance of an Order to Cease and Desist by the Utah Department of Financial Institutions . . . ." (ECF No. 50-15 at 2.) .) The Order to Cease and Desist provided, in part: "IT IS HEREBY ORDERED, that the Bank . . . cease and desist from" certain "unsafe and unsound banking practices." (ECF No. 50-17 at 2–3.)

On November 3, 2008, Commissioner Leary and an individual with the FDIC sent a letter to "America West Bank Members, LC's" "Board of Directors." (ECF No. 50-18.) Attached to the letter was "a copy of the July 14, 2008 Bank Holding Company Inspection Report . . . prepared by the Utah Department of Financial Institutions . . . and the Federal Reserve Bank of San Francisco . . . ." (ECF No. 50-18 at 2.) The letter provided that "[e]xaminers conducted an on-site inspection of America West Bank Members LC . . . ." (ECF No. 50-18 at 2.) The letter further provided that "[t]he report show[ed] the overall condition of America West Bank Members, LC has declined significantly and is now marginal." (ECF No. 50-18 at 2.)

"On January 22, 2009, Plaintiff" and the Utah Department "entered into a written agreement." (Leary Decl. ¶ 11, ECF No. 50-6 at 5; ECF No. 50-19.) The agreement provided, in

part, that "America West shall immediately take steps to correct all violations of laws set forth in the Bank Holding Company Inspection Report dated July 14, 2008." (ECF No. 50-19 at 5.)

"The last" Report of Examination for America West Bank "was on February 9, 2009." (Leary Decl. ¶ 10, ECF No. 50-6 at 5; ECF No. 50-19.) That Report provided that "America West Bank . . . is insolvent." (ECF No 50-2 at 5.) This Report assigned the Bank a Risk Management Composite rating of "5," the lowest possible rating. (ECF No. 50-2 at 4.) The FDIC's rating definition for this rating provides:

> Financial institutions in this group exhibit extremely unsafe and unsound practices or conditions; exhibit a critically deficient performance; often contain inadequate risk management practices relative to the institution's size, complexity, and risk profile; and are of the greatest supervisory concern. The volume and severity of problems are beyond management's ability or willingness to control or correct. Immediate outside financial or other assistance is needed in order for the financial institution to be viable. Ongoing supervisory attention is necessary. Institutions in this group pose a significant risk to the deposit insurance fund and failure is highly probable.[4]

The Report also noted that "America West Bank" was "subject to [the] two similar Cease and Desist Orders" discussed above. (ECF No. 50-2 at 5.) The Report concluded that the Bank's "Management is considered critically deficient as a result of noncompliance with requirements in [those] Orders, the poor overall financial condition of the bank, an inadequately funded [Allowance for Loan and Lease Losses] account, and continued apparent violations of laws and regulations." (ECF No. 50-2 at 5.)

The Report included a section titled "Compliance with Enforcement Actions" relating to the Utah Department's Cease and Desist Order. (*See* ECF No. 50-2 at 14.) The Utah Department's examiner found that the Bank was not in compliance with six provisions of the Cease and Desist Order.

---

[4] https://www.fdic.gov/regulations/examinations/ratings/#4

First, the Cease and Desist Order provided that "[t]he bank shall have and retain qualified management. Each member of management shall have qualifications and experience commensurate with his or her duties and responsibilities at the bank." (ECF No. 50-2 at 14; ECF No. 50-17 at 4.) The Utah Department's Examiner found that the Bank was not in compliance with this provision because it had "retained all management since the institution of the ORDER, implying its confidence in the qualifications and experience of each to be commensurate with his or her duties and responsibilities." (ECF No. 50-2 at 14.)

Second, the Cease and Desist Order provided that "[w]ithin 90 days from August 31, 2008, the bank shall increase its Tier 1 capital in such an amount as to equal or exceed 10 percent of the bank's total assets, and shall thereafter maintain Tier 1 capital in such an amount as to **equal or exceed 10 percent** of the bank's total assets." (ECF No. 50-2 at 15; ECF No. 50-17 at 5 (bold added).) The Utah Department's Examiner found that the Bank was not in compliance with this provision because as of November 30, 2008, the Bank's "Tier 1 Capital ratio was 6.33 percent." (ECF No. 50-2 at 16.) As of December 31, 2008, "that ratio was 4.2 percent," and as of January 30, 2009, "that ratio was 4.02 percent." (ECF No. 50-2 at 16.)

Third, the Cease and Desist Order provided that "[w]ithin 90 days of August 31, 2008, the bank shall develop and submit to the Regional Director and the Commissioner a written three-year strategic plan. Such plan shall include specific goals for the dollar volume of total loans, total investment securities, and total deposits as of December 31, 2009, December 31, 2010, and December 31, 2011." (ECF No. 50-2 at 22; ECF No. 50-17 at 13.) The Utah Department's Examiner found that the Bank was not in compliance with this provision because the Bank's Management "provided to the FDIC and the [Utah Department] a Budget Plan, with assumptions, that projected out to December 2011," but the "plan that was submitted did not

address all the requirements of this provision and is considered unacceptable given it includes many unrealistic assumptions." (ECF No. 50-2 at 22.)

Fourth, the Cease and Desist Order provided that "[w]ithin 90 days from August 31, 2008, the bank shall eliminate and/or correct all violations of law, as more fully set forth in the ROE as of January 22, 2008." (ECF No. 50-2 at 22; 50-17 at 13.) The Utah Department's Examiner found that the Bank was not in compliance with this provision:

> [t]he internal audit staff conducted a review, and presented recommendations to the Board for corrections. The review was comprehensive, addressing both the individual violations, and the particulars of each. As of the date of the report to the Board, there were still 5 issues related to the violations which had not been resolved. Four of the five fall under the 'Apparent Contravention to Appendix A of Part 365 of the FDIC Rules and Regulations'; two of these require loan-to-value adjustments to two individual loans, a third requires the addition of a regulatory loan-to-value limit column to a Board report, and the fourth requires the addition of 4 loans identified to have excess loan-to-values to be added to a Board report. The fifth, under the 'Apparent Violation of the Federal Reserve Act 23B', involving the Durbano law firm, is being finalized. The current examination also identified 3 new apparent violations of laws and regulations . . . .

(ECF No. 50-2 at 22.)

Fifth, the Cease and Desist Order provided that "[w]ithin 90 days from August 31, 2008, the bank shall develop, adopt, and implement a written policy satisfactory to the Regional Director and the Commissioner" that "shall govern the relationship between the bank and its holding company . . . ." (ECF No. 50-2 at 23; 50-17 at 13.) The Utah Department's Examiner found that the Bank was not in compliance with this provision. (ECF No. 50-2 at 23.) The Utah Department's Examiner found that "CFO Brent Wilde indicate[d] that a policy governing the relationship between the bank and its holding company ha[d] not been developed." (ECF No. 50-2 at 23.)

Sixth, the Cease and Desist Order provided that "[t]he bank shall not pay cash dividends without the prior written consent of the Regional Director and the Commissioner." (ECF No. 50-

2 at 23; ECF No. 50-17 at 14.) The Utah Department's Examiner found that the Bank was not in

compliance with this provision:

> The Board determined at its November 2008 meeting that dividends to the
> holding company would be suspended, along with deferral of interest payments
> by the holding company to the security holders of its Trust Preferred Securities.
> However, prior to that decision, yet subsequent to the institution of this ORDER,
> the Board approved, and the bank paid, dividends:
>
> - $82, 078. 00 for September 2008, paid 10/17/2008
> - $82, 078.00 for October 2008, paid 10/17/2008
>
> CFO Brent Wilde indicates that management was of the opinion, when those
> dividends were paid, that this Order allowed dividend payments to the holding
> company for the payment of holding company obligations, without prior written
> consent.

(ECF No. 50-2 at 23.)

The Utah Department's Examiner also found that the Bank was only partially in

compliance with at least four other provisions of the Cease and Desist Order.

On April 22, 2009, Douglas Durbano sent a letter to Perri Babalis of the Utah Attorney

General's Office and to members of the Utah Department. (*See* ECF No. 45 at 74.) That letter

provided, in relevant part:

> Last Friday, April 17, when we met together in our Board meeting, we discussed
> the future possibility of a court proceeding or hearing relative to bank
> receivership. Recognizing that such proceedings can be ex-parte, we requested
> that we be informed in advance of any such proceeding and given the opportunity
> to attend and present evidence. We wanted to write and confirm our request

(ECF No. 45 at 74.) Mr. Durbano signed the letter as "Chairman of the Board." (ECF No. 45 at

74.)

On April 27, 2009, Assistant Attorney General Babalis responded to Mr. Durbano's

letter. That letter provided, in relevant part:

> At no time has the Department made a commitment to this, or any other bank, to provide notice in advance of it taking supervisory action, as provided in [Utah Code Ann.] Title 7, Chapter 2. There are many policy concerns with providing notice to a financial institution of such impending action.

(ECF No. 50-4 at 2.)

"On May 1, 2009, at Commissioner Leary's direction," Assistant Attorney General Babalis" (ECF No. 49 at 24) "filed an ex parte verified petition . . . for an order granting possession of the Bank." (2nd Am. Compl. ¶ 67, ECF No. 33 at 9; ECF No. 36 at 11; *see also* ECF No. 45 at 88.[5]) Commissioner Leary "filed [the] action pursuant to Utah Code Ann. § 7-2-2 (West 2004)[6]" "for an Order" from a state court "approving the taking of possession of" America West Bank "by the Commissioner." (ECF No. 45 at 88.) "As grounds for the Order for which" the petition had been filed, "the Commissioner "represent[ed] to the Court that he ha[d] found," among other things that "[t]he Bank has failed to maintain a minimum amount of capital," that the Bank was or was "about to become insolvent," and that the Bank "or its officers or directors have failed or refused to comply with the terms of a legally authorized order of the Commissioner . . . ." (ECF No. 45 at 90.)

On May 1, 2009, "Ms. Babalis also filed" a "Notice of Need to Seek Judicial Relief within Ten Days," a Motion to Seal Record, and a proposed order granting the Motion to Seal Record. (*See* ECF No. 49 at 24.) The Notice provided:

> G. Edward Leary, Commissioner of Financial Institutions of the State of Utah . . . hereby gives notice that on the 1st day of May, 2009, he took possession of

---

[5] The "Verified Petition for Order Approving Possession provides, in part: "G. Edward Leary, Commissioner of Financial Institutions of the State of Utah . . . hereby petitions the Court for an order approving the taking by him of America West Bank[.]" (ECF No. 45 at 88.)

[6] In 2009, the relevant Utah statute provided: "[b]efore taking possession of an institution . . . or within a reasonable time after taking possession of an institution or other person without court order, as provided in this chapter, the commissioner shall cause to be commenced in the appropriate district court, an action to provide the court supervisory jurisdiction to review the actions of the commissioner." Utah Code Ann. § 7-2-2 (West 2009).

America West Bank pursuant to Utah Code Ann. § 7-2-3(1)(a) (West 2004), if any institution or other person of which the Commissioner has taken possession considers itself aggrieved by the taking, it may within ten (10) days after the taking apply to the Court to enjoin further proceedings, as set forth in that section of the Utah Code.

On that same day, "an ex parte hearing was held . . . regarding the Petition." (ECF No. 45 at 7; ECF No. 49 at 12.) The hearing was held in a state court in Farmington, Utah. (*See* ECF 45 at 76.) Judge John R. Morris was the "assigned judge." (*See* ECF No. 45 at 76.) "In attendance at the Hearing of the Petition on May 1, 2009 were Perri A. Bablis and Bryce Pettey representing the State of Utah; Commissioner Leary, Tyson Sill, and Paul Allred from [the Utah Department of Financial Institutions]; and Scott Fleming with the FDIC." (ECF No. 45 at 7; ECF No. 49 at 12.)

"At the hearing, Ms. Babalis informed Judge Morris that Doug Durbano had asked to attend the Hearing." (ECF No. 45 at 8; *see also* ECF No. 49 at 13 ("Assistant Attorney General Perri Ann Babalis, who represents [the Utah Department] and Commissioner Leary, presented Judge Morris with Doug Durbano's April 22, 2009 letter and her April 27, 2009 letter to Mr. Durbano denying the request.").) "Judge Morris acknowledged [Mr.] Durbano's request and proceeded with the Hearing, stating that [Mr.] Durbano was not entitled to notice of or presence at the Hearing." (ECF No. 49 at 13; ECF No. 51 at 9–10.)

"Commissioner Leary was the only witness at the Hearing." (ECF No. 45 at 8; ECF No. 49 at 14.) "Ms. Babalis conducted the examination of Commissioner Leary." (ECF No. 45 at 8; ECF No. 49 at 14.) Commissioner Leary relied on information in the February 2009 Report of Examination when he testified, which had been summarized for him in a memorandum prepared by Thomas Bay, the Utah Department Supervisor of Banks. (Leary Decl. ¶ 15, ECF No. 50-6 at

5; ECF No. 51 at 12.[7]) The audio-video recording of the hearing before Judge Morris has been

destroyed. (ECF No. 49 at 19.) But the minute entry for that proceeding indicates that the hearing

lasted approximately sixty-eight minutes. (*See* ECF No. 45 at 77 (providing: "Tape Count: 1107-

1215.").) The minute entry further provides:

> This is the time set for petition for order approving possession. Parties are
> introduced. Ms. Babalis motions for the file to be sealed. The Court signs the
> order. The verified petition is presented. Counsel states that a cease and desist
> order has already been issued. Commissioner Leary is sworn and is examined
> regarding each action in the petition by Ms. Babalis. The conclusion of the
> examination of the bank determined that the bank is insolvent, there is negative
> capital. The assets are delinquent and not accruing interest. The loss is estimated
> in excess of 8 million dollars. Mr. Fleming states the FDIC will accept the
> appointment as receiver of the institution. The Court states the findings on the
> record and grants the order for possession.

(ECF No. 45 at 77.)

Judge Morris had the authority to deny the petition if Commissioner Leary's actions were

arbitrary, capricious, fraudulent, or contrary to law.[8] Instead, on May 1, 2009, the same day the

petition was filed, Judge Morris entered an Order Approving Possession. (ECF No. 45 at 102.)

Judge Morris ordered "that . . . [t]he taking of possession of America West Bank by G. Edward

---

[7] Plaintiff does not dispute that Commissioner Leary had a copy of the 2009 Report of Examination and a copy of
Thomas Bay's memorandum when Commissioner Leary testified. (*See* ECF No. 51 at 12 ("Although Defendants'
attempt to assert that Defendant Leary testified that the amount of capital needed for the Bank to become solvent
was $40 million dollars, such figure does not appear in any of the documents **that Defendant Leary had <u>with him
at the ex parte hearing</u>**, including the February 2009 Report of Examination, the Memo from Thomas Bay
summarizing the 2009 Report of Examination and is obviously not found in the Petition and final Order.")
(emphases added).)

[8] *See* Utah Code Ann. 7-2-2(2) (2009) ("Before taking possession of an institution or other person under his
jurisdiction, or within a reasonable time after taking possession of an institution or other person without court order,
as provided in this chapter, the commissioner shall cause to be commenced in the appropriate district court, an
action to *provide the court supervisory jurisdiction to review the actions of the commissioner*.") (emphasis added));
*see also* Utah Code Ann. 7-2-2(4) ("The court may not overrule a determination or decision of the commissioner if it
is not arbitrary, capricious, fraudulent, or contrary to law. If the court overrules an action of the commissioner, the
matter shall be remanded to the commissioner for a new determination by him, and the new determination shall be
subject to court review.")).

Leary . . . is approved, and the Commissioner is vested . . . with title to, and the right to possession of, the business, property, and all assets of the Bank." (ECF No. 45 at 104.)

Judge Morris also entered an Order to Seal Record. (ECF No. 50-10.) Judge Morris ordered:

> that the file in this matter shall be sealed until Monday, May 4, 2009 at 9:00 a.m., to all persons except the Commissioner of Financial Institutions of the State of Utah, the Department of Financial Institutions of the State of Utah, and the Federal Deposit Insurance Corporation. Others shall be granted access only on a showing that the petitioner is a person aggrieved by the taking of possession of the Bank, that the person has need for access to its files, and that the person can and will maintain the confidentiality otherwise required by this Court's Order.

(ECF No. 50-10 at 2–3.) The Notice of Need to Seek Judicial Relief Within Ten Days of the Possession of the Bank was among the documents sealed. (*See* ECF No. 45 at 76.[9]) There is no evidence that the file was unsealed on May 4, 2009, as Judge Morris ordered. (*See* ECF No. 45 at 76 (Indicating that on December 8, 2015, the "Case Classification [was] changed from SEALED to PUBLIC.").)

"At approximately 5:00 p.m. on May 1, 2009, Commissioner Leary met with Durbano and handed him copies of the Petition and Order." (ECF No. 49 at 25; ECF No. 51 at 15–16.) "Commissioner Leary told Durbano that he had obtained an order from the Second District Court of Utah approving possession of the Bank." (ECF No. 49 at 25; ECF No. 51 at 15–16.) "That same day, Commissioner Leary appointed the FDIC as receiver for the Bank." (ECF No. 49 at 25; ECF No. 51 at 15–16.) The Utah Department "had no further involvement in the disposition of the Bank or its assets." (ECF No. 49 at 25; ECF No. 51 at 15–16.)

Under the relevant 2009 Utah statute, America West Bank had ten days to apply to the state court to challenge the Department's taking of the Bank. *See* Utah Code. Ann. § 7-2-3(1)(a)

---

[9] It appears that Plaintiff's counsel accessed the state court docket on October 3, 2018. (*See* ECF No. 45 at 76.) The docket from that day provides that the "Notice of need to seek judicial r[]" is "SEALED." (ECF No. 45 at 76.)

(2009) ("Whenever any institution or other person of which the commissioner has taken possession considers itself aggrieved by the taking, it may within ten days after the taking apply to the court to enjoin further proceedings.")). Under that statute, the state court would have had the authority to enjoin the commissioner from further proceedings and to order the commissioner to surrender the bank. *See* Utah Code. Ann. § 7-2-3(1)(c) (2009) ("If the court enjoins further proceedings, it shall order the commissioner to surrender possession of the institution in a manner and on terms designated by the court in the public interest.")). If America West Bank had applied to the state court within ten days, the state court would have entered a judgment—either in favor of the commissioner or in favor of the Bank—and either side would have had the ability to appeal that judgment. *See* Utah Code. Ann. § 7-2-3(2) ("An **appeal** may be taken by the commissioner, a receiver, or liquidator appointed by the commissioner . . . or by the institution from the **judgment** of the court as provided by law.") (bold added)).

In Utah, "[a]n appeal may be taken from a district . . . court to the appellate court with jurisdiction over the appeal from all final orders and judgments . . . by filing a notice of appeal with the clerk of the trial court within the time allowed by Rule 4" of the Utah Rules of Appellate procedure. Utah R. App. P. 3. The Utah rule requires the notice of appeal to be filed within "30 days after the date of entry of the judgment or order appealed from." Utah R. App. P. 4.

Despite having the ability to challenge the Department's taking under Utah Code Ann. § 7-2-3, America West Bank did not. (*See* ECF No. 49 at 25 ("Plaintiff did not take any legal action to challenge possession of the Bank until filing an action in the Third District Court of

Utah on June 28, 2011."); *see also* ECF No. 51 at 15–16.)).[10] Because the Bank did not challenge the Department's taking, the state court did not issue a judgment, and no appeal was taken.

## Procedural Background

On June 28, 2011, America West Bank filed a Complaint in state court against the Department, and others, alleging violations of procedural and substantive due process—among other things.[11] On November 8, 2011, the Defendants filed a Motion to Dismiss the state complaint. On March 20, 2012, the state district court entered a minute entry granting the Motion to Dismiss "in full." The decision dismissed the Banks's procedural due process claims with prejudice. On October 24, 2014, the Utah Supreme Court issued an opinion "affirm[ing] the district court's dismissal of plaintiff's procedural due process claim, but [found] error in the dismissal of the claim with prejudice." *Am. W. Bank Members, L.C. v. State*, 2014 UT 49, ¶ 37, 342 P.3d 224, 237.

On March 23, 2016, the Bank filed an Amended Complaint in state court against the Department, among others. (*See* ECF No. 2-1 at 34.) In this Amended Complaint, the Bank alleged a due process violation and alleged that "[t]he petition [to Judge Morris] was granted on the day of filing, without notice or opportunity for hearing being given to AWMB or the Bank." (ECF No. 2-1 at 16.) On April 21, 2016, the Defendants filed a Notice of Removal, removing the Bank's action to this court. On February 6, 2018, the court entered an order dismissing the

---

[10] At oral argument, Plaintiff's counsel confirmed that the Bank did not challenge the possession within ten days. (*See* ECF No. 62 at 30 ("the plaintiff did attempt that remedy, hired counsel, sought out the best legal minds, actually found a former commissioner to implement this process. Went to great legal efforts and I recall and a lot of pain because all of the cash that the bank had to spend had to be seized and taken, and yet the bank was required to defend itself and go in for a hearing at significant cost. Documents were prepared, I'll represent to the court at least, documents were prepared, ready for filing, and the attorneys who were representing us, Snow Christensen and Martineau, reputable fellows . . . said guys, we're wasting your money. What good are you going to do? You can't undo a done thing. Excuse my language. Stop. Give it up. You can't come up with a retainer even.").)

[11] The Complaint is available on Utah's Xchange website. The state case number is 110915676.

Bank's contract claims, but allowing the Bank to proceed with their due process claims. (*See* ECF No. 29 at 35.) On April 6, 2018, the Bank filed its currently operative Second Amended Complaint. (ECF No. 33.)

On February 4, 2019, Plaintiff filed a motion seeking "partial summary judgment of its First, Second, and Third Claims for Relief . . . ." (ECF No. 45 at 2.) "Those claims allege (1) violation of Plaintiff's procedural due process rights . . . (2) violation of Plaintiff's substantive due process rights . . . and (3) violation of Plaintiff's civil rights pursuant to U.S.C. §§ 1983 and 1988 . . . ." (ECF No. 45 at 2.) Alternatively, Plaintiff also sought a "declaratory judgment . . . that declares [that] the Verified Petition filed with the Second District Court for Davis County, State of Utah . . . on May 1, 2009, and the ex parte hearing also conducted on May 1, 2009, before Judge Morris . . . resulting in the seizure of the Bank, violated either or both the Plaintiff's procedural and/or substantive due process." (ECF No. 45 at 2.)

In its Motion for Summary Judgment, the Bank alleged that the state proceeding before Judge Morris caused it injury. For example, the Bank alleged:

> Judge Morris . . . held an ex-parte, star chamber hearing and specifically refused to allow Mr. Durbano (the acting CEO and an attorney) to attend despite the fact that he specifically requested to do so in writing. Judge Morris granted the Petition without any opposition or any factual basis on which to do so. Judge Morris[,] then reciting the conclusory statements in the Petition issued an Order Approving Possession . . . to seize the Bank and all of its assets.

(ECF No. 45 at 4; *see also* ECF No. 45 at 9 ("On nothing more than the conclusory statements of Commmissioner Leary . . . the Petition was granted by Judge Morris during the Hearing.") The Bank characterized Judge Morris' decision to grant the May 1, 2009 verified petition as a "rubber stamp." (ECF No. 45 at 15 ("Accordingly, Judge Morris' approval cannot be considered anything more than the type of *rubber stamp* approval that was disapproved of in *State Bank*.") (emphases in original); *see also* ECF No. 45 at 16 ("In combination with an ex parte hearing in

which the Commissioner simply regurgitated the same conclusory statements, resulting in Judge Morris rubber stamping the conclusions of the Commissioner, there can be no question that the Bank's seizure was arbitrary, capricious, fraudulent, or contrary to law.")).

On March 20, 2019, Defendants filed their Opposition to the Motion for Summary Judgment, arguing, among other things, that the Bank's "Motion for Declaratory Judgment should be denied." (ECF No. 49 at 43.)

On April 17, 2019, the Bank filed its Reply, wherein it withdrew its Motion for Declaratory Judgment "but urge[d] the Court to grant the relief sought" in its Motion for Summary Judgment. (ECF No. 51 at 2.)

On July 18, 2019, the court heard oral argument on the Bank's Motion. The Bank's counsel again characterized Judge Morris' approval of the verified petition as a "rubber stamp." (*See* ECF No. 62 at 15, 21, 34, 40, 42.) And the Bank's counsel argued that the Judge Morris himself violated its due process rights. (ECF No. 62 at 13 ("Because if Judge Morris and the government had provided meaningful notice, meaningful hearing, procedural due process would have been complied with.").)

Plaintiffs' counsel also argued that any post-deprivation hearing would have been "too late" for the bank because it had suffered irreparable damage upon the Utah Department's taking possession of the Bank. (*See* ECF No. 62 at 29 ("It's like suggesting that the prisoner subject to an execution or a hanging, if he doesn't like the hanging, has 10 days to object. It's too late. That would be substantively unconstitutional.").)

Defendants' counsel argued that it would be improper for this court to review Judge Morris' decision to grant the verified petition. (*See* ECF No. 62 at 58 ("Did Judge Morris make a mistake signing the order? That's really not a proper question before us today, that should have

been—that is a totally different process. It's inappropriate for us to in federal court second guess the state court's ruling;") *see also* ECF No. 62 at 45 ("I find the characterization of Judge Morris's actions as a mere rubber stamp to be unwarranted and suggest that what they're asking this court to do is to have this federal court review an order of the state court not actually reviewing the actions of the defendant here who is Commissioner Leary.").))

## Standard

Summary judgment is proper when the moving party demonstrates that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A material fact is one that may affect the outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Id.* The nonmoving party may not rest solely on allegations on the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial." *Id.* at 324. The court must "view the evidence and draw reasonable inferences therefrom in a light most favorable to the nonmoving party." *Commercial Union Ins. Co. v. Sea Harvest Seafood Co.*, 251 F.3d 1294, 1298 (10th Cir. 2001).

## Analysis

The arguments that Defendants' counsel raised at oral argument relate to this court's authority to hear the claims presented in the Bank's Motion for Summary Judgment. The court proceeds in two steps. First, it determines which of the Bank's claims it has the authority to consider. Second, it addresses the merits of those claims over which it has jurisdiction.

I.    *Rooker-Feldman*

"Any federal court must, sua sponte, satisfy itself of its power to adjudicate in every case and at every stage of the proceeding, and the court is not bound by the acts or pleadings of the parties." *Harris v. Illinois-California Exp., Inc.*, 687 F.2d 1361, 1366 (10th Cir. 1982).

"The *Rooker–Feldman* doctrine establishes, as a matter of subject-matter jurisdiction, that only the United States Supreme Court has appellate authority to review a state-court decision." *Merrill Lynch Bus. Fin. Servs., Inc. v. Nudell*, 363 F.3d 1072, 1074–75 (10th Cir. 2004); *see also Campbell v. City of Spencer*, 682 F.3d 1278, 1281 (10th Cir. 2012) ("*Rooker–Feldman* is a jurisdictional prohibition on lower federal courts exercising appellate jurisdiction over state-court judgments."). "The *Rooker–Feldman* doctrine . . . is confined to . . . cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005).

The Tenth Circuit has cited with approval *Hoblock*, a Second Circuit decision, stating the requirements to find *Rooker-Feldman* applies. *See Guttman v. Khalsa*, 446 F.3d 1027, 1032 (10th Cir. 2006) (citing *Hoblock v. Albany County Board of Elections,* 422 F.3d 77, 89 (2d Cir.2005)). After examining the Supreme Court's holding in *Exxon Mobil*, the Second Circuit concluded that "there are four requirements for the application of *Rooker–Feldman*." *Hoblock*, 422 F.3d at 85.

"First, the federal-court plaintiff must have lost in state court." *Id*. "Second, the plaintiff must 'complain of injuries caused by a state-court judgment.'" *Id*. (quoting *Exxon Mobil*, 544 U.S. at 284). "Third, the plaintiff must 'invite district court review and rejection of that judgment.'" *Id*. (quoting *Exxon Mobil*, 544 U.S. at 284). "Fourth, the state-court judgment must

have been 'rendered before the district court proceedings commenced'—i.e., *Rooker–Feldman* has no application to federal-court suits proceeding in parallel with ongoing state-court litigation." *Id.* (quoting *Exxon Mobil*, 544 U.S. at 284). "The first and fourth of these requirements may be loosely termed procedural; the second and third may be termed substantive." *Id.*

A. Substantive *Rooker-Feldman* Requirements

The second requirement, that the plaintiff must be complaining of injuries caused by a state court judgment, "may also be thought of as an inquiry into the source of the plaintiff's injury." *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 166 (3d Cir. 2010). "The critical task is thus to identify those federal suits that profess to complain of injury by a third party, but actually complain of injury 'produced by a state-court judgment and not simply ratified, acquiesced in, or left unpunished by it.'" *Id.* at 167 (citation omitted). "A useful guidepost" for making this determination "is the timing of the injury, that is, whether the injury complained of in federal court existed prior to the state-court proceedings and thus could not have been 'caused by' those proceedings." *Id.* "Although this test is seemingly straightforward, application becomes more complicated when a federal plaintiff complains of an injury that is in some fashion related to a state-court proceeding." *Id.*

"For example, in *McCormick v. Braverman,* 451 F.3d 382, 384 (6th Cir.2006), the plaintiff filed suit in federal court contending that she was the owner of certain real property and that the defendants illegally interfered with her ownership." *Great W. Mining*, 615 F.3d at 167. "More specifically, the plaintiff alleged that the defendants engaged in fraud and misrepresentation in state-court divorce proceedings involving the real property at issue." *Id.* (citing *McCormick*, 451 F.3d at 388). "Assessing the plaintiff's allegations, the court held that

while some were barred by the *Rooker–Feldman* doctrine, the remainder were 'independent' claims over which the federal courts had jurisdiction." *Id.* "The non-barred claims were as follows: (1) the defendants committed fraud and misrepresentation in the divorce proceedings; (2) the defendants intentionally did not make the plaintiff a party to the litigation concerning the order of receivership over the real property; and (3) the defendants committed an abuse of process in the divorce proceedings." *Id.* at 167–68.

"Focusing on the source of the alleged injuries, the court held that 'none of these claims assert an injury caused by the state court judgments.... Instead, Plaintiff asserts *independent claims* that those state court judgments were procured by certain Defendants through fraud, misrepresentation, or other improper means....'" *Great W. Mining*, 615 F.3d at 168 (emphasis in original) (quoting *McCormick*, 451 F.3d at 392). "Even though the injuries of which the plaintiff complained helped to cause the adverse state judgments, these claims were 'independent' because they stemmed from 'some other source of injury, such as a third party's actions.'" *Id.* (quoting *McCormick*, 451 F.3d at 393). "On the other hand, the court explained that the plaintiff's claim that the state court's 'order of receivership in and of itself is illegal and causes Plaintiff harm' sought review of that order and thus was not independent and was barred by *Rooker–Feldman.*" *Id.* (quoting *McCormick*, 451 F.3d at 395).

With these principles in mind, the court turns to the facts of this case to determine if the Bank complains of injuries caused by the state proceedings granting the May 1, 2009, verified petition. The record presently before the court demonstrates that the Bank is alleging that those proceedings injured the Bank in at least two distinct ways.

First, the Bank argues that it was entitled to be present at the ex-parte hearing on the verified petition, and argues that it was injured by Judge Morris' decision to not allow the Bank

to be heard. (*See* ECF No. 45 at 4 ("Judge Morris then held an ex-parte, star chamber hearing and specifically refused to allow Mr. Durbano . . . to attend despite the fact that he specifically requested to do so in writing."); *see also* ECF No. 62 at 13 ("Because if Judge Morris and the government had provided meaningful notice, meaningful hearing, procedural due process would have been complied with.").) This injury did not exist prior to the state-court proceeding, and is unrelated to any (alleged) misdeed of the Defendants. The injury alleged therefore stems from the state court proceeding itself. To the extent the Bank seeks this court to review and reject Judge Morris' decision not to allow it to participate at the hearing on the verified petition, this court is substantively barred under *Rooker-Feldman* from doing so.

Second, the Bank is, in essence, arguing that the Order granting the May 1, 2009, verified petition was arbitrary and capricious, fraudulent, or contrary to law. The Bank argues that Commissioner Leary's "petition to the state court containing nothing more than conclusory statements, and devoid of factual support, in combination with the ex parte, star chamber hearing, amounted to a seizure of assets that was arbitrary, capricious, fraudulent, or contrary to law . . . ." (ECF No. 45 at 11.) But at the time Judge Morris granted the verified petition, he had "supervisory jurisdiction to review" Commissioner Leary's actions, and could have denied the verified petition if it was arbitrary, fraudulent, or contrary to law. *See* Utah Code Ann. 7-2-2(2) & (4) (2009). This court can reasonably assume that Judge Morris would not have granted the verified petition if he believed it was contrary to law. Thus, the Bank is effectively arguing that Judge Morris' Order granting the petition was contrary to law. At first blush, it appears that this court is barred under *Rooker-Feldman* from considering any injury related to Judge Morris' Order granting the May 1, 2009 petition.

But the Bank has also alleged that "Commissioner Leary . . . omitted material facts from [the Department's] presentation to [Judge Morris] which would have caused [Judge Morris] to deny the Petition . . . ." (Am. Compl. ¶ 136, ECF No. 33 at 20; *see also* Am. Compl. ¶ 134, ECF No. 33 at 19 ("the false statements and material omissions made by Commissioner Leary and UDFI to the court would constitute a violation of procedural due process.").) It is undisputed that the audio recording of the May 1, 2009, hearing has been destroyed. The court therefore cannot confirm that Commissioner Leary did or did not omit material facts from his presentation to Judge Morris.

The Bank alleges that Judge Morris's Order granting the verified petition was "procured by [the] Defendants through fraud, misrepresentation, or other improper means." *Great W. Mining*, 615 F.3d at 168. If the Bank's allegation of false statements and material omissions is true, the injury it complains of undoubtedly helped to cause the adverse Order granting the May 1, 2009 petition. The claims related to this injury are nevertheless independent from the Order itself because they stem from the actions of the Defendants—not Judge Morris' Order. The court is therefore not barred under *Rooker-Feldman* from considering injuries related to the May 1, 2009 Order.

B. Procedural *Rooker-Feldman* Requirements

As discussed above, the court has already held, on a substantive basis, that *Rooker-Feldman* does not bar this court from considering the Bank's injuries related to the Order granting the May 1, 2009 verified petition. Thus, the only remaining *Rooker-Feldman* question is whether the injury related to Judge Morris' decision to not allow the Bank to attend the May 1, 2009 hearing satisfies *Rooker-Feldman*'s procedural requirements.

As discussed above, there are two procedural requirements for the application of *Rooker-Feldman*. First, "the federal-court plaintiff must have lost in state court." *Hoblock*, 422 F.3d at 85. The injury alleged relates to Judge Morris' decision not to allow the Bank to be present at the May 1, 2009 hearing. The Bank lost on this issue.

Second, "'*Rooker–Feldman* applies only to suits filed after state proceedings are final.'" *D.A. Osguthorpe Family P'ship v. ASC Utah, Inc.*, 705 F.3d 1223, 1232 (10th Cir. 2013) (citation omitted). The present suit was filed long after the May 1, 2009, state proceeding. The question is whether the state proceeding is "final" for purposes of *Rooker-Feldman*. In answering that question, the court emphasizes that it only examines the relevant alleged injury—Judge Morris' decision not to allow the Bank to attend the May 1, 2009 hearing.

The Tenth Circuit has "cited with approval the First Circuit's formulation of when a state-court judgment becomes final under the *Rooker–Feldman* doctrine, as set forth post-*Exxon Mobil* . . . ." *Osguthorpe*, 705 F.3d at 1232 n. 12. Relevant here, a state court proceeding is final "'if the state action has reached a point where neither party seeks further action . . . .'" *Id.* (quoting *Federación de Maestros de Puerto Rico v. Junta de Relaciones del Trabajo de Puerto Rico,* 410 F.3d 17, 24 (1st Cir. 2005)). "For example, if a lower state court issues a judgment and the losing party allows the time for appeal to expire, then the state proceedings have ended." *Federación de Maestros*, 410 F.3d at 24.

Here, under the relevant Utah statute the Bank had ten days to challenge the Department's taking of the Bank, and would have had the opportunity to make argument to Judge Morris. *See* Utah Code. Ann. § 7-2-3(1)(a) (2009). Had the Bank done so, the state court would have considered Bank's challenge and entered a judgment—that either side could have appealed. *See* Utah Code. Ann. § 7-2-3(2). The Bank would have had thirty days to appeal that

judgment. *See* Utah R. App. P. 4. Because the bank did not challenge the taking within ten days, there was no judgment and therefore no possible appeal. The time to appeal Judge Morris' decision not to allow the Bank to attend the May 1, 2009 hearing has long expired. Therefore, the state proceeding has ended for purposes of *Rooker-Feldman* because the state action has reached a point where neither party sought further action—at least as it relates to the relevant injury alleged.

Because all four requirements for the application of the *Rooker-Feldman* doctrine apply to the Bank's injury related to Judge Morris' decision not to allow the Bank to attend the May 1, 2009 hearing, this court is barred from considering that portion of the Bank's claim. But, as discussed above, the court is not barred from considering the Bank's claim of injury related to the Order itself, because the Bank has alleged that it was obtained through fraud.

Having satisfied itself that it has jurisdiction, the court turns to those portions of the Bank's Motion that are not barred by *Rooker-Feldman*.

II.    The Bank's Motion for Summary Judgment

In its Motion, Plaintiff "seeks partial summary judgment of its First, Second, and Third Claims for Relief as stated in its Second Amended Complaint." (ECF No. 45 at 2.)

In its Reply, Plaintiff asks this court to strike the Defendant's declarations and exhibits that were "submitted primarily to establish a record of and prove what transpired in the ex parte hearing before Judge Morris that led to the Order of seizure of America West Bank assets." (ECF No. 51 at 2.) The court need not rule on Plaintiff's evidentiary objections because resolution of its Motion for Summary Judgment does not require the court to consider Defendant's evidence regarding "what transpired in the ex parte hearing."—with one exception.

In his declaration, Commissioner Leary provides that he relied on the information in the February 2009 Report of Examination when he testified in front of Judge Morris. (Leary Decl. ¶ 15, ECF No. 50-6 at 5.) In its Reply, Plaintiff does not dispute this, so the court accepts it as true. (*See* ECF No. 51 at 12 ("such figure does not appear in any of the documents that Defendant **Leary had with him** at the ex parte hearing, including the February 2009 Report of Examination, the Memo from Thomas Bay summarizing the 2009 Report of Examination . . . ." (ECF No 51 at 12 (bold added).) Apart from this single piece of evidence, the court does not need to consider any of the other evidence regarding "what transpired" at the hearing, so the court declines to rule on Plaintiff's evidentiary challenge.

A.  Procedural Due Process Claim

The first claim for relief in Plaintiff's Second Amended Complaint is for a "Violation of Procedural Due Process." (Am. Compl., ECF No. 33 at 17.) Plaintiff alleges that Commissioner Leary made "false statements and material omissions" "to the court" that "constitute a violation of procedural due process." (Am. Compl. ¶ 134, ECF No. 33 at 19.) Plaintiff further alleges that "[t]he facts actually available to Commissioner Leary" "would not support any of the twelve statutory pre-conditions to seizure." (Am. Compl. ¶ 14, ECF No. 5 at 3.) Plaintiff further alleges that "Commissioner Leary did not strictly comply with the statutory requirements and was instead motivated by factors entirely unrelated to the stability of the Bank." (Am. Compl. ¶ 144, ECF No. 33 at 21.)

In its Motion for Summary Judgment, Plaintiff argues that it suffered a violation of its procedural due process rights because the Commissioner's decision to seize the bank was arbitrary and capricious. (*See* ECF No. 45 at 11.) This is so, Plaintiff argues, because "[i]t is undisputed that the Petition for seizure of the Bank is devoid of any factual evidence upon which

Judge Morris could have reasonably based his approval," making Judge Morris' decision nothing more than a "rubber stamp" approval.

The Fourteenth Amendment forbids the State from depriving an individual of life, liberty, or property without due process of law. "A person alleging that he has been deprived of his right to procedural due process must prove two elements: [1] that he possessed a constitutionally protected liberty or property interest such that the due process protections were applicable, and [2] that he was not afforded an appropriate level of process." *Hale v. Fed. Bureau of Prisons*, 759 F. App'x 741, 751–52 (10th Cir. 2019) (quoting *Zwygart v. Bd. of Cty. Comm'rs*, 483 F.3d 1086, 1093 (10th Cir. 2007)).

"Property interests are not created by the Constitution, but rather by independent sources such as state law." *Copelin-Brown v. New Mexico State Pers. Office*, 399 F.3d 1248, 1254 (10th Cir. 2005). Plaintiff has not identified any Utah law granting them a property interest to which due process protection was applicable. But from the undisputed facts, the court can reasonably infer that the Bank would likely be able to demonstrate a property interest to which due process protection was applicable. The court therefore considers whether Plaintiff was afforded an appropriate level of process.

"The right to prior notice and a hearing is central to the Constitution's command of due process." *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 53, 114 S. Ct. 492, 500–01, 126 L. Ed. 2d 490 (1993). "The purpose of this requirement is not only to ensure abstract fair play . . . Its purpose, more particularly, is to protect [the] use and possession of property from arbitrary encroachment—to minimize substantively unfair or mistaken deprivations of property, a danger that is especially great when the State seizes goods simply upon the application of and for the benefit of a private party." *Fuentes v. Shevin*, 407 U.S. 67, 80–81, 92 S. Ct. 1983, 1994,

32 L. Ed. 2d 556 (1972). The United States Supreme Court "tolerate[s] some exceptions to the general rule requiring predeprivation notice and hearing, but only in 'extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event.'" *James Daniel Good Real Prop*, 510 U.S. at 53 (quoting *Fuentes* 407 U.S. 67 at 82).

"Bank failures are emblematic of an instance where government officials may seize property prior to notice or a hearing because of the 'delicate nature of the institution and the impossibility of preserving credit during an investigation.'" *Am. W. Bank Members v. Utah*, No. 2:16-CV-326-CW-EJF, 2018 WL 734401, at *12 (D. Utah Feb. 6, 2018) (quoting *Fahey v. Mallonee*, 332 U.S. 245, 253, 67 S. Ct. 1552, 1556, 91 L. Ed. 2030 (1947)). "Guided by *Fahey*," the Tenth Circuit "held in *Franklin* . . . that the opportunity for a postdeprivation hearing 'precludes any due process violations' when a **conservator** is appointed for a bank that had been seized." *Columbian Fin. Corp. v. Stork*, 811 F.3d 390, 397 (10th Cir. 2016) (bold added) (quoting *Franklin Sav. Ass'n v. Dir., Office of Thrift Supervision*, 934 F.2d 1127, 1140 (10th Cir. 1991)).

But the Tenth Circuit "has acknowledged that the consequences of a receivership and conservatorship are different." *Id*. at 398. Generally, "conservators can control bank assets only temporarily while receivers can permanently dispose of the bank's assets." *Columbian Fin. Corp*., 811 F.3d at 396; *see also James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1090 (D.C. Cir. 1996) ("The principal difference between a conservator and receiver is that a conservator may operate and dispose of a bank as a going concern, while a receiver has the power to liquidate and wind up the affairs of an institution.").

Here, "Commissioner Leary appointed the FDIC as **receiver** for the Bank." (ECF No. 49 at 25 (bold added).) After its appointment, the "FDIC immediately and publicly announced the

failure and seizure of the Bank, and began liquidating assets of the Bank." (2nd Am. Compl. ¶ 109, ECF No. 33 at 16; ECF No. 36 at 18.)

The Tenth Circuit's "precedents have not squarely addressed the need for a predeprivation hearing when a bank's assets are placed in the control of a receiver (rather than a conservator)." *Columbian Fin. Corp*, 811 F.3d at 397. But the Tenth Circuit has noted that "[t]hree other circuits ha[ve] held that a predeprivation hearing [is] unnecessary even when the bank is placed in the hands of a receiver rather than a conservator," so long as the bank is afforded a post-deprivation hearing. *See id*. at 399.[12]

As the court previously provided, "the Supreme Court clearly articulated the test for when government officials may seize property without a prior hearing:"

> 1. The seizure is directly necessary to secure an important governmental or general public interest.
> 2. There is a special need for very prompt action.
> 3. The government kept strict control over its monopoly on legitimate force; the person initiating the seizure has been a government official responsible for determining, under the standards of a narrowly drawn statute, that it was necessary and justified in the particular instance.

*Am. W. Bank Members v. Utah*, No. 2:16-CV-326-CW-EJF, 2018 WL 734401, at *12 (D. Utah Feb. 6, 2018) (citations omitted) (internal quotation marks omitted).

---

[12] Here, the Tenth Circuit cited the three following cases and provided their holdings in explanatory parentheticals:

> [1] *James Madison Ltd. v. Ludwig,* 82 F.3d 1085, 1101 (D.C.Cir.1996) (holding that the right to due process did not require a hearing before the government seized banks and allowed the FDIC to liquidate the banks); [2] *First Fed. Sav. Bank & Trust v. Ryan,* 927 F.2d 1345, 1358 (6th Cir.1991) (holding that a postdeprivation hearing satisfies due process because "[i]n the event of wrongful appointment of a receiver, the plaintiff could sue for all damages arising out of the wrongful appointment"); [3] *FDIC v. Am. Bank Trust Shares, Inc.,* 629 F.2d 951, 953–54 (4th Cir.1980) (rejecting a bank's due process claim when the bank was not provided notice prior to appointment of the FDIC as a receiver and sale of the bank's assets).

*Columbian Fin. Corp.*, 811 F.3d at 399.

Viewing the evidence and drawing all reasonable inferences in the light most favorable to Defendants, the court "believe[s] that this situation meets this three-prong test.." *First Fed. Sav. Bank & Tr. v. Ryan*, 927 F.2d 1345, 1358 (6th Cir. 1991). "First, the safety of the banking system is generally considered to be an important governmental or public interest. In this country, it has long been established that the banking system is subject to government regulation and protection in the interest of economic stability." *First Fed. Sav. Bank*, 927 F.2d at 1358; *see also James Madison Ltd. by Hecht*, 82 F.3d at 1099. ("the Government has a substantial interest in moving quickly to seize insolvent institutions."). Second, an insolvent bank is a "classic . . . situation[ ] in which prompt action is necessary." *Id*. Further, the Utah Department of Financial Institution's examiner had concluded that America West Bank was not in compliance with at least six provisions of its Cease and Desist Order. Viewing the evidence and drawing all reasonable inferences in the light most favorable to the Defendants, prompt action was necessary to correct the actions of the recalcitrant bank management. Third, the Commissioner "kept strict control over" his use of "legitimate force" because his determination that possession of the bank was necessary was permissible under the governing Utah statutes.

Judge Morris's Order Approving Possession of America West Bank provided that "[i]t appear[ed] to the Court that all conditions required by Utah Code Ann. § 7-2-1(2)(a) (West 2004) ha[d] been met for the Commissioner to take possession of the Bank." (ECF No. 45 at 104.) That statute provides that the commissioner may "take possession of [a financial] institution" "subject to the jurisdiction of the department with or without a court order" if the commissioner finds that "any of the conditions set forth in Subsection (1) exist with respect to an institution" and "an order issued pursuant to Section 7-1-307, 7-1-308, or 7-1-313 would not adequately protect the interests of the institution's depositors, creditors, members, or other interested persons from all

dangers presented by the conditions found to exist . . . ." Utah Code Ann. § 7-2-1(2–3.) (West 2004).

Subsection 1 includes twelve conditions that, if found by the commissioner, could subject a financial institution to "supervisory actions." *See* Utah Code Ann. § 7-2-1(1). Most relevant here are four conditions:

> (a)  The institution is not in a safe and sound condition to transact business;
>
> (f)  the institution or other person has failed to maintain a minimum amount of capital as required by the department, any state, or the relevant federal regulatory agency;
>
> (g)  the institution . . . has failed or refused to pay its depositors . . . or has or is about to become insolvent;
>
> (h)  the institution . . . or its officers or directors have failed or refused to comply with the terms of a legally authorized order issued by the commissioner or by any federal authority or authority of another state having jurisdiction over the institution or other person.

Utah Code Ann. § 7-2-1(1)(a, f–h) (West) (2004). The February 9, 2009, Report of Examination provided the Commissioner with ample justification to take possession of America West Bank under any of the four conditions described in subsection one above.

First, the 2009 Report of Examination assigned the Bank a Risk Management Composite rating of "5," the lowest possible rating. (ECF No. 50-2 at 4.) "Financial institutions in this group exhibit extremely unsafe and unsound practices or conditions . . . .[13]" For all the reasons stated in the 81 page Report, the Commissioner had reason to believe that America West Bank was not, "in a safe and sound condition to transact business." Utah Code Ann. § 7-2-1(1)(a) (2004). This provided the Commissioner with a legitimate basis to take possession of the Bank under Utah Code Ann. § 7-2-1(3)(b) (2004).

---

[13] https://www.fdic.gov/regulations/examinations/ratings/#4

Second, the 2009 Report of Examination found that America West Bank was "critically undercapitalized and [was] insolvent." (ECF No. 50-2 at 7.) In a prior Cease and Desist Order, the Utah Department had ordered the Bank to increase its Tier 1 capital "in such an amount as to equal or exceed 10 percent of the bank's total assets" within 90 days from August 31, 2008. (ECF No. 50-2 at 15; ECF No. 50-17 at 5.) As of January 30, 2009, the Bank's Tier 1 Capital Ratio was 4.02 percent. (*See* ECF No. 50-2 at 16.) Based on the 2009 Report of Examination, the Commissioner had reason to believe America West Bank had "failed to maintain a minimum amount of capital as required by the department . . . ." Utah Code Ann. § 7-2-1(1)(f) (West) (2004). This provided the Commissioner with a legitimate basis to take possession of the Bank under Utah Code Ann. § 7-2-1(3)(b) (2004).

Third, the 2009 Report of Examination found that America West Bank was insolvent, meeting condition "g" of subsection 1 of the statute. This provided the Commissioner with a legitimate basis to take possession of the Bank under Utah Code Ann. § 7-2-1(3)(b) (2004).

Fourth, as described in detail above, the 2009 Report of Examination found that America West Bank was not in compliance with at least six provisions of its Cease and Desist Order. Based on the 2009 Report of Examination, the Commissioner had reason to believe America West Bank "or its officers or directors ha[d] failed or refused to comply with the terms of a legally authorized order issued by the commissioner . . . ." Utah Code Ann. § 7-2-1(1)(h) (West) (2004). This provided the Commissioner with a legitimate basis to take possession of the Bank under Utah Code Ann. § 7-2-1(3)(b) (2004).

Based on the 2009 Report of Examination, the Commissioner had at least four legitimate justifications to take possession of the Bank under the statute. Plaintiff does not dispute that Commissioner Leary relied on the information contained in the 2009 Report of Examination with

him when he testified in front of Judge Morris. (*See* ECF No. 51 at 12 ("such figure does not appear in any of the documents that Defendant Leary had with him at the ex parte hearing, including the February 2009 Report of Examination, the Memo from Thomas Bay summarizing the 2009 Report of Examination . . . .").) Viewing the evidence in Defendants' favor, Judge Morris granted the verified petition based on the information contained in the 2009 Report of Examination—and not on the Defendants' false statements or material omissions.[14] The information contained in the 2009 Report of Examination satisfies the *Fuentes* three-prong test.

Because the *Fuentes* three prong test is satisfied, due process did not require a pre-deprivation hearing so long as the Bank was afforded an opportunity for a post-deprivation hearing. Defendants—relying on *Brown v. Weis*, 871 P.2d 552 (Utah Ct. App. 1994)—argue that Plaintiff was afforded an opportunity for a post-deprivation hearing but forwent that opportunity.

In *Brown*, the Utah Department of Financial Institutions took possession of a thrift and loan company under Utah Code Ann. § 7-2-1 after the Commissioner filed a petition with a state district court and after the court granted the petition. *See Brown*, 871 P.3d at 567. The day after the court granted the petition, the president of the thrift and loan company "was served with notice that the petition for possession had been filed and that any objection should be lodged within ten days," as required by statute.[15] *Id.* "However, plaintiffs did not file an objection within

---

[14] As discussed above, the minute entry from the May 1, 2009, proceeding indicates that the hearing lasted approximately sixty-eight minutes. (*See* ECF No. 45 at 77.) Further, the minute entry provides that Commissioner Leary was placed under oath. (*See* ECF No. 45 at 77 (Commissioner Leary is sworn and examined regarding each action in the petition by Ms. Babalis.").) Viewing the evidence in the light most favorable to the Defendants, it is reasonable to infer from the minute entry that Judge Morris did not grant the verified petition based solely on information contained within the petition.

[15] Utah Code Ann. § 7–2–3 (Supp.1986) (bold added) stated, in part:

(1) Whenever any institution or other person considers itself aggrieved by the taking under Subsection 7–2–1(2)(b), it **may within 10 days** after the taking apply to the court to enjoin further proceedings, and the court, after citing the commissioner to show cause why further proceedings should not be enjoined and after hearing the allegations and proofs of the parties and determining the facts, may dismiss the application or, if the court finds the taking to be arbitrary, capricious, an abuse of discretion or otherwise contrary to law, enjoin the commissioner from further

ten days." *Id.* at 568. The court in *Brown* held that the plaintiffs forwent "their opportunity" to challenge the Commissioner's actions as "contrary to law" by failing to object within ten days. *See id.*

Defendant argues that "this case falls squarely within the holding of *Brown* . . . ." (ECF No. 49 at 36.) But unlike in *Brown*, it is unclear whether America West Bank received written notice that any objection to the Commissioner's decision had to be filed within ten days. Defendant only alleges that "Commissioner Leary met with Durbano and handed him copies of the Petition and Order," but does not mention the Notice. (ECF No. 49 at 25.) The Notice was filed with the court under seal. Based on the record available to the court, it is unclear whether America West Bank had access to the Notice that was filed under seal. Regardless, the Bank is charged with notice of the statute.

"To be constitutionally adequate, notice must be reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Reams v. Irvin*, 561 F.3d 1258, 1265 (11th Cir. 2009) (citations omitted) (internal quotation marks omitted). "For one hundred years, the Supreme Court has declared that a publicly available statute may be sufficient to provide constitutionally adequate notice because individuals are presumptively charged with knowledge of such a statute." *Id.* (citations omitted) (internal quotation marks omitted). "Thus, where remedial procedures are established by published, generally available state statutes and case law . . . officials need not take additional steps to inform a property owner of her remedies." *Id.* (citations omitted) (internal quotation marks omitted).

---

proceedings and direct [her] to surrender possession in such manner and upon such terms as the court may designate in the public interest.

The statute here provided: "Whenever any institution or other person of which the commissioner has taken possession considers itself aggrieved by the taking, it may within ten days after the taking apply to the court to enjoin further proceedings." Utah Code Ann. § 7-2-3(1)(a) (2004). America West Bank is charged with knowledge of the contents of this statute. It did not seek a post-deprivation hearing.

Viewing the evidence in the light most favorable to the Defendants, the Commissioner had a legitimate basis to seek a petition for possession of the Bank. The state court granted the petition. The Bank did not file any objection within ten days. Viewing the evidence in Defendants' favor, the Bank waived any procedural due process violation claim.[16] *See Domka v. Portage Cty., Wis.*, 523 F.3d 776, 781 (7th Cir. 2008) ("It is without question that an individual may waive his or her procedural due process rights."). Plaintiff's Motion for Summary Judgment on this claim is DENIED.

### B. Substantive Due Process Claim

The second claim for relief in Plaintiff's Second Amended Complaint is for a "Violation of Substantive Due Process." (Am. Compl., ECF No. 33 at 25.) Plaintiff alleges that "[i]f the authorizing statute is applied here to authorize Defendants to seize the Bank without a hearing," "the statute as applied authorizes conduct so unreasonable as to constitute a flagrant violation of substantive due process." (Am. Compl. ¶ 178, ECF No. 33 at 25–26.) Plaintiff's substantive due process claim appears to be tied to Judge Morris' decision not to allow the Bank to attend the May 1, 2009 hearing. (*See* ECF No. 62 at 13 ("Again, I have gone back to the statute because if the statute says no rights to a hearing, frankly we would be arguing substantive due process. But

---

[16] At oral argument, Plaintiff argued that any post-deprivation hearing would have been "too late" and would not have comported with due process, comparing the Utah Department's taking of the Bank to the execution of a prisoner. (*See* ECF No. 62 at 29.) The court rejects this argument. The Bank could have sought an emergency hearing with the state court and could have prevented the injuries it now complains of.

no, the Utah statute, I have read it many times now, and I'll represent to the court with some confidence that the Utah statute does not exclude an opposition party from attending a hearing that could lead to the seizure.").) To the extent the Bank's substantive due process claim relates to Judge Morrris' decision not to allow the Bank to attend the May 1, 2009, hearing, this court is barred under *Rooker-Feldman* from considering that claim.

If Plaintiff's substantive due process claim stems from injury unrelated to Judge Morris' decision, Plaintiffs are not entitled to summary judgment on their second claim. As Defendants argue, in its Motion Plaintiff "does not even cite the appropriate standard for reviewing a claim of substantive due process rights violation." (ECF No. 49 at 37.) Plaintiff's Motion for Summary Judgment on its second claim is DENIED.

C. Section 1983 Claim

The Third claim for relief in Plaintiff's Second Amended Complaint is for a violation of 42 U.S.C. Section 1983. (Am. Compl. ¶ 187, ECF No. 33 at 27.) "There can be no 'violation' of § 1983 separate and apart from the underlying constitutional violations." *Brown v. Buhman*, 822 F.3d 1151, 1162 n. 9. (10th Cir. 2016). In the Second Amended Complaint, Plaintiff appears to tie its Section 1983 claim to the alleged violations of procedural and substantive due process. Because the court has held that Plaintiff has not established a violation of its due process rights, and because it does not allege any other constitutional violations, its Section 1983 claim fails. Its Motion for Summary Judgment on this claim is DENIED.

**Conclusion**

For the reasons stated, Plaintiff's Motion for Partial Summary Judgment, (ECF No. 45) is DENIED.

SO ORDERED this 2nd day of April, 2020.

BY THE COURT:

_____
Clark Waddoups
United States District Judge