STEPHEN W. GEARY (9635)
CHRISTINE HASHIMOTO (15624)
Assistant Utah Attorneys General
SEAN D. REYES (7969)
Utah Attorney General
160 East 300 South, Sixth Floor
P.O. Box 140856
Salt Lake City, Utah 84114-0856
Telephone: (801) 366-0100
Facsimile: (801) 366-0101
E-mail: swgeary@agutah.gov
        chashimoto@agutah.gov
*Attorneys for the Utah Department of
Financial Institutions and G. Edward Leary*

## IN THE UNITED STATES DISTRICT COURT

## IN AND FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| AMERICA WEST BANK MEMBERS,<br><br>Plaintiff,<br><br>v.<br><br>THE STATE OF UTAH, DEPT. OF FINANCIAL INS., G. EDWARD LEARY,<br><br>Defendants. | **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Case No: 2:16-cv-00326-CW-DAO<br><br>Judge Clark Waddoups<br><br>Magistrate Judge Daphne A. Oberg |

Pursuant to Federal Rule of Civil Procedure 56 and DUCivR 7-1 and 56-1, the State of

Utah, the Utah Department of Financial Institutions ("UDFI"), and G. Edward Leary

(collectively "Defendants"), by and through counsel Stephen W. Geary and Christine Hashimoto,

Assistant Utah Attorneys General, hereby move the Court for summary judgment on all claims

for relief in the Second Amended Complaint ("Complaint," Doc. 33) of Plaintiff America West

Bank Members ("AWBM").

# TABLE OF CONTENTS

INTRODUCTION & RELIEF REQUESTED ............................................................... 2

BACKGROUND ...................................................................................................... 3

    A.  Prompt Corrective Action ("PCA"). ............................................................. 4

    B.  Call Reports and UBPRs............................................................................ 6

    C.  Allowance for Loan and Lease Losses ("ALLL"). ....................................... 7

    D.  Brokered Deposits..................................................................................... 8

    E.  ADC Lending. ............................................................................................ 9

    F.  Bank Examinations. ................................................................................... 9

    G.  Material Loss Reviews............................................................................. 13

STATEMENT OF UNDISPUTED MATERIAL FACTS ........................................... 13

ARGUMENT ....................................................................................................... 24

    I.  LEGAL STANDARD. ............................................................................... 24

    II.  AWBM LACKS STANDING. .................................................................... 26

    III.   CLAIM PRECLUSON BARS AWBM'S CLAIMS. ................................... 30

    IV.   AWBM FAILED TO EXHAUST ITS ADMINISTRATIVE REMEDIES TO CHALLENGE THE ROEs. ............................................................................... 34

    V.  AWBM's PROCEDURAL DUE PROCESS CLAIM FAILS BECAUSE AMERICA WEST BANK WAS RIGHTLY PLACED IN RECEIVERSHIP ON MULTIPLE, INDEPENDENT GROUNDS UNDER UTAH CODE § 7-2-1........................................ 37

    VI.   AWBM DOES NOT HAVE A VIABLE AS-APPLIED SUBSTANTIVE DUE PROCESS CLAIM. ......................................................................................... 44

    VII.  COMMISSIONER LEARY IS ENTITLED TO QUALIFIED IMMUNITY ON THE SECTION 1983 CLAIM. ................................................................................. 47

    VIII. AWBM'S REGULATORY TAKINGS CLAIMS ARE PRECLUDED BY THE HIGHLY-REGULATED BANKING SYSTEM. ..................................................... 48

    IX.   AWBM'S PHYSICAL TAKINGS CLAIMS ARE PRECLUDED BY THE HIGHLY-REGULATED BANKING SYSTEM. ..................................................... 50

CONCLUSION...................................................................................................... 52

# TABLE OF AUTHORITIES

Page(s)

Cases

*3D Constr. & Dev., LLC v. Old Standard Life Ins. Co.,*
 2005 UT App 307, 117 P.3d 1082 ................................................................... 40

*America West Bank Members v. Utah,*
 2014 UT 49, 342 P.3d 224 .............................................................................. 41

*Anderson v. Liberty Lobby, Inc.,*
 477 U.S. 242 (1986) ....................................................................................... 32

*Angel Investors, LLC v. Garrity,*
 2009 UT 40, 216 P.3d 944 .............................................................................. 34

*Applied Genetics Intern. v. First Affiliated,*
 912 F.2d 1238 (10th Cir. 1990) ...................................................................... 32

*Ashcroft v. al-Kidd,*
 563 U.S. 731 (2011) ....................................................................................... 56

*Ashcroft v. Iqbal,*
 556 U.S. 662 (2009) ....................................................................................... 32

*B & G Enterprises, Ltd. v. United States,*
 220 F.3d 1318 (Fed. Cir. 2000) ...................................................................... 59

*Barnes v. Harris,*
 783 F.3d 1185 (10th Cir. 2015) ................................................................. Passim

*Bartel v. Kemmerer City,*
 482 F. App'x 323 (10th Cir. 2012) ................................................................. 36

*Bell Atl. Corp. v. Twombly,*
 550 U.S. 544 (2007) ....................................................................................... 32

*Bishop v. Wood,*
 426 U.S. 341 (1976) ....................................................................................... 45

*Bixler v. Foster,*
 596 F.3d 751 (10th Cir. 2010) ........................................................................ 36

*Branch v. United States,*
 69 F.3d 1571 (Fed. Cir. 1995) ........................................................................ 58

*Branzan Alternative Inv. Fund, LLP v. Bank of New York Mellon Trust Co., NA,*
 677 Fed. Appx. 496 (10th Cir. 2017) ............................................................. 33

*Brown v. Buhman,*
 822 F.3d 1151 ................................................................................................. 55

*Brown v. Weis,*
 871 P.2d 552 (Utah Ct. App. 1994) .................................................. 38, 41, 51

*California Housing Securities, Inc. v. United States,*
 959 F.2d 955 (Fed. Cir. 1992) ........................................................... 11, 58, 60

*Carroll v. Lawton Indep. Sch. Dist. No. 8,*
 805 F.3d 1222 (10th Cir. 2015) ...................................................................... 42

*Celotex Corp. v. Catrett*,
 477 U.S. 317 (1986) ............................................................. 32

*Concrete Pipe & Prods. v. Construction Laborers Pension Trust*,
 508 U.S. 602 (1993) ............................................................. 57

*Cortez v. McCauley*,
 478 F.3d 1108 (10th Cir. 2007) ............................................ 56

*D.A. Osguthorpe Family P'ship v. ASC Utah, Inc.*,
 705 F.3d 1223 (10th Cir. 2013) ............................................ 41

*Dansie v. City of Herriman*,
 134 P.3d 1139 (Utah 2006) ............................................. 35, 37

*Daubert v. Merrell Dow Pharm.*,
 509 U.S. 579 (1993) ............................................................. 32

*Daz Mgmt. v. Honnen Equip. Co.*,
 2022 UT 15, 508 P.3d 84 ..................................................... 38

*Disability Law Ctr. v. Utah*,
 180 F.Supp.3d 998 (D. Utah 2016) ...................................... 53

*Elsken v. Network Multi-Family Sec. Corp.*,
 49 F.3d 1470 (10th Cir. 1995) ............................................. 32

*Fahey v. Mallonee*,
 332 U.S. 245 (1947) ............................................. 10, 52, 54, 57

*Fidelity Fed. Sav. and Loan Ass'n v. de la Cuesta*,
 458 U.S. 141 (1982) ............................................................. 57

*First English Evangelical Lutheran Church v. Los Angeles County*,
 482 U.S. 304 (1987) ............................................................. 58

*First State Bank of Hudson County v. United States*,
 599 F.2d 558 (3d Cir. 1979) ................................................ 17

*Franklin Sav. Ass'n v. Director, Office of Thrift Supervision*,
 934 F.2d 1127 (10th Cir. 1991) ....................................... 43, 44

*Golden Pacific Bancorp v. United States*,
 15 F.3d 1066 (Fed. Cir. 1994) ........................................ 57, 58

*Gomes v. Wood*,
 451 F.3d 1122 (10th Cir. 2006) ............................................ 56

*Harmsen v. Smith*,
 586 F.2d 156 (9th Cir. 1978) ................................................ 17

*In re Beach First Nat'l Bancshares, Inc.*,
 702 F.3d 772 (4th Cir. 2012) ................................................ 35

*In re Mallo*,
 774 F.3d 1313 (10th Cir. 2014) ............................................ 51

*In re Southeast Banking Corp.*,
 69 F.3d 1539 (11th Cir. 1995) .............................................. 35

*Kagan v. Edison Bros. Stores Inc.*,
 907 F.2d 690 (7th Cir. 1992) ................................................ 37

*Kan. Penn Gaming v. Collins*,
 656 F.3d 1210 (10th Cir. 2011) ............................................ 32

*Leach v. FDIC,*
   860 F.2d 1266 (5th Cir. 1988) ............................................................ 35
*McKart v. United States,*
   395 U.S. 185 (1969) ............................................................................ 42
*Medina v. City of Denver,*
   960 F.2d 1493 (10th Cir.1992) ........................................................... 56
*Medina v. Cram,*
   252 F.3d 1124 (10th Cir. 2001) ..................................................... 55, 56
*Metro Oil Co. v. Sun Ref. & Mktg. Co.,*
   936 F.2d 501 (10th Cir. 1991) ............................................................ 32
*Mick v. Brewer,*
   76 F.3d 1127 (10th Cir. 1996) ............................................................ 55
*Mid-State Fertilizer Co. v. Exchange Nat'l Bank,*
   877 F.2d 1333 ...................................................................................... 37
*Palazzolo v. Rhode Island,*
   533 U.S. 606 (2001) ............................................................................ 57
*Pareto v. FDIC,*
   139 F.3d 696 (9th Cir. 1998) .............................................................. 35
*Peterson v. Armstrong,*
   2014 UT App 247, 337 P.3d 1058 ...................................................... 40
*Philip Morris, Inc. v. Reilly,*
   312 F.3d 24 (1st Cir.2002) .................................................................. 57
*Pioneer Ctrs. Holding Co. Emp. Stock Ownership Plan & Tr. v. Alerus Fin.,*
   858 F.3d 1324 (10th Cir. 2017) .......................................................... 32
*Raile Family Trust ex rel. Raile v. Promax Dev. Corp.,*
   2001 UT 40, 24 P.3d 980 ..................................................................... 38
*Ramsay v. Kane County Human Res. Special Serv. Dist.,*
   2014 UT 5, 322 P.3d 1163 .................................................................. 42
*Salt Lake City Mission v. Salt Lake City,*
   2008 UT 31, 184 P.3d 599 .................................................................. 42
*Saucier v. Katz,*
   533 U.S. 194 (2001) ............................................................................ 55
*Spackman ex rel. Spackman v. Board of Educ.,*
   2000 UT 87, 16 P.3d 533 ..................................................................... 47
*State v. Sommerville,*
   2013 UT App 40, 297 P.3d 665 .......................................................... 40
*State v. Tooele County,*
   44 P.3d 680 (UT 2002) ........................................................................ 51
*Taylor v. United States,*
   959 F.3d 1081 (Fed. Cir. 2020) .......................................................... 59
*Terra Utils., Inc. v. Pub. Serv. Comm'n,*
   575 P.2d 1029 (Utah 1978) ................................................................. 53
*Torian v. Craig,*
   2012 UT 63, 289 P.3d 479 .................................................................. 34

*Torres–Rosado v. Rotger–Sabat*,
   335 F.3d 1 (1st Cir. 2003)................................................................ 45
*Tripp v. District Ct.*,
   56 P.2d 1355 (Utah 1936)................................................................ 37
*United States v. Bowen*,
   527 F.3d 1065 (10th Cir. 2008)........................................................ 32
*United States v. Philadelphia Nat'l Bank*,
   374 U.S. 321 (1963) ........................................................................ 57
*United States v. Salerno*,
   481 U.S. 739 (1987) ........................................................................ 53
*Valley View Angus Ranch, Inc. v. Duke Energy Field Services, Inc.*,
   497 F.3d 1096 (10th Cir. 2007)........................................................ 37
*View Condominium Owners Ass'n v. MSICO, LLC*,
   2005 UT 91, 127 P.3d 697............................................................... 57
*Washington Federal v. United States*,
   26 F.4th 1253 (Fed. Cir. 2022)........................................................ 36

## Statutes

12 U.S.C. §1831o..............................................................................Passim
12 U.S.C. § 324 .......................................................................................... 13
12 U.S.C. § 1817 .................................................................................. 16, 21
12 U.S.C. § 1821(d) ............................................................................ 34, 37
12 U.S.C. § 4806 .................................................................................. 19, 43
42 U.S.C. § 1983 and § 1988 .................................................................... 33
Utah Code § 7-1 ..................................................................................Passim
Utah Code § 7-2-1 ...............................................................................Passim
Utah Code § 63G-4-401 ...................................................................... 42, 43
Utah Constitution article I section 22 ....................................................... 33

## Rules

Fed. R. Civ. P. 13(a) ..................................................................... 38, 39, 42
Fed. R. Civ. P. 23.1(b) ............................................................................. 37
Fed. R. Civ. P. 56(a) ............................................................................. 1, 31
Fed. R. Evid. 803(8) ................................................................................. 20
Utah R. Civ. P. 11 .................................................................................... 31
Utah R. Civ. P. 13 ............................................................................. 38, 39
Utah R. Civ. P. 23A ................................................................................. 37

Regulations

12 C.F.R. § 325.103 (2005) (Appx. 4 .......................................................................... 12
12 C.F.R. § 325.103(b)(4)............................................................................................ 12
Intra-Agency Appeal Process: Guidelines for Appeals of Material Supervisory Determinations
    and Guidelines for Appeals of Deposit Insurance Assessment Determinations,
    77 Fed. Reg. 17,055 (Mar. 23, 2012) ................................................................... 20
Utah Admin. Code R331-20 ............................................................................... 19, 43
Utah Admin. Code R331-24-3(1) ............................................................................. 13
Utah Admin. Code R333-13-3(5) ............................................................................. 11

Other Authorities

69 Fed. Reg. 41,479, 41,480 ...................................................................................... 20
DUCivR 7-1 and 56-1 .................................................................................................. 1

## INTRODUCTION & RELIEF REQUESTED

America West Bank failed as its management led the Bank in "a high-risk operating plan"[1] issuing commercial real estate ("CRE") and acquisition, development, and construction ("ADC") loans[2] during the real estate bubble of the early 2000s. When the market collapsed in the Great Recession of 2007 to 2009, the Bank was left critically undercapitalized.

When the Bank was examined by UDFI and the Federal Deposit Insurance Corporation ("FDIC") in February 2009, examiners concluded that the Bank was insolvent. Entirely independent of that examination, the Bank's own external auditors Simpson & Company conducted their audit covering the same time and likewise concluded the Bank "did not meet all of the statutory regulatory capital requirements for financial institutions."[3] Even the Bank's own financial records unequivocally show that the Bank was critically undercapitalized, making the Bank subject to receivership under federal law.[4]

After the Bank's failure, the FDIC Office of Inspector General conducted its own examination and prepared a Material Loss Review, as required by Congress. The Material Loss Review, yet another independent voice, concluded:

> AWB failed because the bank's Board and management deviated from the bank's business plan and did not effectively manage the risks associated with rapid growth in CRE and ADC lending. AWB lacked adequate loan underwriting, credit administration, and allowance for loan and lease loss practices. AWB also relied heavily on wholesale funding sources, primarily brokered deposits, to fund its CRE and ADC concentrations. Finally, AWB was cited for apparent violations and contraventions of various laws, regulations, and interagency policies in seven of eight

---

[1] Stoley Dep. at 39:15-17 (Appx. 47).
[2] Also referred to as construction and development ("CND") loans.
[3] Draft Auditors' Report at 2 (Appx. 1).
[4] McGregor Dep. at 171:8-10 (Appx. 48).

> examinations. In a declining real estate market, AWB could not
> withstand significant loan losses, which led to quick and
> substantial erosion of the bank's capital.

Material Loss Review at 2 (Appx. 2). This conclusion was independently endorsed by the

Division of Supervision and Consumer Protection. *Id.* at 3. The FDIC insurance fund lost over

$100 million on the Bank's failure. *Id.* at 1. Because of this colossal failure, the FDIC changed

its practice of closely monitoring new banks from three years to seven years. *Id.* at 3.

AWBM blames Defendants for the Bank's failure. This is akin to a heavy smoker

blaming the oncologist for his terminal lung cancer diagnosis. Defendants neither created the

conditions for AWB's failure nor caused that failure. That responsibility rests at the feet of the

Bank's owners, officers, and directors, who in this instance were almost entirely consolidated in

the person of Douglas Durbano.

There is no merit to any claim for relief advanced by Plaintiff. AWBM lacks standing to

bring the claims it asserts, and even if it had standing, those claims are barred by AWBM's

failure to exhaust its administrative remedies, its failure to appear in the receivership proceeding,

but most of all by the simple fact – as found by multiple independent and unbiased sources – that

its Bank was critically undercapitalized, unsafe, and unsound. Consequently, none of AWBM's

rights were violated when the Bank was placed in receivership, and Defendants are entitled to

summary judgment on all claims asserted in this litigation.

## BACKGROUND

"Banking is one of the longest regulated and most closely supervised of public callings."

*Fahey v. Mallonee*, 332 U.S. 245, 250 (1947). It is so heavily regulated, in fact, that no

regulatory takings claim is available for the receivership of a bank, because the institution

"voluntarily subjected itself to an expansive statutory regulatory system when it obtained federal deposit insurance" and knew that a receiver would be appointed if the bank's assets were dissipated. *California Housing Securities, Inc. v. United States*, 959 F.2d 955, 958 (Fed. Cir. 1992). The full history and extent of these regulations are not germane to this Motion, but a primer on certain basics provides important context.

**A. Prompt Corrective Action ("PCA").**

In response to the savings and loan crisis of the 1980s, Congress passed the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"). *Barnes v. Harris*, 783 F.3d 1185, 1189 (10th Cir. 2015) ("During the 1980s, the United States banking system faced a crisis due to inadequate and ineffective regulations. . . . In order to protect the FDIC, which is responsible for insuring depositors' funds against loss, and to stabilize the banking system, Congress enacted FIRREA."). This was followed two years later by the Federal Deposit Insurance Corporation Improvement Act of 1991, which enacted prompt corrective action ("PCA") benchmarks and rules, now contained in 12 U.S.C. §1831o. *See* 12 U.S.C. §1831o (2009) (Appx. 3).[5]

Utah law expressly authorizes UDFI to enforce the PCA on the institutions under its jurisdiction. *See* Utah Code § 7-1-325; Utah Admin. Code R333-13-3(5).

PCA and regulations enacted pursuant to that statute establishes a hierarchy of capitalization levels indicating the financial health of an institution:

- "Well capitalized" for an institution that "significantly exceeds the required minimum level for each relevant capital measure";

---

[5] All references to PCA are to the 2009 statute in effect when America West Bank was placed into receivership.

- "Adequately capitalized" for one that "meets the required minimum level for each relevant capital measure";

- "Undercapitalized" for one that "fails to meet the required minimum level for any relevant capital measure";

- "Significantly undercapitalized" for one that "is significantly below the required minimum level for any relevant capital measure"; and

- "Critically undercapitalized" for an institution below even that.

12 U.S.C. § 1831o(b)(1). Specific capitalization levels are set by regulation, except that any institution at or below a 2% capitalization level is "critically undercapitalized" by statute. *Id.* at § 1831o(c)(3)(A).[6] Capitalization levels measured are the "total risk-based capital ratio" or "Tier 1 risk-based capital." *See* 12 C.F.R. § 325.103 (2005) (Appx. 4). In 2008-2009, a bank was "well capitalized" if it had a total risk-based capital ratio of 10% or better and a Tier 1 risk-based capital (or simply "Tier 1 capital") of 6% or better. *Id.* While the details of calculating Tier 1 capital are not germane, it is enough to note that it includes such items as shareholder equity and retained earnings while excluding funds allocated to ALLL (discussed below), and the calculation involves no discretion. Banks must calculate these ratios regularly and report them in their call reports (discussed below).

A significantly undercapitalized institution (Tier 1 capital below 3% at the relevant time) is restricted in the interest rates it may pay depositors and may be required to recapitalize. *See* 12 U.S.C. at § 1831o(f)(2); 12 C.F.R. § 325.103(b)(4).

---

[6] While subsection (A) authorizes the regulatory agency to set the different capitalization limits, subsection (B) requires that no limit may be less than 2%, making 2% the threshold for a critically undercapitalized institution.

A critically undercapitalized institution is subject to receivership. *See* 12 U.S.C. § 1831o(h)(3). PCA *requires* regulatory agencies to place such institutions into receivership within 90 days unless the agency, in conjunction with the FDIC, can document in writing a course of action that will better protect the FDIC insurance fund. *Id.*

**B.  Call Reports and UBPRs.**

Both state and federal law require a financial institution to submit quarterly reports of their financial condition – "call reports" – to UDFI and the FDIC. *See* 12 U.S.C. § 324; Utah Code § 7-1-318; Kemsley Report at ¶¶ 28-30 (Appx. 5). Call reports are verified under oath or affirmation by the bank's officers and directors, Utah Code § 7-1-318, and penalties apply for making false statements, 12 U.S.C. § 324.[7] Call reports are prepared in accordance with generally accepted accounting principles ("GAAP"). Kemsley Report at ¶ 33. Utah banks (and indeed, banks nationally) are required by statute and rule to follow GAAP.[8] Utah Code § 7-1-301(14); Utah Admin. Code R331-24-3(1).

GAAP, federal, and state law require FDIC-insured institutions to use accrual accounting – recognizing both revenue and expenses as incurred rather than when physically received. Kemsley Report at ¶¶ 33-35; Stoley Dep. at 76:21-77:14.[9]

---

[7] Call reports are available on the FDIC's website at https://cdr.ffiec.gov/public/ManageFacsimiles.aspx (Searches are performed on a bank-by-bank basis).

[8] GAAP standards are promulgated by the Financial Accounting Standards Board ("FASB"), an independent, non-profit organization.

[9] Ordinarily, a discussion of the requirement for accrual accounting would be too basic and trivial to require discussion, but during discovery, AWBM repeatedly took the position that the Bank was somehow entitled to use cash accounting and therefore would not have been insolvent so long as they had physical cash in the Bank. That position is devoid of any legal support.

The Federal Financial Institutions Examination Council (FFIEC) assembles call report information into uniform bank performance reports ("UBPR") that compare a bank to its peer group on a percentile basis. Call reports and UBPRs are publicly available and provide an objective measure of a bank's financial condition and a comparison to peer institutions.[10] Daines Dep. at 87:13-18 (Appx. 7). For example, based on America West Bank's December 31, 2008, call report, the relevant UBPR shows that the Bank's interest expenses (the rate a bank is paying depositors, a number that a bank wants to keep as low as possible) was 3.93%, while the Bank's peer group average was only 2.36%, placing the Bank in the 99th percentile of its peer group in this category – a bad place to be. *See* America West Bank UPBR at 2 (Appx. 6).

## C. Allowance for Loan and Lease Losses ("ALLL").

One item specifically reported in the call reports is a bank's allowance for loan and lease losses ("ALLL"). The ALLL is an estimate of the amount of a bank's gross loan portfolio that it will never collect, due to the full or partial default of financially troubled borrowers. Kemsley Report at ¶ 52. As an estimate, there is no one way to calculate the ALLL, and different people with different methodologies will reach different results. McRae Dep. at 41:9-42:25. This entry is reported on call reports and UBPRs as the provision for loan and lease losses. Kemsley Report. at ¶ 53; *see* America West Bank UPBR at 2 (Appx. 6). Studies of the Great Recession (2007-2009) found that understating the ALLL was "the most common accounting ploy banks use[d] to disguise financial problems and to falsely meet regulatory requirements." Kemsley Report at ¶ 56.[11] The variance between America West Bank's calculation of its ALLL and the bank examiners' calculation was a point of contention in the Bank's examinations.

---

[10] UPBRs are available through the FFIEC's website: https://www.ffiec.gov/ubpr.htm.

[11] Citing Garcia, G. 2010. "Failing Prompt Corrective Action," *Journal of Banking Regulation* 11: 171 – 190. Loveland, R. 2016, "How Prompt was Regulatory Corrective Action During the Financial Crisis?" *Journal of Financial Stability* 25: 16-36.

Two key accounting pronouncements that govern estimation of the ALLL are FAS 5 and FAS 114, which work jointly with each other.[12] Under these statements, banks are required to split their loans into two portfolios. The first portfolio is for smaller-balance homogeneous loans that the bank can collectively evaluate for impairment under FAS 5. The second portfolio is for larger or unique loans, especially those that are already showing signs of trouble, that the bank evaluates for impairment individually under FAS 114. After using specific guidance from each statement to separately estimate impairment for the FAS 5 and FAS 114 loan portfolios, the bank then adds the two estimates together to form the bank's total estimated ALLL balance. Kemsley Report at ¶ 57.

**D.  Brokered Deposits.**

The main depositors of a typical community bank such as America West Bank are local residents and businesses. These are referred to as "core deposits." However, banks may also have brokered deposits. In simple terms, these are accounts picked up from brokers, typically with no relation to the community of the bank. The brokers search (often nationwide) for the best interest earnings they can achieve. A bank typically must pay a higher interest rate on its brokered deposits, and they are more volatile than core deposits because they have no community investment and always seek higher returns. *See* Allred Dep. at 98:15-99: 1, (Appx. 8); Rude Dep. at 52:13-54:20 (Appx. 9). Brokered deposits pose a threat for a financially-troubled institution relying upon them. The higher interest rates required mean that the bank has greater expenses than it would if relying upon core deposits, increasing the loss of funds, and the bank's inability

---

[12] FAS 5 and FAS 114 are both available through the FASB's website: https://fasb.org/page/document?pdf=fas5.pdf&title=FAS%205%20(AS%20ISSUED); https://fasb.org/page/document?pdf=fas114.pdf&title=FAS%20114%20(AS%20ISSUED).

to continue paying such high interest rates poses the risk of losing the accounts altogether and decreasing the bank's liquidity. And, brokered deposits are not capital. Allred Dep. at 100:21-101:10.

**E.  ADC Lending.**

ADC lending is a "highly-specialized field with inherent risks that must be managed and controlled to ensure that this activity remains profitable." Material Loss Review at 4. This was well-known in advance of the Great Recession and a serious concern in the real estate bubble leading up to that calamity. In October 1998, the FDIC issued a Financial Institution Letter warning as much. *Id.* This was followed in 2006 with another Financial Institution Letter, which provided specific guidance on such loans, warning "concentrations can pose substantial potential risks and can inflict large losses on institutions." *Id.*

**F.  Bank Examinations.**

UDFI has regulatory responsibility for all Utah financial institutions, including banks. Utah Code Ann. § 7-1-101, et al. The FDIC has regulatory responsibility for institutions receiving FDIC insurance. *See* 12 U.S.C. § 1817. Financial institutions regulated by UDFI and insured by the FDIC are subject to regular examinations. The purpose of the examination is to assess the safety and soundness of the institutions to maintain the safety and soundness of the banking system in general; to protect the FDIC insurance fund; to assess adherence to laws and regulations; and to detect and correct unsafe, unsound, or illegal activities. Gibbons Report at 10 (Appx. 10). Bank examinations are not for the benefit of the officers, directors, or owners of a bank but to prevent losses to the insurance fund underlying the banking system. Any benefit to the bank or its owners is incidental to that goal. *First State Bank of Hudson County v. United States,* 599 F.2d 558, 563 (3d Cir. 1979) ("The purpose of the bank examinations . . . is to

prevent losses that would result in claims against the insurance fund.... If the bank examination by the FDIC reveals any irregularities or fraud such examinations, though they may inure incidentally to the benefit of a bank, are intended primarily for the protection of the insurance fund."); *Harmsen v. Smith*, 586 F.2d 156, 158 (9th Cir. 1978) ("Federal bank examinations are not beacons to light the path of erring directors or gulled stockholders.").

At the institutional level, regulators monitor, review, and examine individual institutions for safety and soundness and compliance. In doing so, they assess risk levels and trends; they assess the adequacy of risk management; they assess managements' and board members' competency and character; they review the composition and quality of assets and liabilities; they evaluate the strength of income relative to capital and liquidity; they determine non-compliance with laws; and they use communication, moral suasion, and/or enforcement authority to affect correction. Gibbons Report at 10.

Bank examiners use the Uniform Financial Institutions Rating System (UFIRS) to assess the soundness of an institution. This system evaluates each financial institution on six financial and operational components identified by the acronym CAMELS, for "C"apital adequacy, "A"sset quality, "M"anagement capabilities, "E"arnings sufficiency, "L"iquidity position, and "S"ensitivity to market risk. Each component is scored from 1 to 5, with lower scores being better. An institution is also given a composite rating that generally bears a close relationship to its component ratings but is not a simple average. When assigning a composite rating, some components may be given more weight than others depending on the situation at an institution. A composite rating may incorporate any factor that bears significantly on the overall condition of the financial institution. Kemsley Report at ¶¶ 37-38.

The FDIC promulgates a manual used for guidance on these examinations. *See* DSC Risk Management Manual of Examination Policies ("Exam Manual") (Appx. 11).[13] UDFI examiners follow the Exam Manual.

UDFI and the FDIC conduct joint examinations of financial institutions subject to their jurisdiction. Each agency assigns an Examiner in Charge ("EIC"). Gregson Dep. 17:14-22 (Appx. 12); Sill Dep. at 17:7-10 (Appx. 13). The EICs decide the assignments of the other examiners, dividing them among the different CAMELS categories. Gregson Dep. at 17:23-18:13; Sill Dep. 98: 10-18. Below the EICs are the Operations Manager and Assets Manager. Sill Dep. at 17:14-17; Romero Dep. at 16:6-18, 21:16-23:14 (Appx. 14); Gregson Dep. at 46:17-22.

The Assets Manager oversees the review of the bank's loan portfolio. An examiner assigned to review loans will review a selected loan file, check whether the loan is being paid, the value of the collateral, whether the loan file is up to date, whether the bank has sufficiently documented the loan. Gregson Dep. at 41:20-42:19. The examiner determines a classification of each loan. Sill Dep. 54:4-9, 60:10-18, 61:14-62:22, 90:1-10, 19-25; Gregson Dep. 28:1-16, 34:19-35:12, 41:20-42:19. If an examiner downgrades a loan below how the bank classified it, that determination is reviewed with the Asset Manager, the bank loan officer, and ultimately the bank's management team. Gregson Dep. at 56:7-57:14.

After the EICs have received the data from the managers and examiners, they draft the initial ROE. Gregson Dep. at 19:1-6, 47:21-48:15; Romero Dep. at 27:22-28:13. UDFI's Supervisor of Banks will review the draft ROE for completeness and accuracy. Bay Dep. at

---

[13] The Exam Manual for 2009 is 560 pages, most of which have no relevance in this Motion specifically or the litigation generally. Only the cited pages and the preceding and following pages (for context) are included, but the complete manual was produced by the FDIC in discovery and is available upon request.

20:13-18, 64:19-65:2 (Appx. 15); Romero Dep. at 28:11-13. The Supervisor of Banks will collaborate with their counterpart at the FDIC, called a case manager, to finalize any edits to the ROE. Bay Dep. at 28:25-29:20, 64:25-65:7; Romero Dep. at 28:11-21. The Supervisor of Banks reports the findings to the Chief Examiner and often directly to the Commissioner and Deputy Commissioner. Bay Dep. at 16:17-24, 17:24-18:3, 34:2-6. The FDIC case manager reports the findings to the FDIC regional office. Bay Dep. 34:2-6

Before the ROE is finalized, it is reviewed with bank management, and if CAMELS ratings are being downgraded, it will be presented to the bank's board of directors. Bay Dep. at 60:2-8; Sill Dep. at 26:23-27:7, 99:12-100:2; Gregson Dep. at 48:21-24.

If an affected person disagrees with the final ROE, there is an administrative review process under both state and federal law to have that dispute heard. This is an informal administrative proceeding under the Utah Administrative Procedures Act, commenced by making a written request to the UDFI Commissioner. *See* Utah Code §§ 7-1-302, 63G-4-202; Utah Admin. Code R331-20. A federal administrative process is mandated by 12 U.S.C. § 4806. The FDIC has established a Supervision Appeals Review Committee ("SARC") and adopted guidelines for that administrative review ("SARC guidelines").[14]

In sum, a bank examination is a multi-person endeavor, with no single individual controlling the outcome. Each substantive decision of an examiner is reviewed at multiple levels within two independent agencies, results are disclosed and discussed with the bank, and the bank may challenge the final determination in state or federal administrative proceedings.

---

[14] *See* Intra-Agency Appeal Process: Guidelines for Appeals of Material Supervisory Determinations and Guidelines for Appeals of Deposit Insurance Assessment Determinations, 77 Fed. Reg. 17,055 (Mar. 23, 2012); 69 Fed. Reg. 41,479, 41,480-81 (July 9, 2004).

**G.  Material Loss Reviews.**

The PCA requires the FDIC Office of Inspector General to investigate and report on any "material" losses to the Deposit Insurance Fund. 12 U.S.C. § 1831o(k). At the time of the events in question, the materiality threshold was $25 million. *Id.* at § 1831o(k)(2)(B). The written report reviews the FDIC's supervision of the institution, "ascertain why the institution's problems resulted in a material loss to the Deposit Insurance Fund; and . . . make recommendations for preventing any such loss in the future." *Id.* at § 1831o(k)(1)(A). Copies of the report are required to be provided to the FDIC, the Comptroller General of the United States, and the relevant state regulatory agency – UDFI, for Utah institutions. *Id.* The reports are available to the public and are also subject to review by the Government Accounting Office. *Id.* at § 1831o(k)(4),(5). Thus, a Material Loss Review is a "public record" setting out the activity of the FDIC OIG on "a matter observed while under a legal duty to report." Fed. R. Evid. 803(8).

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      UDFI has regulatory responsibility for all Utah financial institutions, including banks. Utah Code § 7-1-101, et al.

2.      Commissioner Leary was (until his March 2022 retirement) the chief executive officer of UDFI. Utah Code § 7-1-202.

3.      UDFI granted America West Bank a charter as a Utah bank on May 1, 2000. Complaint at ¶ 11 (Doc. 33); Findings, Conclusions and Order Conditionally Approving Application (Appx. 16).

4.      The Bank was wholly owned by AWBM, a limited liability company. Complaint at ¶¶ 1, 16; Material Loss Review at 2.

5.      Douglas Durbano was Chairman of the Bank's Board of Directors, and he and his family controlled 61% of AWBM. Material Loss Review at 2.

6.      The Bank was supervised and insured by the FDIC. Material Loss Review at 2.

7.      The Bank was subject to frequent examination and reporting by the FDIC and UDFI to ascertain financial data regarding the Bank's condition and the results of its operations, including capital. *See* 12 U.S.C. § 1817; Utah Code § 7-1-314, -317.

8.      While the Bank's business plan stated it would maintain a diversified loan mixture in which no general loan type would constitute more than 40% of the overall loan portfolio, the Bank "pursued a lending strategy that resulted in CRE and ADC concentrations, both of which exceeded 40 percent of total loans throughout the bank's existence." Material Loss Review at 4.

9.      The 2001 ROE found over half the Bank's portfolio consisted of ADC loans, an "elevated concern" as a sudden economic downturn would expose the Bank to losses. Material Loss Review at 3-4.[15]

10.     Compared to its peer group, the Bank's ADC concentrations were consistently in the 99th percentile, while its CRE concentrations ranged from the 73rd to the 98th percentile. Material Loss Review at 4.

11.     In July 2002, examiners cautioned that the Bank was overemphasizing income and earnings rather than sound asset quality. Material Loss Review at 3.

---

[15] ROEs are held confidential by the FDIC. The 2008 and 2009 ROEs for America West Bank, with personal financial information redacted, were previously filed publicly with the Court and are no longer confidential, but the earlier ROEs remain confidential. To avoid the burden to the Court and the parties of having documents under seal, this Motion relies on information from the earlier ROEs as it is referenced in the Material Loss Review, a public document.

12.     The Bank funded this rapid growth by heavy reliance on brokered deposits, contrary to its own business plan. Material Loss Review at 8.

13.     Brokered deposits create a risk to the Bank in the event of a downturn, because Congress expressly limited a financial institution's ability to rely on such deposits if it is significantly undercapitalized. *Id.* at 8 & n.6; 12 U.S.C. § 1831o(f)(2)(C).

14.     The Bank's percentage of brokered deposits to total deposits rose from 20% at the outset to over 70%, and the Bank was in the 99th percentile for the Bank's peer group throughout the life of the Bank. Material Loss Review at 9.

15.     The Bank "not only continued but intensified its levels of ADC and CRE concentrations from 2007 until the bank closed, those levels exceeded the parameters for concentrations that warrant greater supervisory concern according" to the FDIC's 2006 guidance. Material Loss Review at 5.

16.     The Bank's ADC concentration to total capital compared to its peers:



Figure 2:  AWB's ADC Concentration to Total Capital Compared to Peers

Source: OIG review of UBPRs for AWB.

Material Loss Review at 5.

17.     The Bank's CRE concentration to total capital, compared to its peers:

**Figure 3:  AWB's CRE Concentration to Total Capital Compared to Peers**



Source: OIG review of UBPRs for AWB.
Note:  Owner occupied loans were not included in the 2008 and 2009 CRE concentrations.

Material Loss Review at 6.

18.     After two consecutive quarters of declining GDP growth, the Great Recession commenced in December 2007. Waters Rep. at 3-4 (Appx. 19).

19.     The Recession continued to June 2009, and real estate values would continue to drop until their ultimate trough in the first quarter of 2010. *Id.* at 4, 7.

20.     Real estate values did not return to pre-Recession levels until sometime after 2012. *Id.* at 5-7.

21.     Inflated real estate values were "the driving factor of the Great Recession." *Id.* at 8.

22.     Along with the drop in real estate values, unemployment rates jumped, both in Utah and nationally. *Id.*

23.     As borrowers found they owed more on their homes than their homes were worth, loan defaults increased. *Id.*

24.     As banks moved to sell the glut of houses in their inventory, this further depressed real estate values in a vicious circle. *Id.* at 9.

25.     The January 2008 ROE found the Bank's overall condition "deteriorated significantly since the last examination and is now deficient." January 2008 ROE at 1 (Appx. 20).

26.     Bank "management has continued to lend and grow the portfolio despite obvious signs of adverse conditions in the real estate business cycle." *Id.*

27.     The Bank had maintained a constant ALLL of approximately 1% of the loan portfolio over the previous three years, yet as the market collapsed and the number of non-performing loans significantly increased, the Bank only increased the allowance by 9 basis points.[16] *Id.* at 4.

28.     The ALLL was underfunded by at least $2.4 million. *Id.* at 5; *see also id.* at 39 (noting $2.441 million to be "transferred to Tier 2 for Inadequate Allowance for Loan and Lease Losses").

29.     This almost doubled the Bank's ALLL to approximately $5 million. *See id.* at 39 (noting the Bank had $2.67 million in "Allowance for Loan & Lease Losses" prior to the addition of the $2.4 million).

30.     On May 16, 2008, the FDIC and UDFI formally designated the Bank a "problem institution," subject to "closer regulatory supervision" because of its "unsatisfactory" condition and "potential for continued deterioration." May 16, 2008, Letter (Appx.21).

---

[16] A basis point is 1/100 of 1%.

31.     In September 2008, the Bank stipulated to cease and desist orders ("C&D") from the FDIC and UDFI.[17] September 2008 FDIC C&D and Stipulation (Appx. 22 & 23); September 2008 UDFI C&D and Stipulation (Appx. 24 & 25).

32.     In each stipulation, the Bank waived its rights to a hearing on the charges of its unsafe and unsound practices and violations of law. *See* FDIC Stipulation at ¶ 1; UDFI Stipulation at ¶ 1.

33.     The C&D Orders required the Bank, inter alia, to cease and desist from operating with (1) management whose policies and practices were detrimental to the bank and jeopardized the safety of its deposits; (2) a board of directors that failed to provide adequate supervision over the Bank; (3) inadequate capital; (4) inadequate loan loss reserves; (5) poor quality loans; (6) inadequate liquidity; and (7) to cease engaging in unsatisfactory lending practices. FDIC C&D Order at 2-3; UDFI C&D Order at 2-3.

34.     The Bank was also ordered to increase its Tier 1 capital ratio to 10% within 90 days of August 31, 2008 (i.e., by November 29, 2008). FDIC C&D Order at 4; UDFI C&D Order at 4.

35.     On November 3, 2008, the FDIC and UDFI sent a transmittal letter to AWBM's Board of Directors with a copy of the July 14, 2008, Bank Holding Company Inspection Report for the Bank. *See* November 3, 2008, letter (Appx. 26).

---

[17] FDIC Cease & Desist Orders are public documents. The America West C&D Order is available at https://www.fdic.gov/news/news/press/2008/pr08107.html (Oct. 31, 2008, Press Release announcing September 2008 enforcement actions and including links to the operative documents).

36.     The letter stated that the referenced Report showed "the overall condition of America West Bank Members, LC has declined significantly and is now marginal." It further stated that:

> Concerns over the financial condition of your organization are elevated and have resulted in the issuance of formal supervisory actions against the subsidiary bank. As mentioned at the October 23, 2008 exit meeting with management and the board, two independent formal enforcement actions against America West Bank Members, LC will be forthcoming shortly.

The letter then listed requested action. *Id*.

37.     The last ROE for the Bank was on February 9, 2009. 2009 ROE (Appx. 27).

38.     The February 2009 ROE concluded that the Bank was insolvent, that the Bank's ALLL was underfunded by at least $15 million, and that the Bank lost $11.2 million in 2008. *Id*. at 2.

39.     The ROE found that, while the Bank's ALLL (as of December 31, 2008) equaled 2.84% of total loans, net losses to average loans in 2008 was 3.70%. *Id*. at 3.

40.     Further, the volume of problem loans ("classified assets") had significantly increased, indicating an even higher loss rate for 2009. *Id*.

41.     The ROE further noted that, while the Bank's existing ALLL (as of December 31, 2008), was $6.7 million, examiners had identified loan losses of $12.2 million. *Id*.

42.     Examiners applied three different methodologies for calculating an appropriate ALLL for the Bank, coming up with a range from $22.4 million to $32.6 million. *Id*. at 4.

43.     They required the Bank increase its ALLL by $15.0 million to reach the lower limit of that range. *Id*.

44.     The ROE also found the Bank was not in compliance with multiple provisions of the C&D Orders:

      (a) The Bank was not operating in a safe and sound condition; *id.* at 11;

      (b) The Bank did not have a Tier 1 capital ratio of at least 10%; *id.* at 12-13;

      (c) The Bank failed to develop and submit a three-year strategic plan; *id.* at 19;

      (d) The Bank failed to eliminate or correct violations of law identified in the 2008 ROE; *id.*

      (e) The Bank failed to develop an acceptable plan governing its relationship with AWBM and limiting payments to AWBM; *id.* at 20;

      (f) The Bank paid dividends to AWBM in violation of the C&D Orders; *id.*

45.     Neither the Bank nor AWBM sought administrative review of the 2009 ROE (or any ROE), because they were unaware of the process. Durbano Dep. at 84:24-85:9 (Appx. 28).

46.     Although disputing the examiners' valuation of the Bank's loans in 2009, Eric Sheehan, the head of the Bank's Special Workout Team ("SWOT"), charged with managing those troubled loans, acknowledged that, in retrospect, the examiners' valuations were correct. Sheehan Dep. at 61:7-16 (Appx. 29).

47.     By 2009, the Bank was unable to sell its troubled loans at the valuations the Bank placed on them. Exec. Comm. Minutes February 2, 2009 (Appx. 46) Sheehan Dep. at 84:3-85:2, 120:6-15.

48.     Brandon Zern, identified by AWBM as one of its non-retained experts, was also part of the SWOT under Sheehan and worked with the Bank's troubled loans. Zern Dep. at 26:23-28:18 (Appx. 30).

49.     After the closure of the Bank, Zern went to work for another bank that was considering bidding on the America West Bank loans offered for auction by the FDIC. Zern recommended that his new bank *not* bid for the loans, and the bank did not. *Id.* at 50:9-51:23.

50.     Simpson & Company, the Bank's outside auditors, conducted their audit of the Bank for the same period as the 2009 ROE. *See* Draft Auditor's Report at 1.

51.     The auditors examined the Bank's loan files, particularly for large and troubled loans. McRae Dep. at 15:14-16:23 (Appx. 31).

52.     The "number one" criteria in assessing a loan is "if they are performing, if they are receiving payments." *Id.* at 33:11-34:11.

53.     The auditors calculated an ALLL for the Bank of $13.7 million. Draft Auditors Report at 4 ("Provision for Loan Losses").

54.     The auditors completed their audit, but it was not finalized, because the Bank refused to give the auditors a representation letter, representing that the Bank managers had not withheld any material information. McRae Dep. at 20:23-23:14 (Appx. 31).

55.     The auditors concluded that the Bank was not likely to continue as a going concern. *Id.* at 23:15-24:15.

56.     Based on the auditors' own calculations of the Bank's performance, "there is no capital left in the bank." *Id.* at 24:19-25:9.

57.     The Bank's own internal financial documents, as of March 31, 2009, calculate an ALLL for the Bank of $11.5 million and a Tier 1 capital ratio of 0.41%. March 31, 2009, Monthly Financial Report at 1 (Appx. 32); *see also* Wilde Dep. at 204:9-12, 251:16-20 (even if examiners accepted Bank's calculations, Bank was still critically undercapitalized and in violation of the C&D Order requirements).

58.     The Bank's Tier 1 capital as of that date was $1.2 million. *Id.* at 1.

59.     By the Bank's own accounting, the Bank had lost $11.8 million in the first quarter of 2009 of $11.8 million, or approximately $132,000 per day. *Id.* at 3 ("net income (loss) before taxes").[18]

60.     On May 1, 2009, UDFI petitioned the state court for an Order approving receivership of the Bank on the following grounds:

    (a) The Bank was not in a safe or sound condition to transact business;

    (b) The Bank failed to maintain a minimum amount of capital as required by UDFI;

    (c)  The Bank was or was about to become insolvent;

    (d) The Bank had failed or refused to comply with an order of the Commissioner;

    (e) Other remedies provided by Utah statute were inadequate to address the situation; and

    (f)  The Bank was in violation of PCA.

*See* Verified Petition for Order Approving Possession at ¶ 6 (Appx. 34).

61.     Commissioner Leary was the only testifying witness and described in detail the basis for possession, including the findings from the February 2009 ROE that the Bank was insolvent, the Bank was not in a safe and sound condition, that management was critically deficient, and that the Bank needed $40 million to recapitalize. Leary Decl. at ¶¶ 15, 16 (Appx. 35); Babalis Decl. at ¶ 11 (Appx. 36); Allred Decl. at ¶ 3-5 (Appx. 37); Bay Decl. at ¶¶ 4-6 (Appx. 38); Allred Notes (Appx. 39).

---

[18] Based on these figures, if the Bank's rate of loss during the first quarter continued into the second quarter, it would have wiped out the Bank's remaining Tier 1 capital in less than 10 days.

62.    The 2009 ROE was proffered to the court, as well, though not admitted as an exhibit. Babalis Dep. at 58:10-59:4 (Appx. 40).

63.    The Utah court granted the petition without the presence or participation of AWBM. Order Approving Possession (Appx. 41).

64.    That same day, the FDIC was appointed receiver for the Bank. Certificate of Appointment (Appx. 42).

65.    At approximately 5:00 p.m. that day, Commissioner Leary met with Durbano and handed him copies of the Petition and Order and informed him the court had approved possession of the Bank. Certificate of Service (Appx. 43); Leary Decl. at ¶ 17; Babalis Decl. at ¶13.

66.    Durbano, testifying as the 30(b)(6) representative for AWBM, acknowledged that he consulted legal counsel for the purpose of responding to the state court proceeding but elected not to do so upon being informed that they had "[n]o way to get around Rule 11." 30(b)(6) dep. (Durbano) at 167:4 (Appx. 44).[19]

67.    The Bank was one of 140 banks to fail during 2009 and one of over 500 failed institutions since 2008, six of which have been in Utah.[20]

68.    UDFI had no further involvement in the disposition of the Bank or its assets. Leary Decl. ¶ 19.

---

[19] Civil Procedure Rule 11, in both the Utah and Federal rules is the rule against filing frivolous pleadings. *See* Utah R. Civ. P. 11.
[20] *See* FDIC Failed Bank List, *available at* https://www.fdic.gov/bank/individual/failed/banklist.html.

69.     AWBM did not take any legal action to challenge possession of the Bank until filing an action in Third District Court of Utah on June 28, 2011. *See* Original Complaint (Appx. 45).

70.     Cache Valley Bank took over the Bank's deposits, but declined assuming the Bank's loan portfolio even with the offer of the FDIC *paying* Cache Valley to take it. Daines Dep. at 109:2-110:24, 149:10-150:10.

71.     The FDIC lost an estimated $119 million as a result of the Bank's closure and asset liquidation. Material Loss Review at 1.

## ARGUMENT

## I.   LEGAL STANDARD.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To meet this standard and be entitled to summary judgment, Defendants need only establish "that there is an absence of evidence to support [AWBM]'s case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). To avoid summary judgment, AWBM "must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Intern. v. First Affiliated Sec.*, 912 F.2d 1238, 1241 (10th Cir. 1990).

To avoid summary judgment, AWBM cannot rely upon unsubstantiated, conclusory allegations, *Elsken v. Network Multi-Family Sec. Corp.*, 49 F.3d 1470, 1476 (10th Cir. 1995), nor a mere "scintilla of evidence," *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 596 (1993). Rather, AWBM's opposition must cite evidence such that a "reasonable jury could return a

verdict for" AWBM. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). While AWBM

is entitled to *reasonable* inferences in its favor, it is not entitled to inferences that require "'a

degree of speculation and conjecture that renders [the factfinder's] findings a guess or mere

possibility.'" *Pioneer Ctrs. Holding Co. Emp. Stock Ownership Plan & Tr. v. Alerus Fin.*, 858

F.3d 1324, 1334 (10th Cir. 2017) (quoting *United States v. Bowen*, 527 F.3d 1065, 1076 (10th

Cir. 2008)) (brackets in original).

Generally, summary judgment is intended to *pierce* the pleadings. *Metro Oil Co. v. Sun

Ref. & Mktg. Co.*, 936 F.2d 501, 504 (10th Cir. 1991). Thus, neither formulaic recitations of the

elements of an action nor implausible claims for relief can survive a motion. *Kan. Penn Gaming

v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011) (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009);

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)).

AWBM asserts seven claims for relief:

- "violation of procedural due process" under the Utah Constitution, Complaint at ¶¶ 120-75;

- "violation of substantive due process" [not clear whether state or federal], Complaint at ¶¶ 176-83;

- 42 U.S.C. § 1983 and § 1988 against Commissioner Leary, Complaint at ¶¶ 184-206;

- a physical taking claim under Utah Constitution article I section 22, Complaint at ¶¶ 207-38;

- a regulatory taking claim under the same provision, Complaint at ¶¶ 239-55;

- a physical taking under the Fifth Amendment of the United States Constitution, Complaint at ¶¶ 256-59;

- and a regulatory taking under the same federal provision, Complaint at ¶¶ 260-263.

These claims suffer individual deficiencies that will be addressed in order, but they also suffer certain shared failings that entirely preclude AWBM's claims. These universal failings are addressed first.

## II.   AWBM LACKS STANDING.

The Court should grant summary judgment in favor of Defendants on all claims because Plaintiff's claims are derivative claims of the Bank, not AWBM, which passed to the FDIC-as-receiver by operation of federal law. Thus, AWBM lacks standing to pursue its asserted claims.

### A.   All AWBM's claims are derivative claims of America West Bank.

Federal courts defer to state law on derivative claims. *See, e.g., Branzan Alternative Inv. Fund, LLP v. Bank of New York Mellon Trust Co., NA*, 677 Fed. Appx. 496, 497 (10th Cir. 2017) (referencing Delaware law for Delaware entity). Both the Bank and AWBM are Utah entities, and all relevant events occurred in Utah. SAC at ¶¶ 1, 4, 11-12. Under Utah law, a claim is derivative when: (1) the corporate entity, rather than the shareholder, is the one that suffered the alleged harm, and (2) when the corporate entity, rather than an individual shareholder, is the one that would receive the benefit of the recovery or other remedy. *See, e.g., Torian v. Craig*, 2012 UT 63, ¶ 24, 289 P.3d 479; *Barnes v. Harris*, 783 F.3d 1185, 1193 (10th Cir. 2015) (applying Utah law). The same standard applies to derivative claims involving a limited liability company and its members, as is the case here. *See, e.g., Angel Investors, LLC v. Garrity*, 2009 UT 40, ¶ 15, 216 P.3d 944.

The remedies sought by AWBM would benefit the Bank with only derivative benefit to AWBM as the holding company. Specifically, AWBM is seeking "an order requiring UDFI to issue a corrected press release with terms approved by the court; an order requiring UDFI to

reissue the Bank's charter and provide the Bank with the minimum capital required for operation; and an order requiring UDFI to correct its files and records consistent with the findings of the court." Complaint at ¶¶ 175, 183. To the extent AWBM seeks money damages (*see id.* at ¶¶ 205, 238, 255), the calculation is for the fair market value of the Bank. *See* Jackson Report at 7 (Appx. Exh. 49).[21]   AWBM is not seeking *its own* damages but is trying to pursue derivative claims of the Bank.

### B.  The Derivative Claims Belong to the FDIC, not AWBM.

When the Bank failed in 2009, the FDIC in its receivership capacity succeeded to all "rights, titles, powers, and privileges" of the Bank, "and of any stockholder, member, accountholder, depositor, officer, or director . . . with respect to the institution and the assets of the institution." 12 U.S.C. § 1821(d)(2)(A). As such, the FDIC as receiver owns, and is the only party that can assert, any claim for harms done to the Bank—and that expressly includes the rights of the Bank's "stockholders" or "members" such as AWBM. Courts have routinely recognized in these circumstances that shareholders of the failed bank cannot stand in the shoes of the bank and demand the return of their investment. *See, e.g.*, *In re Beach First Nat'l Bancshares, Inc.*, 702 F.3d 772, 778-79 (4th Cir. 2012) ("[T]he Trustee has pled mainly claims deriving from defalcations at the Bank level, not a distinct and separate harm specific to Bancshares at the holding company level. Consequently, the Trustee lacked standing to pursue the derivative claims under FIRREA as the right to pursue such claims belongs to the FDIC."); *Pareto v. FDIC*, 139 F.3d 696, 700 (9th Cir. 1998) ("But, again, the statute has vested all stockholders' rights and powers in the FDIC itself. … Congress also covered privileges just to be

---

[21] AWBM's Initial Disclosures contain no damage calculation. The Jackson Report is the only evidence of any such calculation AWBM has produced.

sure that nothing was missed. In other words, Congress has transferred everything it could to the FDIC…"); *In re Southeast Banking Corp.*, 69 F.3d 1539, 1549 (11th Cir. 1995); *Leach v. FDIC*, 860 F.2d 1266, 1272 (5th Cir. 1988).

The Tenth Circuit, applying Utah law, has stated as much. In *Barnes v. Harris*, 783 F.3d 1185 (10th Cir. 2015), the court held that "[i]f the Holding Company's claims are based on harm derivative of injuries to the Bank, then they qualify as claims of a shareholder 'with respect to the bank and the assets of the bank' and belong to the FDIC." *Id.* at 1193. The court in *Barnes* noted that, under Utah law, shareholders may bring a direct action only for a harm that "'was visited upon [them] and not the corporation,'" and if "'plaintiffs were injured because the company was injured,' the claim is derivative." *Id.* (quoting *Dansie v. City of Herriman*, 134 P.3d 1139, 1144 (Utah 2006)). Applying that rule, the Tenth Circuit found no "harm to the Holding Company that is distinct and separate from the harm to the Bank," specifically noting that certain allegedly improper dividend payments "did not cause any independent harm, but rather resulted in injury because of the Bank's failure. . . . Only because the Bank failed could [the payments] have resulted in injury." *Id.* at 1193-94. The court therefore affirmed the dismissal of the claim, noting that "shareholders [may] not circumvent the interests of creditors and the FDIC." *Id.* at 1195; *see also Bixler v. Foster*, 596 F.3d 751, 757 (10th Cir. 2010) ("[C]onduct which harms a corporation confers standing on the corporation, not its shareholders.").

*Barnes* directly controls here. AWBM's interest in this action arises solely from its former ownership of the Bank, SAC at ¶ 16, and all the injuries claimed in the action arise from the closure of the Bank. AWBM expressly alleges that it brought this suit to remedy harm to its "property interest in the Bank and in the assets developed in its operation, including capital, accounts, investments of various types . . . and the goodwill arising therefrom." *Id.* at ¶ 220; *see*

*also id.* at ¶ 234 (closure of Bank "wholly deprived AWBM of both the profitable use and enjoyment of its rights under the charter and the valuable and marketable assets . . . which AWBM had acquired and developed in operation of the Bank"). Nowhere does AWBM claim to have sustained any injury independent of the harm allegedly suffered by the Bank. AWBM's claims are therefore derivative rather than direct and belong to the FDIC as receiver for the Bank.[22]

The Complaint therefore alleges claims that AWBM lacks standing to pursue. AWBM plead its claims as direct rather than derivative claims in violation of Utah law. Specifically, AWBM did not file this suit in the name of the Bank, nor does AWBM claim to have demanded that the FDIC-Receiver pursue any of the Bank's claims. *Dansie*, 134 P.3d at 1146; *Tripp v. District Ct.*, 56 P.2d 1355, 1359 (Utah 1936); Fed. R. Civ. P. 23.1(b); Utah R. Civ. P. 23A.[23]

---

[22] The rule that shareholders lack standing to sue to redress injuries suffered by a corporation is no different when due process and takings claims are alleged. *See, e.g., Washington Federal v. United States*, 26 F.4th 1253, 1268 (Fed. Cir. 2022) ("Because the Washington Federal Plaintiffs' alleged injuries, as pled, depend on an alleged injury to the Enterprises, the Washington Federal Plaintiffs lack standing to assert their substantively derivative claim as a direct takings claim."); *Bartel v. Kemmerer City*, 482 F. App'x 323, 327 (10th Cir. 2012) ("Mr. Bartel and Mr. Thurgood do not assert injury separate from the due process injury . . . properly asserted by Tri–State. . . . Because their claims derive wholly from the claims of Tri–State, they therefore do not have standing to sue on their own behalf.").

[23] Furthermore, as the court in *Barnes* explained, when an action belongs to the FDIC as receiver for a failed bank, recoveries in that action must flow first to the depositors and creditors of the bank. 783 F.3d at 1195. Specifically, recoveries in the name of the Bank must be distributed to the depositors and creditors of the Bank *before* the shareholders can recover anything. *See* 12 U.S.C. § 1821(d)(11); *see also Kagan v. Edison Bros. Stores Inc.*, 907 F.2d 690, 692 (7th Cir. 1992) (shareholders of insolvent corporation cannot displace creditors' priority by bringing a direct action); *Mid-State Fertilizer Co. v. Exchange Nat'l Bank*, 877 F.2d 1333, 133-36 (7th Cir. 1989) (same). The FDIC's Deposit Insurance Fund—the Bank's largest and highest-priority creditor—by itself lost $119 million in connection with the Bank's failure, an amount that vastly exceeds the value of the Bank according to Plaintiff's own expert.

Thus, summary judgment for Defendants on all counts of the Second Amended Complaint is appropriate.

## III.    CLAIM PRECLUSON BARS AWBM'S CLAIMS.

Even if the claims asserted by AWBM did not now belong to the FDIC-Receiver, AWBM would be barred by claim preclusion – *res judicata* – from asserting these claims.

State law determines whether a claim is a compulsory counterclaim and the legal effect if it is. *Valley View Angus Ranch, Inc. v. Duke Energy Field Services, Inc.*, 497 F.3d 1096, 1100 (10th Cir. 2007). Likewise, state law determines the preclusive effect of any state court judgment. *Id.* Under Utah law, claim preclusion applies to (1) cases involving the same parties or their privies, (2) with a claim that was, could, or should have been presented in the first proceeding, and (3) that proceeding resulted in a final judgment on the merits. *Daz Mgmt. v. Honnen Equip. Co.*, 2022 UT 15, ¶ 21, 508 P.3d 84.

Parties are in privity when "their legal interests and rights [are] substantially aligned when considered in relation to the subject matter of the litigation." *Daz Mgmt.* at ¶ 47. The parties to the receivership proceeding were America West Bank and the Commissioner. *See* Verified Petition at ¶¶ 1-2. The Commissioner is the same party in this proceeding, and UDFI is in privity with the Commissioner: their legal interests and rights are substantially aligned when considered in relation to this litigation. They are both accused of the same conduct, and the Commissioner was, at all relevant times, the chief executive officer of UDFI. Likewise, the Bank and AWBM are in privity. The Bank was wholly owned by AWBM. *See* Complaint at ¶ 16. And as discussed above, the claims asserted here by AWBM are all derivative claims of the Bank.

The claims asserted in this litigation are all claims that could have been asserted in the receivership proceeding and – indeed – were required to be asserted there. Any party sued in litigation is required to assert any "compulsory counterclaims" in answer to the suit. Fed. R. Civ. P. 13(a); Utah R. Civ. P. 13(a). A compulsory counterclaim is one that "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim; and . . . does not require adding another party over whom the court cannot acquire jurisdiction." Fed. R. Civ. P. 13(a); Utah R. Civ. P. 13(a). Failure to assert a compulsory counterclaim bars the claim in a subsequent proceeding. *See Raile Family Trust ex rel. Raile v. Promax Dev. Corp.*, 2001 UT 40, ¶¶ 9-16, 24 P.3d 980. The Utah Court of Appeals has already held that the opportunity to appear in receivership proceedings bars subsequent objections. *Brown v. Weis*, 871 P.2d 552, 567-68 (Utah Ct. App. 1994).

AWBM's claims arise out of the receivership proceeding and the examination process leading to that proceeding. *See, e.g.,* Complaint at ¶¶ 133 (Defendants violated law by "seizing" Bank), 134-136 (Commissioner made false statements or omissions in receivership proceeding), 178 (seizure was a "flagrant violation of substantive due process"), 192 (Commissioner deprived AWBM of property without a hearing), 234 (UDFI's petition deprived AWBM of property), 251 (UDFI seized property), 259 (incorporating same claim), 262 (asserting regulatory taking).

These are claims that by their very nature should have been raised in the receivership proceeding: "Whenever *any institution or other person* of which the commissioner has taken possession considers itself *aggrieved by the taking*, it may within 10 days after the taking apply to the court to enjoin further proceedings." Utah Code § 7-2-3(1) (emphasis added). According to its own Complaint, AWBM is "aggrieved by the taking." Likewise, under civil procedure rule

13(a), these are claims "aris[ing] out of the transaction or occurrence that is the subject matter of the [Commissioner]'s claim" in the receivership proceeding. Utah Fed. R. Civ. P. 13(a). Based on the 2009 ROE, the Commissioner contended that the Bank was insolvent or in danger of insolvency. *See* Leary Decl. at ¶¶ 15, 16 (Appx. 35); Babalis Decl. at ¶ 11 (Appx. 36); Allred Decl. at ¶ 3-5 (Appx. 37); Bay Decl. at ¶¶ 4-6 (Appx. 38); Allred Notes (Appx. 39). AWBM here contends that it was not, and AWBM would have no viable claim if the Bank was insolvent.

That these were compulsory counterclaims for the receivership proceeding bars all of AWBM's claims under Rule 13, but they are also barred by claim preclusion, because that proceeding resulted in a final judgment on the merits.[24] A judgment is "on the merits" when the ruling is "driven by the parties' actions or the claims and defenses asserted." *Daz Management* at ¶ 35. The state court's order was on the merits. The Commissioner petitioned for receivership on the Bank on insolvency and other grounds, and the state court granted the petition on the asserted grounds. *See* Order Approving Possession. Although an evidentiary hearing is not required for a ruling to be on the merits, it is a strong indication of a decision on the merits. *Cf. Daz Management* at ¶ 36.

It is of no consequence that neither the Bank nor AWBM appeared in the receivership proceeding. "[T]he appearance of all parties is not a prerequisite for a judgment to be a final judgment on the merits for the purposes of claim preclusion." *Peterson v. Armstrong,* 2014 UT App 247, ¶ 17, 337 P.3d 1058 (citing *State v. Sommerville,* 2013 UT App 40, ¶ 32, 297 P.3d

---

[24] *Daz Management* holds that the was-could-or-should-have-been-presented element of claim preclusion is broader than compulsory counterclaims. *See Daz Management* at ¶ 64. As AWBM's claims fall within the ambit of compulsory counterclaims, they are all the more within the ambit of claims that should have been presented under a claim preclusion analysis.

665). "[T]his element is met if the party against whom issue preclusion is sought had adequate notice and an opportunity to litigate the issue." *3D Constr. & Dev., LLC v. Old Standard Life Ins. Co.*, 2005 UT App 307, ¶ 19, 117 P.3d 1082. This Court has already held AWBM had that notice and opportunity as a matter of law. *See* Doc. 64 at 34 ("America West Bank is charged with knowledge of the contents of this statute. It did not seek a post-deprivation hearing.").

This Court has previously wrestled with the unusual posture of the receivership proceeding, wherein the state court issued an order authorizing the receivership, Utah statute allowed for further proceedings by any aggrieved party such as AWBM, but no such proceedings happened. The *Rooker-Feldman* issue considered in the Court's prior ruling on AWBM's partial motion for summary judgment involves essentially the same finality question. *See* Doc. 64 at 23-24. For purposes of that analysis, the Court held, "a state court proceeding is final 'if the state action has reached a point where neither party seeks further action.'" *Id.* at 23 (quoting *D.A. Osguthorpe Family P'ship v. ASC Utah, Inc.*, 705 F.3d 1223, 1232 n.12 (10th Cir. 2013)).

Although the Utah Supreme Court has not yet addressed the issue, the Utah Court of Appeals has held that the opportunity to appear in receivership proceedings bars subsequent objections. *See Brown*, 871 P.2d at 567-68. In other contexts deciding if an order is "final," the Utah Supreme Court applies "a pragmatic test": "Our general rule in determining whether an order is final is – whether the effect of the ruling is to finally resolve the issues." *America West Bank Members v. Utah*, 2014 UT 49, ¶11, 342 P.3d 224. Thus, for example, when a dismissal is without prejudice, an order is nevertheless "final" for purposes of appeal, even though a party may still proceed further in the trial court. *Id.* That is analogous to the situation in the receivership proceeding: although AWBM could have appeared and litigated there, Plaintiff's

failure to do so does not prevent that proceeding from now being "final," particularly when the time for AWBM has long since expired. Under the pragmatic approach encouraged by the Utah Supreme Court, the state court's receivership order finally resolved all issues that were ever presented in that proceeding.

Defendants submit that under these considerations, the receivership proceeding for purposes of claim preclusion has been "final" for over a decade. Because AWBM had the opportunity to litigate these claims in the receivership proceeding, it should not be permitted to do so here. *See Brown*, 871 P.2d at 567-68 (barring claims that could have been raised in receivership proceeding). Defendants respectfully request that the Court hold AWBM's claims are barred as Rule 13(a) compulsory counterclaims in that proceeding and that claim preclusion bars their assertion here.

## IV.    AWBM FAILED TO EXHAUST ITS ADMINISTRATIVE REMEDIES TO CHALLENGE THE ROEs.

"The doctrine of exhaustion of administrative remedies is well established in the jurisprudence of administrative law. . . . The doctrine provides that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *McKart v. United States*, 395 U.S. 185, 193 (1969). Under both Utah and federal law a party must first exhaust any administrative remedies before proceeding to court. *See Carroll v. Lawton Indep. Sch. Dist. No. 8*, 805 F.3d 1222, 1227 (10th Cir. 2015); *Ramsay v. Kane County Human Res. Special Serv. Dist.*, 2014 UT 5, ¶ 9, 322 P.3d 1163.

Under Utah law, administrative exhaustion is an issue of subject matter jurisdiction. Where jurisdiction has been delegated to an administrative agency, the court lacks subject matter

jurisdiction until that process has been pursued to completion. *Ramsay* at ¶ 9.[25] The Utah Administrative Procedures Act ("UAPA") requires that a party may not seek judicial review unless it has first exhausted its administrative remedies. Utah Code § 63G-4-401. A party is only excepted if a statute expressly states that exhaustion is not required or if a court determines either that administrative remedies would be inadequate or exhaustion would result in irreparable harm disproportionate to the public benefit in requiring exhaustion. *Id.*

Any "institution or other person affected, any act or order of a [UDFI] supervisor" may make a written request to the Commissioner for review of that act or order. Utah Code § 7-1-302. The request for review must be in writing. *Id.* And the subsequent proceeding is an informal proceeding under the Utah Administrative Procedures Act. *See* Utah Code § 63G-4-202 (agency authority to designate UAPA actions as formal or informal); Utah Admin. Code R331-20 (designating all UDFI proceedings as informal under the UAPA). The statute makes no exception to UAPA's exhaustion requirement (section 401).

The FDIC likewise has an administrative review process in place for challenging an ROE, mandated by 12 U.S.C. § 4806, which requires each federal banking agency to establish an independent intra-agency appellate process to review "material supervisory determinations." "Material supervisory determinations" include "examination ratings." 12 U.S.C. § 4806(f)(1)(A).

---

[25] *Salt Lake City Mission v. Salt Lake City*, 2008 UT 31, 184 P.3d 599, is not to the contrary. Although *Salt Lake City Mission* nominally states that federal constitutional claims are not subject to administrative exhaustion requirements, it proceeds to note that under federal law, such claims must be "ripe," and a claim is not ripe until administrative remedies are exhausted. *Id.* at ¶¶ 14-16.

The FDIC has implemented section 4806 by establishing a Supervision Appeals Review Committee ("SARC") and adopting Guidelines for Appeals of Material Supervisory Determinations ("SARC Guidelines").

Utah's authorizing statute is structured similarly to FIRREA regarding receivership proceedings. In both cases, the Commissioner (or director under FIRREA) is expressly authorized to make the decision whether receivership (conservatorship under FIRREA) is warranted and is given broad powers over financial institutions. He or she is expected "to be vigilant and responsive," because a financial institution's "assets consist principally of its depositors' funds; assets can be quickly dissipated; liabilities may be just as quickly created; and liquidity may suddenly disappear. If there is inadequate capital to absorb losses, the losses fall upon the FDIC, and if these funds are depleted, then upon taxpayers." *Franklin Sav. Ass'n v. Director, Office of Thrift Supervision*, 934 F.2d 1127, 1137 (10th Cir. 1991); *see also* Utah Code §§ 7-1-301 (detailing broad powers of Commissioner), -2-1 (vesting decision on receivership in Commissioner). Interpreting and applying FIRREA, the Tenth Circuit has held this regime dictates a limited scope for judicial review, limited to the administrative record:

> The close supervision, broad discretion, and quick response directed by FIRREA dictates a narrow and limited scope of review that gives deference to the director's judgment, knowledge, and expertise.

> In cases where Congress has provided for judicial review without setting forth the standards to be used or procedures to be followed in conducting that review, the Supreme Court has advised such review shall be confined to the administrative record and, in most instances, no de novo proceedings may be had.

*Franklin Sav. Ass'n*, 934 F.2d at 1137. Without an administrative proceeding, there is no administrative record.

Most of the allegedly-wrongful conduct complained of by AWBM was in the ROE process. *See, e.g.,* Complaint at ¶¶ 37 (CAMELS ratings), 40 (alleged changes in valuation), 42 (change in accounting procedures), 51 (assertion that "proper reports" would have reflected differently), 58 (complaining about "negative examination report"). It is undisputed, however, that the Bank and AWBM never sought administrative review of any of the ROEs, neither with UDFI nor with the FDIC. AWBM did not even believe such a process existed. *See* Durbano Dep. at 84:24-85:9.

AWBM cannot make out an exception to the exhaustion requirement under Utah law. That remedy would not be inadequate: the Commissioner, better than anyone else, is positioned to review the work of his subordinates, consider the substantive arguments of the petitioner, and direct whatever correction is needed to an ROE. Neither would requiring this administrative exhaustion have caused AWBM any irreparable harm. Under the facts of this case, AWBM delayed for *years* to seek judicial review. That is not the conduct of a party that believed it faced imminent irreparable harm.

Inasmuch as AWBM never exhausted its administrative remedies to challenge the ROEs and the time to do so has long since passed, Defendants are entitled to summary judgment on all claims to the extent they are based upon the ROEs and the attendant examination process.

## V.   AWBM's PROCEDURAL DUE PROCESS CLAIM FAILS BECAUSE AMERICA WEST BANK WAS RIGHTLY PLACED IN RECEIVERSHIP ON MULTIPLE, INDEPENDENT GROUNDS UNDER UTAH CODE § 7-2-1.

AWBM's first claim, for violation of the procedural due process provision of the Utah Constitution,[26] depends upon the assertion that Commissioner Leary lacked a statutory basis to

---

[26] AWBM nowhere identifies which constitution, nor which due process clause, it asserts in its first claim for relief, but that claim makes multiple references to the Utah Supreme Court's *America West* decision (a predecessor to this litigation), which addressed Utah constitutional claims. *See America West* at ¶ 35 (Nehring, J, dissenting).

petition for receivership of the Bank. *See* Complaint at ¶¶ 133. This claim fails because the Commissioner readily met the standard for placing the Bank in receivership on multiple, independent grounds.

Procedural due process claims are not a vehicle for changing the substance of government decision-making. As long as appropriate procedural protections were afforded, AWBM cannot cloak its disagreement with the merits of UDFI's and Judge Morris's decision-making in the due process clause. *See, e.g., Bishop v. Wood*, 426 U.S. 341, 349-50 (1976) ("The Due Process Clause is not a guarantee against incorrect or ill-advised . . . decisions."); *Torres–Rosado v. Rotger–Sabat*, 335 F.3d 1, 10 (1st Cir. 2003) ("We do not review the substance of decision-making under the rubric of procedural due process analysis.").

With one minor exception addressed later, AWBM has not challenged the constitutionality of the statutes under which the Bank was placed in receivership. Such actions are governed by Utah Code § 7-2-1. Pursuant to that statute, any institution under the jurisdiction of UDFI is subject to supervisory action by the UDFI Commissioner if the Commissioner observes any of the following conditions:[27]

- the institution is not in a safe and sound condition to transact its business;

- the institution or other person has violated its articles of incorporation or any law, rule, or regulation governing the institution or other person;

- the institution or other person is conducting its business in an unauthorized or unsafe manner, or is practicing deception upon its depositors, members, or the public, or is engaging in conduct injurious to its depositors, members, or the public;

---

[27] This is not an exhaustive list of the statutory elements but only those most relevant to the America West Bank receivership.

- the institution or other person has failed to maintain a minimum amount of capital as required by the department, any state, or the relevant federal regulatory agency;

- the institution . . . has or is about to become insolvent;

- the institution or other person or its officers or directors have failed or refused to comply with the terms of a legally authorized order issued by the commissioner or by any federal authority or authority of another state having jurisdiction over the institution or other person;

- any person who controls the institution or other person subject to the jurisdiction of the department has used the control to cause the institution or other person to be or about to be in an unsafe or unsound condition, to conduct its business in an unauthorized or unsafe manner, or to violate this title or any rule or regulation of the department issued under it.

Utah Code § 7-2-1(1). The Commissioner may take receivership of such an institution, with or without judicial action, if the Commissioner finds that a cease and desist order, removal of the institution's officers, or requiring the institution to take remedial action would not sufficiently protect the interests of depositors, creditors, and other interested persons. *Id.* at §§ 7-2-1(2)(3), -307, -308, -313. Action by the Commissioner may only be enjoined if it is arbitrary and capricious, an abuse of discretion, or contrary to law. Utah Code at §§ 7-2-1(5), -2(4).

To make out a procedural due process claim, AWBM must show that Defendants "flagrantly" violated AWBM's constitutional rights. *America West* at ¶ 38. "In essence, this means that a defendant must have violated 'clearly established' constitutional rights 'of which a reasonable person would have known.' . . . . [This] ensures that a government employee is allowed the ordinary human frailties of forgetfulness, distractibility, or misjudgment without rendering [him or her]self liable for a constitutional violation.'" *Spackman ex rel. Spackman v. Board of Educ.*, 2000 UT 87, ¶ 23, 16 P.3d 533. Such "ordinary human frailties" and "misjudgments" necessarily include following an existing statute. Where, as here, Defendants have followed state statutes, their conduct necessarily cannot constitute a flagrant constitutional violation.

39

Here, UDFI conducted an examination of the Bank. The examination was not the work of any single individual nor even a single agency. It was the joint production of UDFI and the FDIC, each with several bank examiners organized in multiple supervisory tiers. An individual examiner will review a loan file and make a determination about the classification of a loan. Sill Dep. 54:4-9, 60:10-18, 61:14-62:22, 90:1-10, 19-25; Gregson Dep. 28:1-16, 34:19-35:12, 41:20-42:19. If that decision downgrades the loan below how the bank classified it, that determination is reviewed with the Asset Manager (the next-higher tier in the examination team); if the Asset Manager agrees, it will also be reviewed with the bank's loan officer, and ultimately the bank's management team. Gregson Dep. at 56:7-57:14. When UDFI and the FDIC determined that the Bank's ALLL was too low, that was the culmination of multiple examiners looking at multiple loan files, discussing their conclusions with the Asset Manager, the Bank, and the Examiners in Charge.

Nor does the process stop there. The EICs will draft the initial ROE from that information, and it will then be reviewed and critiqued by the Supervisor of Banks (for UDFI) and the case manager (for the FDIC). Gregson Dep. at 19:1-6 and 47:21-48:15; Romero Dep. at 27:22-28:13; Bay Dep. at 20:13-18, 64:19-65:2.

Based on all of that, the examiners concluded that the Bank's ALLL was significantly underfunded. 2009 ROE at 3-4. That conclusion is supported by multiple other data points. For example, the Bank's existing ALLL was only 2.84% of its total loans, while its actual net losses for the prior year had been almost a full percentage point higher, 3.70%, indicating the Bank was significantly underfunding the ALLL. 2009 ROE at 3.

The Bank's own outside auditors – Simpson & Co. – performing an audit at the same time reached substantially the same conclusion. The auditors did not come up with the same ALLL calculation as the examiners, nor would one expect them to, as these are estimates that may be prepared in many different ways. *See* McRae Dep. at 41:9-42:12. Like the examiners, however, the outside auditors concluded that the Bank had no capital. *Id.* at 24:19-25:9.

Even the Bank's own financial calculations indicated that the Bank was critically undercapitalized, with only about $1 million capital left, and losing money at the rate of over $100,000 per day as of March 31, 2009. March 31, 2009, Monthly Financial Report at 1 (Appx. 32); Wilde Dep. at 204:9:12, 251:16-20. That is a perfect illustration of an institution that is, or is about to become, insolvent. Based on the Bank's own numbers, it would have no capital less than two weeks into April 2009, and we know from AWBM's own economics expert, the Great Recession was still deepening then. *See* Waters Report at 4, 7.

The precise calculations are not material. *See* McRae Dep. at 41:9-42:25. What matters is the overall picture of the health of the Bank. In this case, the examiners, the outside auditors, and the Bank's own CFO all concluded that the Bank was critically undercapitalized around the time of the receivership. If UDFI has reached the same substantive conclusion as the Bank and the outside auditor – two groups that, if they have any bias at all would favor the Bank – then UDFI's determination is *necessarily* not arbitrary, not capricious, not an abuse of discretion, not a violation of any law.[28]

---

[28] This conclusion is further supported by the facts that Sheehan, the Bank's head of Special Workout Team concluded UDFI's evaluation of the Bank's loans was correct, and at least two other banks with the opportunity to bid on those loans when offered by the FDIC – including one bank advised by a former America West Bank employee who worked on its troubled loans, avoided those loans. *See* Sheehan Dep. at 61:7-16; Zern Dep. at 50:9-51:23; Daines Dep. at

The Court has previously held that the only aspect of AWBM's procedural due process claim that can survive *Rooker-Feldman* is if AWBM can show that Commissioner Leary lied to the state court in the receivership proceeding. *See* Doc. 64 at 22, 24. AWBM has no evidence of any such false statements. The undisputed evidence is that Commissioner Leary testified about the findings from the February 2009 ROE that the Bank was insolvent, the Bank was not in a safe and sound condition, that management was critically deficient, and that the Bank needed $40 million to recapitalize. *See* Leary Decl. at ¶¶ 15, 16; Babalis Decl. at ¶ 11; Allred Decl. at ¶ 3-5; Bay Decl. at ¶¶ 4-6; Allred Notes. This is all information reported to Commissioner Leary in the 2009 ROE. Even if AWBM disputes those findings, it does not change the fact the Commissioner testified truthfully.

Furthermore, while this may be the most talked about aspect of the examiner's conclusions, it was by no means the only one, nor the only one on which the state court approved receivership. The Bank had also been ordered, in the C&D Orders, to reach and maintain a Tier 1 capital ratio of 10%. *See, e.g.,* UDFI C&D Order at 4. According to the Bank's own documents, the Bank never reached that level and was at only 0.41%, less than one-twentieth the required amount, as of March 31, 2009, approximately one month before the receivership. March 31, 2009, Monthly Financial Report at 1 (Appx. 32); Wilde Dep. at 204:9:12, 251:16-20. This was a failure to maintain a minimum amount of capital, a failure to comply with a legally authorized order, and an unsafe and unsound condition – each of which are grounds for receivership. Utah Code § 7-2-1(a), (f), (h), (k). AWBM's own banking expert acknowledges the Bank was in an unsafe and unsound condition. Stoley Dep. at 36:14-24.

---

109:2-110:24, 149:10-150:10. Inasmuch as the central dispute in the final ROE was the correct calculation of the Bank's ALLL, this information indicates the Bank overvalued its loans (and correspondingly underfunded its ALLL).

The Bank had violated further conditions of the C&D Orders. They had failed to develop and submit a three-year strategic plan; failed to eliminate or correct violations of law identified in the 2008 ROE; failed to develop an acceptable plan governing its relationship with AWBM and limiting payments to AWBM; and paid out dividends in violation of the orders. 2009 ROE at 19-20. None of these are arbitrary, capricious, unlawful, or abuse of discretion grounds.

The PCA *requires* receivership for an institution in this condition. 12 U.S.C. at § 1831o(h)(3). It cannot be a violation of AWBM's procedural due process rights under the Utah Constitution – it certainly cannot be a flagrant violation – for UDFI and Commissioner Leary to follow Utah and federal law to take into receivership an obviously failing bank.

AWBM must also show that existing remedies would not redress its injuries. *America West* at ¶ 38. Plaintiff necessarily fails this element, as well. As already argued, Utah law gave AWBM ten days to file a judicial challenge to a bank seizure. Utah Code § 7-2-3(1). AWBM, through Doug Durbano, consulted legal counsel for this very purpose. They decided not to proceed, not because the remedy would be ineffective, but because in the estimation of legal counsel, they could not file a pleading in compliance with Rule 11. *See* 30(b)(6) dep. (Durbano) at 167:4. The absence of a meritorious argument does not mean the existing remedy is inadequate. It means that AWBM was not wronged.

To whatever extent the Bank or AWBM disagreed with the conclusions of the 2009 ROE, they had an avenue to challenge them, as set forth above, and did not pursue it. The decision not to file a challenge waived any right to pursue a wrongful closure theory. AWBM cannot now do so years after the fact. *See Brown*, 871 P.2d at 567-68. Permitting this end-run around the statutorily created remedy would render the challenge closure provisions, including the ten-day period, meaningless, contrary to rules of statutory interpretation. *See In re Mallo*, 774 F.3d 1313,

1317 (10th Cir. 2014) ("We construe statutes 'so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.'"); *State v. Tooele County*, 44 P.3d 680, 685 (UT 2002) ("[W]e avoid interpretations that will render portions of a statute superfluous or inoperative.").

Finally, AWBM must also show that equitable relief, such as an injunction, was wholly inadequate to protect its rights or redress its injuries. *America West* at ¶ 38. Again, AWBM cannot surmount this hurdle. Had Plaintiff challenged the receivership under the statutory procedure and persuaded the court that the closure was "arbitrary, capricious, an abuse of discretion, or contrary to law," the court could have enjoined Defendants from proceeding further with the closure and directed Defendants to return possession of the Bank to AWBM. Utah Code § 7-2-3(1)(b), (c). That is not only the express statutory procedure, it's what bankers who allege they have been wronged do. *See, e.g., Fahey v. Mallonee*, 332 U.S. 245 (1947). The commissioner had appointed a conservator for the plaintiff's savings and loan, and the plaintiff successfully petitioned the lower court to oust the conservator. *Id.* at 248. In fact, it worked all too well, as the Supreme Court held that was the wrong result and reversed. *Id.* at 257-58.

For these reasons, Defendants are entitled to summary judgment on AWBM's first claim for relief.

## VI.   AWBM DOES NOT HAVE A VIABLE AS-APPLIED SUBSTANTIVE DUE PROCESS CLAIM.

AWBM's second claim purports to assert an as-applied challenge to the constitutionality of the *ex parte* receivership hearing: "If the authorizing statute is applied here to authorize Defendants to seize the Bank without a hearing . . . the statute as applied authorizes conduct so unreasonable as to constitute a flagrant violation of substantive due process." Complaint at ¶ 178.

The Court has already considered and rejected this issue on *Rooker-Feldman* grounds. The decision to hold the receivership hearing *ex parte* was made by the state court judge. *See* Doc. 64 at 21.[29] "To the extent the Bank [sic, AWBM] seeks this court to review and reject Judge Morris' decision not to allow it to participate at the hearing on the verified petition, this court is substantively barred under *Rooker-Feldman* from doing so." *Id.*

Even if this were not the case, however, AWBM's substantive due process claim is not viable. The Utah Supreme Court holds federal case law on the federal constitution's substantive due process protections "'are highly persuasive as to the application of that clause of our state Constitution.'" *Disability Law Ctr. v. Utah*, 180 F.Supp.3d 998, 1013 (D. Utah 2016) (quoting *Terra Utils., Inc. v. Pub. Serv. Comm'n*, 575 P.2d 1029, 1033 (Utah 1978)). Under that law, "a state may not engage in conduct that 'shocks the conscience' or otherwise 'interferes with rights implicit in the concept of ordered liberty.'" *Id.* (quoting *United States v. Salerno*, 481 U.S. 739, 746 (1987)).

*Ex parte* hearings for bank receivership proceedings are so common and widely used that the United States Supreme Court cites them as the paradigmatic example of when an *ex parte* proceeding may be authorized:

> It is complained that these regulations provide for hearing after the conservator takes possession instead of before. This is a drastic procedure. But the delicate nature of the institution and the impossibility of preserving credit during an investigation has made it an almost invariable custom to apply supervisory authority in this summary manner. It is a heavy responsibility to be exercised with disinterestedness and restraint, but in the light of the history and customs of banking we cannot say it is unconstitutional

---

[29] For purposes of this argument, Defendants incorporate by reference the evidence and argument submitted in connection with AWBM's previous motion for partial summary judgment. These are summarized in the Court's decision at Docket 64.

*Fahey,* 332 U.S. at 253. A practice that is so widespread and which "in the light of history and customs of banking" is not unconstitutional, necessarily cannot "shock the conscience" nor "interfere[] with rights implicit in the concept of ordered liberty."

Nor can AWBM make it conscience-shocking by contending that the underlying grounds for receivership were insufficient or inappropriate. As already noted above, those grounds were substantive and validated, including by the Bank's own outside auditors and the Bank's own financials. It is not conscience-shocking to close a bank with the myriad capital and ALLL deficiencies, C&D violations, and legal shortcomings the Bank had, none of which were in dispute when UDFI went before Judge Morris, since neither the Bank nor AWBM had challenged any of the ROE conclusions on these points. Put another way, Defendants reasonably relied on the conclusions in the undisputed ROE when they petitioned for receivership. AWBM's arguments many years later that the examiners erred in reaching those conclusions are irrelevant to their challenges to the receivership. If the petition was not supported by the ROE conclusions, that might be different, but there is no reason to believe that was the case.

Even if that were not the case, however, pursuing a receivership for a bad or unfounded reason does not make the *process* of the receivership – and *ex parte* hearing – improper. The proceeding would be wrongful because of the bad or unfounded reason underlying it, not because an *ex parte* hearing was held like a typical bank receivership.

In sum, AWBM cannot make out a substantive due process claim, neither under the Utah nor the federal constitutions, so the Court should grant summary judgment on this claim.

## VII.   COMMISSIONER LEARY IS ENTITLED TO QUALIFIED IMMUNITY ON THE SECTION 1983 CLAIM.

AWBM's third claim for relief is a § 1983 claim against Commissioner Leary. *See* Complaint at ¶¶ 187. "There can be no 'violation' of § 1983 separate and apart from the underlying constitutional violations. . . . In the Second Amended Complaint, Plaintiff appears to tie its Section 1983 claim to the alleged violations of procedural and substantive due process." Doc. 64 at 35 (quoting *Brown v. Buhman*, 822 F.3d 1151, 1162 n. 9. (10th Cir. 2016)).

Once a defendant asserts qualified immunity, the burden shifts to plaintiff to show that "defendant's actions violated a federal constitutional or statutory right," and that the asserted right "was clearly established at the time of the [alleged] unlawful conduct." *Medina v. Cram*, 252 F.3d 1124, 1128–30 (10th Cir. 2001). *See also Saucier v. Katz*, 533 U.S. 194 (2001); *Mick v. Brewer*, 76 F.3d 1127, 1134 (10th Cir. 1996). If Plaintiff meets this "heavy two-pronged burden," the burden shifts back to Commissioner Leary to show that his actions were objectively reasonable under the circumstances, or that he was reasonably mistaken as to the legality of the actions. *Medina*, 252 F.3d at 1128-30.

The question whether Commissioner Leary's conduct violated a federal constitutional or statutory right is addressed in the discussion of other claims above and below, and Defendants incorporate that argument here. To summarize, there is no evidence that Commissioner Leary lied to Judge Morris in the receivership proceeding, and the evidence does show that the Bank was insolvent or in danger of insolvency as well as in violation of C&D orders, so there was no constitutional violation in seeking a receivership of the Bank.

To show that a right is clearly established, "there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Cortez v. McCauley*, 478 F.3d 1108, 1114–15 (10th Cir. 2007) (en banc) (quoting *Medina v. City of Denver*, 960 F.2d 1493, 1498 (10th

Cir.1992)). General propositions of law are insufficient in determining whether a government actor violated a "clearly established" right. *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011); *Gomes v. Wood*, 451 F.3d 1122, 1128 (10th Cir. 2006).

When the Court previously considered this issue, it was in the context of a motion to dismiss, where AWBM could rely upon the allegations of its Complaint. *See* Doc. 29 at 29. Discovery did not bear out those allegations. AWBM has produced no evidence of any political motive in the closure of the Bank. Meanwhile, there has been abundant evidence of necessity and reasonable justification for the receivership. Not only did the examiners find the Bank was insolvent, so did the Bank's outside auditors. The Bank's own financials admit the Bank was critically undercapitalized. PCA requires such banks be placed in receivership.[30]

AWBM cannot produce any Supreme Court or Tenth Circuit decisions in which a bank regulator, confronted with a bank with minimal or non-existent capital and still hemorrhaging money, violated any constitutional right by the act of placing such a bank in receivership, as required by federal law.

For these reasons, Commissioner Leary is entitled to qualified immunity on AWBM's § 1983 claim.

## VIII.   AWBM'S REGULATORY TAKINGS CLAIMS ARE PRECLUDED BY THE HIGHLY-REGULATED BANKING SYSTEM.

AWBM's fifth and seventh claims are for regulatory takings under the state and federal constitutions, respectively. *See* Complaint at ¶¶ 241-55, 261-63. As Utah courts expressly reference federal takings law in applying the Utah constitution's takings clause, the analysis for both claims is identical. *See, e.g., View Condominium Owners Ass'n v. MSICO, LLC,* 2005 UT

---

[30] These same facts demonstrate that Commissioner Leary's action was objectively reasonable under the circumstances. *See  Medina*, 252 F.3d at 1128-30

91, ¶ 31, 127 P.3d 697 (referencing *Philip Morris, Inc. v. Reilly*, 312 F.3d 24, 33 (1st Cir.2002), while addressing issue of Utah constitution takings analysis).

A regulatory taking occurs only when the government "interferes with reasonable investment-backed expectations." *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001). A claimant's interest in a heavily regulated industry, however, does not confer a "reasonable investment-backed expectation" entitling the holder to compensation. *See, e.g.*, *Concrete Pipe & Prods. v. Construction Laborers Pension Trust*, 508 U.S. 602, 645-46 (1993).

The banking industry is unquestionably heavily regulated. *See Fahey v. Mallonee*, 332 U.S. 245, 250 (1947) ("Banking is one of the longest regulated and most closely supervised of public callings.").[31] Courts have accordingly declined to hold that an interest in a bank is protected by the Takings Clause. In *Golden Pacific Bancorp v. United States*, 15 F.3d 1066 (Fed. Cir. 1994), in which a holding company sought compensation for the closure of a bank, the court held that the banking agency "could not possibly have interfered with a reasonable investment-backed expectation on the part of Golden Pacific" because Golden Pacific knew that the agency would close the bank if it became insolvent. *Id.* at 1074; *see also Branch v. United States*, 69 F.3d 1571, 1580, 1581 (Fed. Cir. 1995) (seizure of bank assets did not result in taking, as it was a "'necessary consequence of the statute's regulatory scheme'" and "reasonable investment-backed expectations are greatly reduced in a highly regulated field").

---

[31] *See also Fidelity Fed. Sav. and Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 145 (1982) (an insured depository institution is regulated "from its cradle to its corporate grave"); *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 329 (1963) (considering wide array of supervisory tools available to bank regulators, the "frequent and intensive" nature of the examination process, and finding that "the agencies maintain virtually a day-to-day surveillance of the American banking system."); K. Davis , Administrative Law Treatise, ¶ 4.04 at 247 (1965) ("The regulation of banking may be more intensive than the regulation of any other industry").

Likewise, AWBM had no reasonable investment-backed expectation in the continued operation of the Bank, or in any benefits to be derived from such continued operation. AWBM voluntarily invested in a highly-regulated industry, and knew that the Bank was subject to regular examinations, continuous supervision and closure by regulators and the appointment of a receiver based on any one of multiple statutory factors. UDFI concluded that closure was warranted under those factors, and AWBM had no reasonable expectation that it would be permitted to continue the operation of the Bank following such a determination by the regulators. Thus, AWBM has no claim under the federal or Utah takings clauses. [32]

The Court should enter summary judgment in favor of Defendants on these claims.

## IX. AWBM'S PHYSICAL TAKINGS CLAIMS ARE PRECLUDED BY THE HIGHLY-REGULATED BANKING SYSTEM.

Finally, AWBM's fourth and sixth claims are for physical takings under the state and federal constitutions, respectively. *See* Complaint at ¶¶ 208-09, 258-59. As noted in the preceding section, the legal analysis is identical under the Utah and federal constitution. These claims must likewise be rejected because the alleged physical takings are plainly regulatory, not

---

[32] Arguing that Defendants erred in finding the Bank insolvent does not save AWBM's position. *See* Complaint at ¶ 230 ("UDFI did not act in compliance with the statute in seeking and obtaining the Petition."). AWBM had an avenue for challenging the closure on its merits and elected not to pursue that remedy. The takings clause is a vehicle for challenging the *authorized* takings of property. *See, e.g.*, *First English Evangelical Lutheran Church v. Los Angeles County*, 482 U.S. 304, 315 (1987) (Takings Clause "is designed . . . to secure compensation in the event of *otherwise proper* interference amounting to a taking") (emphasis added). Arguments that the closure was not in fact authorized could have been made in the receivership proceeding, but were not. Those arguments are not available under the takings clause. *See Golden Pacific*, 15 F.3d at 1075 (rejecting "Golden Pacific's final argument—that the Comptroller closed a solvent Bank and therefore . . . 'made a mistake' when he closed the Bank . . . . [A] mistake may give rise to a due process claim, but not a taking claim."); *California Housing Securities*, 959 F.2d at 958 (if bank disagreed with closure decision, it "could have reasonably expected to be able to contest the appointment of the conservator and the receiver in a U.S. district court").

physical. AWBM asserts two categories of supposed physical takings. The first is "AWBM's property interest in the Bank and the assets developed in its operation, including capital, accounts, investments of various types (including loans), going concern, and the goodwill arising therefrom." Complaint at ¶ 220. The second is the bank charter. *Id.* at ¶ 221; *see also id.* at ¶ 259 (purporting to duplicate the state physical taking allegations).

The charter belonged to the Bank, not to AWBM. *See* Appx. 16. In any case, this is a regulatory taking, not a physical taking. The gravamen of the claim is not that Defendants physically took back a piece of paper but that they negated the right to operate a Utah bank that the charter represents. In this respect, the charter is analogous to a contractual right, which is a regulatory taking. *See, e.g.*, *Taylor v. United States*, 959 F.3d 1081, 1087-90 (Fed. Cir. 2020) (distinguishing between regulatory taking of contract rights and physical taking of land enjoyment); *B & G Enterprises, Ltd. v. United States*, 220 F.3d 1318, 1323 (Fed. Cir. 2000) ("[W]e understand B & G to argue that it has suffered a regulatory rather than a physical taking, since it does not allege that the federal government physically occupied or destroyed its property, but rather that its vending machine contracts were property rights that were 'taken' by federal legislative action.").

Likewise, the Bank, including its assets, goodwill, etc., is essentially a regulatory taking, not a physical one. Again, the gravamen of the claim is not that Defendants took possession of a physical building or tangible documents but of the intangibles. This issue was squarely presented in *California Housing Securities, Inc. v. United States*, 959 F.2d 955 (Fed. Cir. 1992), where a holding company brought a takings claim following closure of a bank and expressly tried to predicate the claim as a physical taking. *Id.* at 957 ("The sole contention of CHS on appeal is that

the actions of OTS, in appointing the RTC as conservator and receiver of Saratoga, and the RTC's subsequent actions as conservator and receiver of Saratoga resulted in a permanent occupation and *physical* taking . . . .") (emphasis added). The Federal Circuit rejected this contention for the same reasons a regulatory taking claim would fail:

> The RTC's occupation and seizure of Saratoga, and its subsequent liquidation of Saratoga's assets, cannot constitute a physical fifth amendment taking because neither Saratoga nor CHS could have developed a historically rooted expectation of compensation for such a seizure. Saratoga did not possess the most valued property right in the bundle of property rights, the right to exclusive possession, or stated conversely the right to exclude others, at the time of the alleged taking in this case.

*Id.* at 958. The insured institution "voluntarily subjected itself to an expansive statutory regulatory system when it obtained federal deposit insurance" and knew that a receiver would be appointed if the bank's assets were dissipated, the holding company had no reasonable expectation of compensation in that event. *Id.*

In sum, where the "property" is the bank itself, as a going concern, it does not matter if a plaintiff tries to posture its takings claim as regulatory or physical. The courts do not recognize a takings claim in this highly-regulated environment. Consequently, the Court should grant summary judgment to Defendants on AWBM's physical takings claims, as well.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that the Court grant this Motion in its entirety and enter summary judgment in favor of Defendants and against AWBM on all remaining claims for relief.

DATED: June 8, 2022

**OFFICE OF THE UTAH ATTORNEY GENERAL**

*/s/ Stephen W. Geary*
STEPHEN W. GEARY
CHRISTINE HASHIMOTO
Assistant Utah Attorneys General
*Attorneys for the Utah Dept. of Financial*
*Institutions and G. Edward Leary*