STEPHEN W. GEARY (9635)
Assistant Utah Solicitor General
CHRISTINE HASHIMOTO (15624)
Assistant Utah Attorney General
SEAN D. REYES (7969)
Utah Attorney General
160 East 300 South, Sixth Floor
P.O. Box 140856
Salt Lake City, Utah 84114-0856
Telephone: (801) 366-0100
Facsimile: (801) 366-0101
E-mail: swgeary@agutah.gov
        chashimoto@agutah.gov
*Attorneys for the Utah Dept. of Financial Institutions and G. Edward Leary*

## IN THE UNITED STATES DISTRICT COURT

## IN AND FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| AMERICA WEST BANK MEMBERS,<br><br>       Plaintiff,<br><br>v.<br><br>THE STATE OF UTAH, DEPT. OF FINANCIAL INS., G. EDWARD LEARY,<br><br>       Defendants. | **REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Case No: 2:16-cv-00326-CW-DAO<br><br>Judge Clark Waddoups<br><br>Magistrate Judge Daphne A. Oberg |

Pursuant to Federal Rule of Civil Procedure 56 and DUCivR 7-1 and 56-1, the State of

Utah, the Utah Department of Financial Institutions ("UDFI"), and G. Edward Leary

(collectively "Defendants"), by and through counsel Stephen W. Geary, Assistant Utah Solicitor

General, and Christine Hashimoto, Assistant Utah Attorney General, hereby submit their reply in

support of Defendants' Motion for Summary Judgment (Doc. 280).

## TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 7

MATERIAL FACTS ................................................................................................... 8

ARGUMENT ............................................................................................................. 24

   I.   AWBM LACKS STANDING. ........................................................................ 24

   II.  CLAIM PRECLUSION BARS AWBM'S CLAIMS. ..................................... 27

   III.    AWBM FAILED TO EXHAUST ITS ADMINISTRATIVE REMEDIES TO

   CHALLENGE THE ROEs................................................................................. 30

   IV.   COMMISSIONER LEARY IS ENTITLED TO QUALIFIED IMMUNITY. .............. 36

      A.   AWBM Fails to Show Commissioner Leary Violated a Federal Constitutional or

      Statutory Right.................................................................................................. 37

      B.   AWBM Fails to Show Any Alleged Right Was Clearly Established........................ 40

      C.   Commissioner Leary's Actions Were Objectively Reasonable Under the

      Circumstances.................................................................................................... 43

   V.  AWBM's PROCEDURAL DUE PROCESS CLAIM FAILS........................................ 43

   VI.   AWBM's SUBSTANTIVE DUE PROCESS CLAIM FAILS. ..................................... 45

   VII.   AWBM'S TAKINGS CLAIMS FAIL. ............................................................. 46

CONCLUSION................................................................................................................ 48

## TABLE OF AUTHORITIES

Page(s)

Cases

*America West Bank Members, L.C. v. State,*
2014 UT 49 ........................................................................................... 32, 46

*American Capital Corp. v. FDIC,*
472 F.3d 859 (Fed. Cir. 1996) ....................................................................... 26

*Anderson v. Creighton,*
483 U.S. 635 (1987) ................................................................................ 43, 46

*Ashcroft v. al-Kidd,*
563 U.S. 731 (2011) ....................................................................................... 43

*Barnes v. Harris,*
783 F.3d 1185 (10th Cir. 2015) ................................................ 25, 26, 27, 28

*Beach v. City of Olathe,*
203 F.R.D. 489 (D. Kan. 2001) ..................................................................... 10

*Bones v. Honeywell Int'l, Inc.,*
366 F.3d 869 (10th Cir.2004) ........................................................................ 37

*Bott v. DeLand,*
922 P.2d 732 (Utah 1996) .............................................................................. 43

*Branch v. United States,*
69 F.3d 1571 (Fed. Cir. 1995) ....................................................................... 50

*Branzan Alternative Inv. Fund, LLP v. Bank of New York Mellon Trust Co., NA,*
677 Fed. Appx. 496 (10th Cir. 2017) ............................................................ 27

*Browder v. City of Albuquerque,*
787 F.3d 1076 (10th Cir. 2015) .................................................................... 43

*Brown v. Perez,*
835 F.3d 1223 (10th Cir. 2016) .................................................................... 40

*Brown v. Weis,*
871 P.2d 552 (Utah Ct. App. 1994) ........................................ 31, 32, 44, 45

*California Housing Securities, Inc. v. United States,*
959 F.2d 955 (Fed. Cir. 1992) ....................................................................... 49

*Castle v. United States,*
301 F.3d 1328 (Fed. Cir. 2002) ..................................................................... 50

*Centennial Assocs. Ltd. P'ship v. FDIC,*
927 F. Supp. 806 (D.N.J. 1996) .................................................................... 29

*Clark v. Edmunds,*
513 F.3d 1219 (10th Cir. 2008) .................................................................... 43

*Cortez v. McCauley,*
478 F.3d 1108 (10th Cir. 2007) .................................................................... 43

*Cypert v. Independent School Dist. No. I-050,*
661 F.3d 477 (10th Cir. 2011) ................................................................ 37, 41

*Dansie v. City of Herriman,*
2006 UT 23, 134 P.3d 1139 .......................................................................... 27

*Dernis v. FDIC*,
  2013 WL 12109431,& n.1 (W.D. Mich. July 3, 2013) ........................ 29
*Disability Law Ctr. v. Utah*,
  180 F.Supp.3d 998 (D. Utah 2016) .............................................. 48
*Dobbins v. Dobbins*,
  2015 WL 3952737 (W.D. Okla. June 29, 2015) ............................. 29
*ECCO Plains, LLC v. United States*,
  728 F.3d 1190 (10th Cir. 2013) .................................................. 27
*Elmco Properties, Inc. v. Second Nat'l Fed. Sav. Ass'n*,
  94 F.3d 914 (4th Cir. 1996) ....................................................... 29
*Fahey v. Mallonee*,
  332 U.S. 245 (1947) ................................................................. 44
*Farmers & Merchants Nat. Bank v. Bryan*,
  902 F.2d 1520 (10th Cir. 1990) .................................................. 13
*First Fed. Sav. Bank and Trust v. Ryan*,
  927 F.2d 1345 (6th Cir. 1991) ................................................... 29
*Franklin Sav. Ass'n v. Office of Thrift Supervision*,
  35 F.3d 1466 (10th Cir. 1994) .................................................. 29
*Free the Nipple v. City of Fort Collins*,
  916 F.2d 792 (10th Cir. 2019) .................................................. 38
*Freeman v. FDIC*,
  56 F.3d 1394 (D.C. Cir. 1995) .................................................. 29
*Fuentes v. Shevin*,
  407 U.S. 67 (1972) ................................................................. 44
*Golden Pacific Bancorp v. United States*,
  15 F.3d 1066 (Fed. Cir. 1994) .................................................. 49
*Gomes v. Wood*,
  451 F.3d 1122 (10th Cir. 2006) ................................................ 43
*Hall v. Bellmon*,
  935 F.2d 1106 (10th Cir. 1991) ................................................ 10
*Harlow v. Fitzgerald*,
  457 U.S. 800 (1982) ............................................................... 46
*Hindes v. FDIC*,
  137 F.3d 148 (3d Cir. 1998) .................................................... 31
*Home Savings v. United States*,
  51 Fed. Cl. 487 (2002) ........................................................... 50
*Hope v. Pelzer*,
  536 U.S. 730 (2002) ............................................................... 43
*James Madison Ltd. v. Ludwig*,
  82 F.3d 1085 (D.C. Cir. 1996) ............................................ 22, 29
*Jensen ex rel. Jensen v. Cunningham*,
  2011 UT 17, 250 P.3d 465 ................................................. 43, 44
*Kagan v. Edison Bros. Stores Inc.*,
  907 F.2d 690 (7th Cir. 1992) ................................................... 28
*Kansas ex rel. Kansas Dep't for Children and Families v. SourceAmerica*,
  874 F.3d 1226 (10th Cir. 2017) ................................................ 38

*Kokins v. Teleflex, Inc.*,
   621 F.3d 1290 (10th Cir. 2010) ................................................................. 45
*Luciano v. E. Cent. Bd. of Co-op. Educ. Servs.*,
   885 F. Supp. 2d 1063 (D. Colo. 2012) ...................................................... 24
*Medina v. Cram*,
   252 F.3d 1124 (10th Cir. 2001) .......................................................... 38, 45
*Mick v. Brewer*,
   76 F.3d 1127 (10th Cir. 1996) ................................................................. 39
*Mid-State Fertilizer Co. v. Exchange Nat'l Bank*,
   877 F.2d 1333 ........................................................................................... 28
*Myers v. Koopman*,
   738 F.3d 1190 (10th Cir. 2013) ............................................................... 31
*Nat'l Trust v. FDIC*,
   995 F.2d 238 (D.C. Cir. 1993) ................................................................. 29
*Nelson v. Safeco Ins. Co.*,
   396 F. Supp. 2d 1274 (D. Utah 2005) ...................................................... 24
*Patterson v. Am. Fork City*,
   2003 UT 7, 67 P.3d 466 ............................................................................ 33
*Peak Alarm Co., Inc. v. Salt Lake City Corp.*,
   2010 UT 22, 243 P.3d 1221 ..................................................................... 47
*Pinder v. Mitchell*,
   658 F. App'x 451 (10th Cir. 2016) ........................................................... 31
*Pioneer Centres Holding Co. Emp. Stock Ownership Plan & Tr. v. Alerus Fin., N.A.*,
   858 F.3d 1324 (10th Cir. 2017) ............................................................... 24
*Placida Prof'l Ctr., LLC v. FDIC*,
   512 F. App'x 938 (11th Cir. 2013) ........................................................... 29
*Prairie Band of Potawatomi Indians v. Pierce*,
   253 F.3d 1234 (10th Cir. 2001) ............................................................... 38
*Randolph-Sheppard Vendors of Am. v. Weinberger*,
   795 F.2d 90 (D.C. Cir. 1986) ................................................................... 38
*Rawers v. United States*,
   488 F.Supp.3d 1059 (D.N.M. 2020) ........................................................ 15
*RoDa Drilling Co. v. Siegal*,
   552 F.3d 1203 (10th Cir. 2009) ............................................................... 38
*Rodriguez v. City of Carlsbad*,
   2002 WL 35649875 (D.N.M. June 13, 2002) .......................................... 31
*Saucier v. Katz*,
   533 U.S. 194 (2001) ................................................................................. 39
*Shroff v. Spellman*,
   604 F.3d 1179 (10th Cir. 2010) ............................................................... 43
*Spackman ex rel. Spackman v. Board of Educ.*,
   2000 UT 87, 16 P.3d 533 .......................................................................... 46
*Stanley v. McMillian*,
   594 F. App'x 478 (10th Cir. 2014) ........................................................... 31
*Strawberry Elec. Serv. Dist. v. Spanish Fork City*,
   918 P.2d 870 (Utah 1996) ........................................................................ 50

*Summerhaze Co., L.C. v. FDIC,*
   2014 UT 28, 332 P.3d 908........................................................................... 10, 33
*Tabb Lakes Ltd. v. United States,*
   10 F.3d 796 (Fed.Cir.1993) ............................................................................... 49
*Utah Stream Access Coalition v. VR Acquisitions, LLC,*
   2019 UT ¶ 47, 439 P.3d 593 ............................................................................ 33
*Walker v. State,*
   624 P.2d 687 (Utah 1981)................................................................................. 43

Statutes

12 U.S.C. § 1821 ..................................................................................... Passim
12 U.S.C. § 1831 ......................................................................... 11, 14, 46
12 U.S.C. § 4806(f)(1)(A)........................................................................ 32
Utah Code § 7-1-302..................................................................... 32, 34, 35
Utah Code § 7-2-2.................................................................................... 30
Utah Code § 7-2-1........................................................................ 41, 46, 48
Utah Code § 7-2-3(1)(c)........................................................................... 30
Utah Code § 10-2-424.............................................................................. 50
Utah Code § 48-3a-802(2)........................................................................ 27
Utah Code § 48-3a-806............................................................................ 28
Utah Code § 63G-4-301 ........................................................................... 34
Utah Code § 63G-4-401(3)(a)................................................................... 35
Utah Code § 78A-5-102(1) ....................................................................... 30

Rules

Fed. R. Civ. P. 23 .................................................................................... 26
Fed. R. Civ. P. 56 ................................................................................. 1, 40
Fed. R. Evid. 602 ............................................................................... 12, 14
Fed. R. Evid. 701 ............................................................................... 12, 14
Fed. R. Evid. 702 ............................................................................... 12, 14
Fed. R. Evid. 704 ............................................................................... 12, 14
Fed. R. Evid. 801 ............................................................................... 15, 18
Fed. R. Evid. 803 ............................................................... 10, 12, 13, 14
Fed. R. Evid. 1006 ................................................................................... 13
Fed. R. Evid. 901 .................................................................................... 22
Fed. R. Evid. 902(14)............................................................................... 22
Fed. R. Evid. 1002 .................................................................................. 22

Other Authorities

DUCivR 7-1 and 56-1 ............................................................................... 1
DUCivR 56-1(c)(5).................................................................................. 39

## **INTRODUCTION**

AWBM's prolix Opposition – more than twice the length of the Motion – is "a tale . . . full of sound and fury, signifying nothing."[1] The evidentiary support offered for the grand conspiracy claims of the Second Amended Complaint is trivial and contrived. Viewed in the light most favorable to Plaintiff, it amounts to no more than this: (1) the parties disagreed over the valuation of America West Bank's ("Bank") loan portfolio – particularly, the Allowance for Loan and Lease Losses ("ALLL"); and (2) in the wake of the 2008 ROE that downgraded the Bank, Commissioner Leary opined that the Bank President "deserves the treatment."

AWBM cannot refute the Bank's own financial records, showing the Bank was critically undercapitalized, a status requiring receivership under the federal Prompt Corrective Action statute. AWBM cannot refute the testimony of its own external auditor – whom AWBM identifies as an expert on this very topic – that working independently of the state and federal bank examiners, he likewise concluded the Bank was insolvent. AWBM cannot refute the multiple other, independent grounds for receivership presented in the state court proceeding. AWBM presents no evidence that Commissioner Leary misled the state court.

This was not a close case. According to their own expert, Plaintiff's Bank pursued a high-risk strategy that was crippled by the Great Recession. The deterioration in the Bank's loan portfolio was a result of that downturn, not the consequence of regulatory actions. Considering this Bank's extreme concentration in high-risk construction and land development loans, it would have been miraculous had the Bank not experienced severe financial difficulty in the recession. The Bank's failure was not the result of any regulatory overreach but the natural consequence of their own business strategy, a bitter truth that AWBM and the Bank's principals are still unable to swallow.

---

[1] Wm. Shakespeare, *Macbeth*, act 5, sc.5 ls. 25-27.

## MATERIAL FACTS

As an initial matter, AWBM's Appendix skips numbers 20, 26, 28, 29, 68, 77, and 99, and exhibits 19, 23, 24, 25, 30, 36, and 43, while included in the Appendix, are nowhere referenced or relied upon in the Opposition. For this reason, Defendants will not address them in this Reply, and Defendants object to their use in any decision upon the Motion.

The following facts are either expressly not disputed by AWBM or the "disputes" asserted by AWBM are not material: Fact nos. 1-4, 6-7, 16-17, 30, 35, 48-49, 63-65, 67-68. For example, AWBM "dispute[s] in part" Fact no. 4 on the ground that the Bank was formed in 2000, while AWBM was organized in 2005. While AWBM submits no evidence in support of its assertions, even if true, that evidence would not change any issue in the summary judgment motion, and AWBM nowhere argues that it would. In fact, AWBM frequently submits no evidence in support of these contentions, so its Opposition is deficient on this ground. *See, e.g.,* Doc. 326 at 4-5 (no evidentiary citations in response to Fact nos. 6-7). Similarly, while AWBM seeks to argue the reasons for its high concentration of construction and development loans, Plaintiff presents no evidence to rebut that concentration, nor how that concentration far exceeded the Bank's peers. *See* Doc. 326 at 22 (response to Fact nos. 16-17). Gary Stoley, Plaintiff's own banking expert, readily acknowledged the Bank followed a "high-risk operating plan" with "very high concentration of acquisition and development and construction loans," and its concentrations *considerably* exceeded the regulatory guidance on such lending. *See* Doc. 280-46 at 13 (lines 39:15-40:24). "[O]nly *material* factual disputes preclude summary judgment; factual disputes about immaterial items are irrelevant." *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991).

**Admissibility of the Material Loss Review ("MLR"):** Where relied upon, AWBM objects to the Material Loss Review. *See, e.g.,* Doc. 326 at 4-22 (Fact nos. 5-6, 8-17). As noted in the Motion, the MLR is admissible under Rule 803(8) as a public record containing factual findings from a legally authorized investigation. *See* Doc. 280 at 19; Fed. R. Evid. 803(8). AWBM, itself, relies upon the MLR in the complaint. *See* Doc. 33 at 5. As have other courts in litigation concerning the insolvency of the Bank. *See Summerhaze Co., L.C. v. FDIC*, 2014 UT 28, ¶ 5 n.4, 332 P.3d 908 (noting the $119 million loss found by the MLR). AWBM attacks the trustworthiness of the MLR (*see* Fed. R. Evid. 803(C)(8)(B)), but that attack is unavailing.

First, AWBM argues that the MLR is untrustworthy because it is prepared by the FDIC Inspector General, and the FDIC was allegedly complicit in the plan to take down the Bank. *See* Doc. 326 at 5. AWBM presents no evidence of any such conspiracy, much less any involvement by the Inspector General in any such conspiracy.[2] The OIG is "an independent organizational unit established under the Inspector General Act of 1978, as amended, that conducts audits, evaluations, investigations, and other reviews of FDIC programs and operations. The OIG's mission is to promote the economy, efficiency, and effectiveness of FDIC programs and operations, and to prevent, deter, and detect waste, fraud, abuse, and misconduct in FDIC programs and operations."[3] The very purpose of the OIG is, among other things, to investigate whether any misconduct by the FDIC has occurred. Its independent under federal law rebuts AWBM's unsubstantiated insinuation that the OIG is part of the grand conspiracy.

---

[2] AWBM seems oblivious to the role of an Inspector General, as exhibited by its uninformed analogy of a police department investigating the misconduct of its own officers. *See* Doc. 326 at 5-6. This is exactly the role of an internal affairs investigation. *See, e.g., Beach v. City of Olathe*, 203 F.R.D. 489, 493 (D. Kan. 2001) (discussing police department internal affairs investigation of officers). The Office of the Inspector General ("OIG") is tantamount to an internal affairs department, tasked with investigating its subject agency.

[3] https://www.fdic.gov/about/strategic-plans/strategic/inspectorgeneral.html (last visited August 30, 2022).

Second, Plaintiff challenges the timeliness of the Material Loss Review investigation on the ground that it was six months after the May 1, 2009, appointment of the FDIC as receiver. Doc. 326 at 7. But AWBM misapprehends the relevant time period. At the relevant time, a Material Loss Review was not mandated unless losses on a bank exceeded $25 million. *See* Doc. 280 at 19. It is not the date of receivership that starts the clock but when the FDIC has concluded the liquidation and can tally the loss. In that regard, six months from the date of receivership to allow for liquidation of the Bank's assets and the preparation of a report is timely. AWBM presents no contrary evidence.

Third, Plaintiff argues motivation issues because drafts of the report were provided to the FDIC and others, but AWBM overlooks the fact that this process is required by statute. *See* Doc. 280 at 19; 12 U.S.C. § 1831o(k). It in no way calls into question the trustworthiness of the report.

Other arguments by AWBM contain their own rebuttal. While Plaintiff argues that "the OIG Report relies entirely on the FDIC's data, which it did not verify was accurate or truthful," the very quote from the Material Loss Review used to support this contention contradicts it: "We relied on our analysis of *information from various sources*, including ROEs, *correspondence files*, and *testimonial evidence to corroborate data obtained from [FDIC] systems* that were used to support our audit conclusions." Doc. 326 at 8 (emphasis added). The Motion cites conclusions in the MLR that rest on information ultimately drawn from AWBM and/or its Bank, supplied in call reports. *See* Fact nos. 4-6, 8, 10, 12, 14-17. It is telling that, throughout, AWBM fails to present evidence contradicting the MLR.

Regarding trustworthiness, AWBM's final argument is the assertion by its banking expert Stoley that the MLR "missed the mark" by not concluding that the ROEs had been improperly done. Doc. 326 at 8-9. This is a *non sequitur*. Stoley concedes there is no indication that the MLR performed any validation of the loan ratings or allowance for loan and lease losses ("ALLL"). *Id.* Stoley offers no support for the implication that the MLR needed to do so. Loan ratings and the ALLL are both forward-looking estimates of the likely performance of a loan and loan portfolio. *See* Doc. 280 at 13 (discussing ALLL, "an estimate of the amount of a bank's gross loan portfolio that it will never collect"). After a liquidation, the OIG is making a backward-looking summary of what was actually realized.

Plaintiff asserts additional evidentiary objections that are quickly dismissed. *See* Doc. 326 at 5, 25. Rule of Evidence 602, requiring personal knowledge, is applicable to witness testimony, not to documents. The requirements for admissibility of a public record are expressly set out in Rule 803(8), and Rule 602 has no application here. For the same reason, the reports are not inadmissible "expert testimony" under Rules 701 and 702. One expects that government employees making "factual findings from a legally authorized investigation" (Fed. R. Evid. 803(8)(A)(iii)) *are* applying their relevant expertise. That is exactly what should make a public record pertinent and admissible in evidence. Plaintiff's contention that the reports are opinion on the ultimate issue (Rule 704) is not apt. The "ultimate issue" in this litigation is whether Defendants violated any of AWBM's asserted constitutional rights. The MLR is evidence that Defendants did not do so, as it rebuts Plaintiff's claim that their Bank was in a safe and sound condition, but it expresses no opinion on the constitutional claims, themselves.

**Admissibility of the Reports of Examination ("ROEs"):** Likewise, Plaintiff objects to the ROEs. *See id.* at 25-32, 34-44 (Fact nos.25-29, 37-44). These too are admissible as public records. *See* Fed. R. Evid. 803(8); *Farmers & Merchants Nat. Bank v. Bryan*, 902 F.2d 1520, 1523-24 (10th Cir. 1990) ("Defendants claim that the trial court erred in admitting the above-mentioned examination reports. We do not agree. . . . The reports, including the various conclusions critical of defendants' actions contained therein, were admissible under Rule 803(8)(C) of the Federal Rules of Evidence, the 'public records' exception to the hearsay rule.").

As to the ROEs, AWBM argues they should not be admissible because AWBM has not received all the underlying work papers. Doc. 326 at 24. There is no such production requirement for a public record. *See* Fed. R. Evid. 803(8). Without explicitly referencing the rule, Plaintiff is relying upon the requirements of Rule 1006 for summaries of voluminous writings, records, and other documents. *See* Fed. R. Evid. 1006. But an ROE is not such a summary. The report itself is the final product, the conclusion of a legally authorized investigation. *See* Fed. R. Evid. 803(8)(A)(iii). Further, as discussed in the Motion and *infra*, while the conclusions of the ROEs may be "hotly disputed" (Doc. 326 at 26), the time to raise any challenge to the ROEs expired well over a decade ago, before even AWBM's initial complaint. *See* Doc. 280 at 40-43; *infra* at Section III. Plaintiff is foreclosed from pursuing that challenge now.

AWBM's "hearsay within hearsay" objection is similarly unavailing. See Doc. 326 at 5. As with the MLR, Plaintiff nowhere identifies what statements within the ROEs they contend are hearsay within hearsay. The ROE relies upon the Bank's own documents, which are not hearsay under Rule 801(d)(2); the factual findings of the Report are not hearsay-within-hearsay, and are admissible under Rule 803(8)). *See, e.g.,* Doc. 280 at 23, 25-26 (Fact nos. 25-29, 38-44). AWBM's other objections, under Rules 602, 701, 702, and 704 have no more merit here than they did in objection to the MLR. Defendants incorporate their preceding response in that regard.

**Remaining facts:** Defendants respond on the remaining facts as follows:

**Fact no. 5**: AWBM contends that Commissioner Leary "specifically instructed [Mr. Durbano] to leave his law practice and office and immediately take over duties of [the Bank's President and CFO] and to oversee management of the Bank." Doc. 326 at 5. While AWBM's assertion is disputed,[4] more to the point, it does not rebut any portion of Fact no. 5.

**Fact nos. 8-12**: Other than the objection to the MLR, AWBM's response to these facts consist of multiple assertions, many without evidentiary citations, that do not refute the facts. To reiterate, the bottom line, acknowledged by Plaintiff's own banking expert, is that the Bank followed a "high-risk operating plan" with "very high concentration of acquisition and development and construction loans," and its concentrations *considerably* exceeded the regulatory guidance on such lending. *See* Doc. 280-46 at 13 (lines 39:15-40:24).

**Fact no. 13:** Plaintiff's response to this fact is inapposite, as the fact stated is a matter of statute, which Plaintiff cannot refute.[5]

---

[4] The Commissioner testified that the management changes at the Bank, though approved by UDFI, were "red flags," and it was concerning that Durbano would become President of the Bank. *See* Doc. 332-52 at 12-13 (lines 38:1-11, 42:23-44:23).

[5] AWBM also protests that Prompt Corrective Action (the statute in question) "makes *no* reference to brokered deposits." Doc. 326 at 18. What the statute expressly references in 12 U.S.C. § 1831o(f)(2)(C) is a limitation on paying interest rates "to the prevailing rates of interest on deposits of comparable amounts and maturities in the region where the institution is located." Brokered deposits are "accounts picked up from brokers, typically with no relation to the community of the bank. The brokers search (often nationwide) for the best interest earnings they can achieve. A bank typically must pay a higher interest rate on its brokered deposits, and they are more volatile than core deposits because they have no community investment and always seek higher returns." Doc. 280 at 14; Doc. 280-9 at 28 (lines 98:15-99: 1); Doc. 280-10 at 16-17 (lines 52:13-54:20). The statute does not need to expressly name brokered deposits. Brokered deposits are clearly within the scope of the statute, as the MLR recognized.

**Fact no. 14:** Other than the objection to the MLR, AWBM in no way disputes the rise in its brokered deposits and the fact it was in the 99th percentile of its peer group.

**Fact no. 15:** Plaintiff fails to refute this fact, which refers to ADC and CRE *concentrations*, that is, the percentage of these loans in relation to the overall portfolio. The Haws memo – the only evidence cited in response – does not reference concentrations at all but rather a modest (less than 7%) decrease in overall portfolio value. *See* Doc. 332-34 at 1. Stoley, Plaintiff's own banking expert, readily acknowledged the Bank followed a "high-risk operating plan" with "very high concentration of acquisition and development and construction loans," and its concentrations *considerably* exceeded the regulatory guidance on such lending. *See* Doc. 280-46 at 13 (lines 39:15-40:24).

**Fact nos. 18-24:** Plaintiff fails to submit any evidence to dispute these facts, which come from its own economic expert's report. As the statements of Plaintiff's designated expert, the contents of the Waters Report constitute party admissions of AWBM. *See Rawers v. United States, 488 F.Supp.3d 1059, 1084 n.29 (D.N.M. 2020)* ("When a party introduces its opponent's expert report, however, courts have found this evidence admissible as non-hearsay under Rule 801(d)(2) of the Federal Rules of Evidence.") (citing multiple cases). Equally unsupported is AWBM's claim in response to Fact no. 19 that the Waters Report does not state that real estate values would continue to decline until the first quarter of 2010. This is exactly the information relayed by the graph on page 7 of that report. *See* 280-18 at 9. The graph illustrates the change over time in residential housing prices in both the U.S. and Utah.

**Fact nos. 25-29:** These facts are drawn directly from the 2008 ROE, which AWBM never formally challenged and for which challenge is now foreclosed. *See supra* at 9-10 and *infra* at Section III.

**Fact nos. 31-34:** Plaintiff submits no relevant evidence to dispute these facts. Moreover, the Cease and Desist Orders, signed by the Board of the Bank, speak for themselves as to the rights the Bank expressly waived. It is telling that, while at this very late stage AWBM argues vociferously about all the flaws in the 2008 ROE, the Bank had the opportunity to assert those failings in an administrative proceeding, as expressly noted in the stipulation, *and they waived that right. See* Doc. 280-23 at 2 ("Bank has been advised of its right to receive an Order to Cease and Desist detailing the unsafe and unsound practices *and of its right to a hearing on the Order to Cease and Desist, and has waived those rights.*") (emphasis added). AWBM fails to make any claim in this litigation and fails to substantiate any argument in opposition to this Motion that they should be relieved of the effects of the Cease and Desist Orders.

**Fact no. 36**: Plaintiff objects on the grounds of relevance and confusion of issues, neither of which are relevant objections on a summary judgment motion. Those rules concern evidence presented to a jury, not to the Court. Plaintiff further objects on the basis of legal conclusions, but no legal conclusions are asserted in this fact.

**Fact nos. 37-43:** These facts are drawn directly from the 2009 ROE, which AWBM never formally challenged and for which challenge is now foreclosed. *See infra* at Section III. Plaintiff relies principally on the criticisms made of the ROE in the Stoley Report, but that argument misses the boat. The narrow question before this Court is whether Defendants procured the judicial order approving possession of the Bank through fraud. *See* Doc. 64 at 24 ("[T]he court is not barred from considering the Bank's claim of injury related to the Order itself, because the Bank has alleged

that it was obtained through fraud."). The alleged failings of the 2009 ROE claimed by the Stoley Report is that the available examiners' work papers did not adequately support the ALLL calculations. *See, e.g.,* Doc. 332-4 at 6 (claiming ROE ALLL calculation is "not supported . . . by examination work papers"). That is a contention that goes to the weight the 2009 ROE should have been given by the state court. It does not evidence a misrepresentation. Stoley acknowledges the Bank had "significant asset quality deterioration," and that this was not caused in any way by Defendants. *Id.* at 13 (lines 38:5-39:9). For the time period covered by the 2009 ROE, Stoley conceded that the Bank should have been "significantly higher capitalized" for the high-risk business strategy it was following. *Id.* (lines 43:20-45:2). In fact, Stoley concedes that, while he disputes whether the Bank was "insolvent," he offers no opinion about whether the Bank was "about to become insolvent." *Id.* at 17 (lines 55:8-22). Stoley admits that, even using his more favorable capitalization level, at the Bank's current rate of loss, it would have been critically undercapitalized within 15 days of March 31st, well before the May 1st receivership date. *Id.* at 19-20 (lines 65:3-68:18).

**Fact no. 44:** This fact, detailing additional grounds found in the 2009 ROE for receivership, while heatedly argued by Plaintiff, is not refuted. Plaintiff cites no evidence that the Bank was in a safe and sound condition. To the contrary, Plaintiff's own expert admits it was not. *See* Doc. 280-46 at 12 (lines 36:14-24). No evidence the Bank had a 10% or better Tier 1 capital ratio. No evidence of an adequate strategic plan. No evidence they had corrected violations identified in the 2008 ROE. No evidence of an acceptable plan limiting payments between the Bank and AWBM. No evidence they had not made dividend payments in violation of the Cease and Desist Orders.

**Fact no. 45:** Plaintiff's response to this fact is addressed in the Argument, below. *See infra* at Section III.

**Fact nos. 46-47:** Plaintiff objects to the relevance of Mr. Sheehan's testimony on loan calculations made by the bank examiners and to contest the foundation of the Bank's own internal documents discussing its troubled loans. *See* Doc. 326 at 46-48. Sheehan's qualifications are beyond dispute. He was the head of the Bank's Special Workout Team managing troubled loans – the very loans whose deterioration ultimately rendered the Bank insolvent. In his work, Sheehan was necessarily familiar with the loans, and interacting with examiners in the 2009 examination, he was likewise familiar with the examiner's valuations of those loans. It is significant and *damning* to Plaintiff's position that Sheehan testified unambiguously that in retrospect, he has concluded the examiners' position – not the Bank's – was correct.

As for the meeting minutes, these are the internal documents of the Bank – party admissions under Rule 801. Sheehan is expressly identified as an attendee, and he acknowledged he was presented with these minutes while employed with the Bank in 2009 and verified his attendance at the meeting. *See* Doc. 280-45 at 1; Doc. 280-28 at 21 (lines 72:22-73:22).

**Fact nos. 50-56:** AWBM's challenges and objections to the draft Audit Report and the testimony of the Bank's external auditor Richard McRae are unavailing and borders upon the absurd. AWBM expressly identified McRae as an expert "expected to testify regarding the Bank's accounting practices and their compliance with GAAP and the Bank's financial condition at the time of seizure." *See* Plaintiff's Rule 26(a)(2) Disclosure of Expert Witnesses at 12, attached as Supp. Appx. 49. McRae testified that the only reason the Audit Report was not finalized was the Bank's refusal to provide the representations letter that the Bank's representations to the auditors was accurate and truthful. *See* Doc. 280-30 at 8-9 (lines 20:23-23:14). Further, to the extent the Audit Report and McRae's testimony relied upon other documents, these are documents of the Bank – party admissions – not excluded by the hearsay rule.

AWBM also attempts to challenge these facts with the declaration of Brent Wilde, asserting that McRae and Simpson & Company were biased. *See* Doc. 326 at 50; Doc. 326-98 at 2. The Wilde declaration, seeking to testify about McRae and Simpson & Company, lacks foundation and is, in fact, directly contradicted by McRae's deposition testimony, wherein McRae testifies that he and Simpson & Company have no contact with the bank examiners and perform their work and reach their conclusions entirely independently. *See* Doc. 280-30 at 13 (lines 40:15-41:8). In fact, this is the strength of the process, according to McRae, "It's like two people coming to an answer independently and not referring to each other to make that decision. I think that's a healthy thing." *Id*. (lines 40:25-41:2). AWBM had the opportunity to depose McRae about bias but declined to ask him any questions at all. *See* Doc. 280-30 at 18 (line 59:21). Wilde's claim of Simpson & Company deferring to UDFI or the FDIC is incredible on its face, as neither of these institutions has any regulatory control over auditors or CPAs. Defendants object to consideration of the Wilde Declaration for any purpose. On its face, it lacks foundation and consists solely of speculation.

**Fact nos. 57-59:** AWBM's attempt to contest the Bank's own financial records is unavailing. Plaintiff nowhere disputes that these are the Bank's own, internal financial records, on which the Bank itself relied. The reference to Stoley's report and opinions is inapposite. Stoley has no foundation for challenging the Bank's financial statements, as he admits the Bank had access to loan documents and other information necessary to that analysis, which Stoley did not have. *See* Doc. 280-46 at 21-22 (lines 72:4-75:9).

**Fact nos. 60-62:** Nothing Plaintiff says can refute the plain language of the Petition. Neither are any of Plaintiff's evidentiary objections valid. Defendants' declarations are not testifying as to the contents of any transcript of the proceeding but are declarations of their individual, percipient observations and conduct as participants in that proceeding.

**Fact no. 66:** Plaintiff seeks to spin Durbano's testimony in a way to excuse AWBM's failure to act, but it does not change the essential point: Plaintiff made no challenge to the receivership proceeding, and the decision to refrain rested upon the advice of counsel that any such challenge would run afoul of Rule 11.

**Fact no. 69:** Plaintiff's only dispute is that it filed a Notice of Claim almost one year after the receivership. A notice of claim, however, is not a legal action. This fact is undisputed.

**Fact no. 70:** Nothing in Plaintiff's response refutes this fact.[6] Plaintiff falsely states that Cache Valley Bank expected to realize "over $300,000 profit" from purchasing a loan from the FDIC-as-Receiver several months after the receivership. Doc. 326 at 65 ("When CVB purchased some of the Bank's loans from the FDIC on October 23, 2009, it expected to realize over $300,000 in profit."). The relevant deposition testimony is unrelated to the loan purchase. Rather, George Daines, President of Cache Valley Bank, testifies about his expectation of realizing a benefit from assuming the Layton location of America West Bank. *See* Doc. 332-18 at 2 (lines 186:6-16). Durbano's own proffered testimony is self-serving hearsay that Daines never adopted. Defendants object to the Durbano testimony on that ground.

**Fact no. 71**: AWBM attempts to dispute the degree of the FDIC insurance fund loss on the Bank by reference to the online Receivership Balance Sheet Summary. That summary notes a net deficit of $115,494,000, which in the context of this litigation is not materially different from the $119 million estimate of the Material Loss Report. The summary, contrary to AWBM's assertion, does not attribute the deficit to a "reserve . . . for unpaid deposit claims." Doc. 326 at 64. Rather,

---

[6] Furthermore, the cited Doug Durbano testimony is hearsay, as he attempts to testify about statements of George Daines. Plaintiff had the opportunity to depose Daines and failed to corroborate any such statements.

it states that the FDIC has a "Subrogated Deposit Claim," in the amount of $115,386.000, and under federal law the FDIC's deposit subrogation rights arise upon "the assumption of any deposit . . . by another insured depository institution," in this instance Cache Valley Bank. 12 U.S.C. § 1821(g)(1). The FDIC's losses arose, in short, not from any "reserve," but from the Deposit Insurance Fund's $115 million payment to Cache Valley Bank (the only entity that bid on the bank) in exchange for that bank's assumption of deposits at America West.

**Response to AWBM's Additional Facts**: Most of AWBM's asserted facts merit no substantive response. While Defendants question their veracity and, more importantly, their significance, for purposes of this Motion, Defendants do not dispute them except as follows:

**AWBM Fact no. 19:** AWBM seeks to characterize the Berrett email as "tr[ying] to prime the Federal Reserve to respond negatively." Doc. 326 at 70. This is not an assertion of fact, nor is it evidenced in the document. It is AWBM's argument as to the meaning of the email, which is not appropriate.

**AWBM Fact no. 22:** Likewise, this assertion, AWBM seeks to characterize Defendants as "forced" to approve the application, something not supported by the evidence. The bottom line is that Defendants approved Plaintiff's application.

**AWBM Fact nos. 28, 30:** AWBM's only support for these facts is an uncertified transcript apparently made from an audio recording by an unknown person. It lacks authentication (FRE 901), is not self-authenticated (FRE 902(14)), and is not the original audio recording (FRE 1002).

**AWBM Fact no. 31:** AWBM attempts to characterize witness statements, which is improper and objectionable. The Tyson Sill email speaks for itself.

**AWBM Fact no. 34:** The only support for this fact is the McGregor Report. McGregor, who had no involvement with the 2008 proceedings and participates only as a retained expert, lacks any foundation to opine as to "evidence of preconceived objectives" by the bank examiners. That is not a proper subject of expert opinion. *See James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1095-96 (D.C. Cir. 1996) (disallowing conclusory statements that "it appeared" from the examiners' hostile attitudes, their unwillingness to correct errors, and the "severity" of the reserves, that the examiners were "expected," "instructed," or had a "predetermined agenda" to render the bank insolvent by requiring additional loan loss reserves).

**AWBM Fact no. 47:** This fact assertion is unsupported. AWBM cites Exhibit 96, which includes a series of handwritten notes allegedly made by Doug Durbano. These are not authenticated, and even if they were, they are inadmissible hearsay. Plaintiff is not introducing any statement by Defendants; rather, they are relying on handwritten statements by Durbano of his own assessment of what someone else said. Those do not purport to be verbatim restatements, and they do not fit any hearsay exception.

**AWBM Fact no. 48:** AWBM inappropriately characterizes a witness statement as "vindictive." Commissioner Leary's email speaks for itself.

**AWBM Fact no. 50:** Improper characterization, without any support, that Commissioner Leary would "make sure that he was right about Doug Durbano in the end."

**AWBM Fact no. 51:** Improper characterization and lack of any evidence that the statement in Commissioner Leary's email (AWBM Fact No. 48) was connected to, much less a determination of, any "formal enforcement action."

**AWBM Fact no. 58:** Improper characterization of Paul Allred as "disingenuous." On their face, AWBM Fact nos. 55-58 are not relevant to any issue in the Motion. Plaintiff can point to no authority that a regulatory agency must use one form of enforcement action over another when either may be appropriate. The implication of AWBM's position, however, is troubling: AWBM and the Bank wanted a private enforcement action (a memorandum of understanding) rather than a public one (Cease and Desist Orders), because they wanted to conceal this material information from potential investors. In other words, Plaintiff wanted to perpetrate a fraud on prospective investors and is upset that the Defendants would not enable that conduct.

**AWBM Fact nos. 65-70:** The only foundation for these claims is the Jim McGregor report and deposition testimony. The stated opinions, on their face, are not proper subject matter for expert testimony, opining that McGregor can conclude, on the basis of the ROEs, "that the examiners entered the examination of America West Bank with a preconceived agenda to conclude insolvency" and "[the January 2008 ROE] was the setup, the [2009 ROE] concluded with the insolvency," and that, on the basis of a single sentence in one email is "evidence of personal bias and the unprofessional culture under Mr. Leary's leadership." *See* Doc. 326 at 78-79. No witness – not even an expert – is qualified to testify about another person's motivations or state of mind. *See Pioneer Centres Holding Co. Emp. Stock Ownership Plan & Tr. v. Alerus Fin., N.A.,* 858 F.3d 1324, 1342 (10th Cir. 2017); *Luciano v. E. Cent. Bd. of Co-op. Educ. Servs.,* 885 F. Supp. 2d 1063, 1072 (D. Colo. 2012). Particularly with regard to McGregor's opinions on "regulator risk" (AWBM Fact nos. 67-70), this is a "theory" created solely by McGregor, not subjected to any studies or articulable criteria. *See* Doc. 332-41 at 52-53 (lines 69:7-71:22). Simply put, "regulator risk" is whatever McGregor says it is, which is not an admissible basis for expert testimony. *See Pioneer Centres Holding Co. Emp. Stock Ownership Plan and Tr. v. Alerus Fin., N.A.,* 858 F.3d 1324, 1341-42 (10th Cir. 2017); *Nelson v. Safeco Ins. Co.*, 396 F. Supp. 2d 1274, 1278-79 (D. Utah 2005).

**AWBM Fact no. 72:** While it is undisputed that the quoted language comes from Stoley, Stoley's assertions lack any evidentiary backing. To the extent AWBM offers that its expert makes this claim, that is not disputed, but the assertion is unsubstantiated. Further, notwithstanding Stoley's blanket assertion, his engagement was limited solely to the issue of Defendants' determination of the Bank's insolvency. Doc. 280-46 at 16 (lines 53:4-17). He had no opinion on whether the Bank was in a safe and sound condition (in fact, he admitted it was not); he admits the Bank failed to reach a 10% Tier 1 capital ratio; and could not say whether the Bank was about to become insolvent. *See* Doc. 280-46 at 12, 16 (lines 36:14-24, 53:18-55:22). As those are independent grounds within the 2009 ROE for receivership, Stoley's assertion, in the final analysis, is meaningless.

**AWBM Fact no. 75:** The foundation for this fact is the assertion of McGregor about Commissioner Leary's legal duty, which on its face is a conclusion of law and improper subject matter for expert opinion. (It's notable that neither here nor anywhere in argument does AWBM identify any legal basis for this alleged duty.)

**AWBM Fact no. 77:** The only foundation is the McGregor report, seeking to opine on Commissioner Leary's truthfulness in the receivership proceeding. In his deposition, McGregor acknowledged he was not a witness to that proceeding, reviewed no transcript or recording of that proceeding, interviewed no witnesses to that proceeding, reviewed no deposition testimony of those witnesses, does not know what Commissioner Leary said in that proceeding, reviewed only a one-page document of notes prepared by someone else at the hearing. *See* Doc. 332-41 at 81-82 (lines 182:9-186:15). McGregor obviously has no foundation to testify about Commissioner Leary's statements in the receivership proceeding.

**AWBM Fact no. 81:** The only support AWBM offers for this fact is not the deposition testimony of Mr. Allred but the assertion of AWBM's counsel, which was never adopted by Mr. Allred. *See* Doc. 332-2 at 55 (lines 213:5-9).

## ARGUMENT

### I.    AWBM LACKS STANDING.

As detailed in the Motion (Doc. 280 at 27), upon appointment, the FDIC-as-receiver succeeded to all claims belonging to America West Bank. *See* 12 U.S.C. § 1821(d)(2)(A); *Barnes v. Harris*, 783 F.3d 1185,1193 (10th Cir. 2015). Rather than contest that its claims are derivative, AWBM attempts to distinguish *Barnes* on the basis that, in that case, the claims at issue were brought against the bank itself, whereas here, they are brought against Defendants. *See* Doc. 326 at 79-80. This is a distinction without a difference. Plaintiff cites no authority to support its argument, and it is contrary to the express language of the Tenth Circuit in *Barnes*: "Because almost all of the plaintiffs' claims assert injury to the Holding Company that is *derivative of harm to the Bank*, *those claims belong to the FDIC*." *Barnes*, 783 F.3d at 1188 (emphasis added). The Courts have made no distinction on the basis advanced by AWBM. *See, e.g., American Capital Corp. v. FDIC,* 472 F.3d 859, 866-67 & n.3 (Fed. Cir. 1996) (disallowing shareholder to pursue financial institution's derivative claim against FDIC). What matters is whether the claims are "derivative of harm to the Bank," and if so, "those claims belong to the FDIC" under the plain operation of 12 U.S.C. § 1821(d)(2)(A).

Plaintiff further seeks to argue that it is entitled to pursue the Bank's derivative claims because a demand upon the FDIC-as-receiver to do so would be futile. *See* Doc. 326 at 80-81. This argument fails on multiple grounds. First, although all of AWBM's claims are derivative, Plaintiff

did not *plead* any of its claims as derivative claims, as required under Utah law and federal procedural requirements. Among other failings, the Second Amended Complaint is not verified nor does it anywhere state "with particularity" any efforts made to obtain the desired action from the FDIC-as-receiver nor "the reasons for not obtaining the action or not making the effort." Fed. R. Civ. P. 23.1(b); Utah R. Civ. P. 23A (same). These failings are sufficient for dismissal of the claims under Utah law: "The second amended complaint, in which Plaintiffs brought their derivative claims, makes no mention of the futility exception and fails to address why demand would have been futile. This fact alone would be a sufficient basis for turning away Plaintiffs' futility claims." *Dansie v. City of Herriman*, 2006 UT 23, ¶ 25, 134 P.3d 1139.[7]

Second, relying on Utah Code § 48-3a-802(2),[8] AWBM contends that it need not make any demand upon the FDIC-as-receiver because such demand would be futile. Doc. 326 at 81. Not only does this argument improperly conflate the FDIC in its corporate capacity with its capacity as receiver, *see ECCO Plains, LLC v. United States*, 728 F.3d 1190, 1192 n.1 (10th Cir. 2013), AWMB cites no evidentiary support. Under Utah law, the Court "must exercise considerable caution before using futility to relieve a shareholder of his obligation to make the statutorily-required demand." *Dansie* at ¶ 26. "Courts must not leave such determinations of futility to the subjective determination of the party upon which the law requires action; to do so unnecessarily risks stripping the corporation of its rights. In fact, it will generally require less effort for the

---

[7] Although the Second Amended Complaint asserts federal claims, state law determines the handling of derivative claims. *See* Doc. 280 at 26; *Barnes*, 783 F.3d at 1193 (applying Utah law); *Branzan Alternative Inv. Fund, LLP v. Bank of New York Mellon Trust Co., NA*, 677 Fed. Appx. 496, 497 (10th Cir. 2017) (referencing Delaware law for Delaware entity).

[8] AWBM's citation to the statute – Utah Code § 428-3a-802 – is obviously erroneous. The Utah Code has no Title 428.

plaintiff to make a demand on the corporation than to satisfy rule 23.1's stringent pleading requirements. For this reason, application of rule 23.1's futility exception requires close scrutiny." *Id.* at ¶ 27. As a result, the Utah Supreme Court recognizes only two instances in which the futility exception will be met: "if the corporation had specifically and explicitly stated that it would not pursue the claims brought in the derivative action" or "[when] making a demand . . . would be substantively detrimental. Such a circumstance could arise if the demand would risk further injury to the corporation by, for example, permitting the alleged perpetrator to cover up his misdeeds or to cause further harm to the corporation because he had been alerted that his unlawful conduct had been uncovered." *Id.* at ¶ 28. AWBM's argument does not address either situation, and AWBM asserts no evidence to support such.

Finally, Plaintiff does not grasp the implications of a derivative claim. Any recovery in a derivative action belongs to the corporate entity (in this case, the FDIC-as-receiver) not the plaintiff(s) pursuing the derivative suit:

> (a) [A]ny proceeds or other benefits of a derivative action, whether by judgment, compromise, or settlement, belong to the . . . company and not to the plaintiff; and
>
> (b) if the plaintiff receives any proceeds, the plaintiff shall remit them immediately to the . . . company.

Utah Code § 48-3a-806; *see also Barnes*, 783 F.3d at 1195; 12 U.S.C. § 1821(d)(11); *Kagan v. Edison Bros. Stores Inc.*, 907 F.2d 690, 692 (7th Cir. 1992) (shareholders of insolvent corporation cannot displace creditors' priority by bringing a direct action); *Mid-State Fertilizer Co. v. Exchange Nat'l Bank*, 877 F.2d 1333, 133-36 (7th Cir. 1989) (same). The FDIC's Deposit Insurance Fund – the Bank's largest and highest-priority creditor – by itself lost $119 million in connection with the Bank's failure, an amount that vastly exceeds the value of the Bank according

to Plaintiff's own expert. *See* Doc. 280-3 at 3; Doc. 280-47 at 6. As the Deposit Insurance Fund and the Bank's other creditors have a higher repayment priority than shareholders of the Bank, *see* 12 U.S.C. § 1821(d)(11), no recovery on the derivative claims would flow to Plaintiff.

In sum, AWBM lacks standing to pursue any of its claims, all of which are derivative of the Bank, and summary judgment should therefore be entered in favor of Defendants.

## II.   CLAIM PRECLUSION BARS AWBM'S CLAIMS.

AWBM contends that it suffers no claim preclusion because "the statute conferring jurisdiction on the Utah court" limited the scope of the proceedings and made them "not subject to the normal rules of civil procedure." Doc. 326 at 84. This argument is devoid of support in Utah statutes, case law, and the rules of civil procedure.

Plaintiff argues that it could not present its arguments in the Utah court because of the immediate appointment of the FDIC as receiver of the Bank. *Id.* They cite no authority for how the immediate appointment of a receiver would divest the Utah court of jurisdiction to provide a remedy, but presumably they are alluding to the argument made in Plaintiff's Motion for Partial Summary Judgment. *See* Doc. 258. Defendants have already addressed and rebutted this contention and incorporate that argument here by reference. *See* Doc. 284 at 24-31. To briefly summarize, every court that has considered this question has concluded that federal statutes governing the FDIC and similar regulatory bodies are no obstacle to a challenge to remove the FDIC's receivership when improvidently granted. *See James Madison Ltd. v. Ludwig,* 82 F.3d 1086, 1093 (D.C. Cir. 1996) ("We . . . read section 1821(j) to prevent courts from interfering with the FDIC only when the agency acts within the scope of its authorized powers, not when the agency was improperly appointed in the first place."); *Franklin Sav. Ass'n v. Office of Thrift Supervision,*

35 F.3d 1466, 1470 (10th Cir. 1994) (holding that a similar statute "limit[s] judicial review to the initial appointment of a conservator or receiver" – that is, it does not bar statutory review procedures like Utah's).[9] The federal statute expressly preserves "powers" and "duties" provided by state law when the FDIC is appointed receiver by a state regulatory agency. *See* 12 U.S.C. § 1821(c)(3)(B). AWBM never addresses this provision and cites no contrary authority.

Without any caselaw support, AWBM instead makes a tortured reading of the relevant Utah statutes, arguing that Utah Code § 7-2-2 grants the Utah court only a "narrow . . . jurisdiction." Doc. 326 at 86. This is not true. The Utah district courts are courts of general jurisdiction, having "original jurisdiction in all matters civil and criminal" unless specifically excepted by statute or the Utah Constitution. *See* Utah Code § 78A-5-102(1). Nothing in § 7-2-2 limits that jurisdiction. Neither can AWBM cite any authority holding that it does. The jurisdictional discussion in § 7-2-2 instead, on its face, is setting forth the proper venue ("The district court for the county in which the principal office of the institution or other person is situated") and – directly contrary to AWBM's argument – confirms that the court's power is plenary in addressing any challenge to the receivership proceeding: "The court has jurisdiction to hear *all objections* to the actions of the commissioner and *may rule upon all motions and actions coming before it*." Utah Code § 7-2-2(3) (emphasis added). "Actions" in this context necessarily

---

[9] Other courts have made the point that the relevant federal statutes should not be read to deny a party's due process rights. *See, e.g., Placida Prof'l Ctr., LLC v. FDIC*, 512 F. App'x 938, 948-49 (11th Cir. 2013); *Elmco Properties, Inc. v. Second Nat'l Fed. Sav. Ass'n*, 94 F.3d 914, 923 (4th Cir. 1996); *Freeman v. FDIC*, 56 F.3d 1394, 1399 (D.C. Cir. 1995); *Nat'l Trust v. FDIC*, 995 F.2d 238, 240 (D.C. Cir. 1993), aff'd in relevant part, 21 F.3d 469 (D.C. Cir 1994); *First Fed. Sav. Bank and Trust v. Ryan*, 927 F.2d 1345, 1358 (6th Cir. 1991); *Dobbins v. Dobbins*, 2015 WL 3952737, *4 (W.D. Okla. June 29, 2015); *Dernis v. FDIC*, 2013 WL 12109431, *1 & n.1 (W.D. Mich. July 3, 2013); *Centennial Assocs. Ltd. P'ship v. FDIC*, 927 F. Supp. 806, 813 (D.N.J. 1996).

means causes of action, such as those asserted by AWBM here. It has no other meaning in context. If the state court finds the receivership was wrongful, it may not only order the surrender of the institution but also do so "in a manner and on terms designated by the court in the public interest." Utah Code § 7-2-3(1)(c).

AWBM knew, as a matter of fact, of those rights, and consciously chose not to pursue them, on the advice of legal counsel. *See* Doc. 280-43 at 44-45 (deposition lines 164:24-167:20). Under both state and federal law, where a party has the opportunity to challenge the receivership proceeding and does not do so, it has waived its claims. *See Hindes v. FDIC*, 137 F.3d 148, 167 (3d Cir. 1998); *Brown v. Weis*, 871 P.2d 552, 568 (Utah Ct. App. 1994). This Court has already rejected AWBM's argument in substance:

> At oral argument, Plaintiff argued that any post-deprivation hearing would have been "too late" and would not have comported with due process, comparing the Utah Department's taking of the Bank to the execution of a prisoner. . . . The court rejects this argument. The Bank could have sought an emergency hearing with the state court and could have prevented the injuries it now complains of.

Doc. 64 at 34 n.16.

AWBM cannot speculate about the adequacy of state judicial remedies it never invoked. *See, e.g., Pinder v. Mitchell*, 658 F. App'x 451, 455-56 (10th Cir. 2016) (rejecting argument that plaintiffs were not required to pursue post-deprivation remedies and finding no basis for assertions that those remedies were inadequate); *Stanley v. McMillian*, 594 F. App'x 478, 480 (10th Cir. 2014) ("speculation" that remedy would be inadequate not sufficient to show denial of due process); *Myers v. Koopman*, 738 F.3d 1190, 1194 (10th Cir. 2013) ("Myers had an adequate remedy. He let it wither. Due process has been duly satisfied."); *Rodriguez v. City of Carlsbad*, 2002 WL 35649875, *5 (D.N.M. June 13, 2002) ("A procedural due process claim such as

Plaintiff's tests the adequacy of process actually provided. Here, Plaintiff did not afford himself of the available process. Thus, this Court is unable to review the procedures to determine whether or not they would have been adequate.").

Finally in regard to this argument, it is notable that AWBM fails even to address Utah case law directly on point, holding that the failure to challenge a receivership proceeding is a bar to subsequent litigation. *See Brown v. Weis*, 871 P.2d 552, 567-68 (Utah Ct. App. 1994). Although *Brown*, as a Utah Court of Appeals decision, is not controlling on this Court, it is notable that the Utah Supreme Court – in its examination of AWBM's claims – expressly examines and relies upon *Brown*, although on other grounds. *See America West Bank Members, L.C. v. State*, 2014 UT 49, ¶ 25, 342 P.3 224. Never even grappling with this decision, AWBM offers no reasoned argument why it should not apply here.

Simply put, in addition to its lack of standing to assert its claims, AWBM's claims are also barred by its failure to assert them when it had the opportunity – and the obligation – to do so in the state court proceeding. For this additional and independent reason, the Court should enter summary judgment in favor of Defendants on all claims.

## III.   AWBM FAILED TO EXHAUST ITS ADMINISTRATIVE REMEDIES TO CHALLENGE THE ROEs.

AWBM does not contest that both UDFI and the FDIC provide administrative processes to challenge an ROE. *See* 12 U.S.C. § 4806(f)(1)(A); Utah Code § 7-1-302. Neither does AWBM dispute that most of the allegedly wrongful conduct complained of by AWBM was in the ROE process. *See, e.g.*, Complaint at ¶¶ 37 (CAMELS ratings), 40 (alleged changes in valuation), 42 (change in accounting procedures), 51 (assertion that "proper reports" would have reflected differently), 58 (complaining about "negative examination report"). Instead, Plaintiff argues that

administrative exhaustion does not apply because "Plaintiff's claims are for violation of constitutional rights, which violations were not completed until the Commissioner took possession of the Bank," Doc. 326 at 88. This is a *non sequitur*. Administrative exhaustion does not depend upon the point at which the elements of a claim are complete nor the legal theory asserted. Exhaustion applies any time an administrative process exists for challenging any portion of the alleged misconduct asserted by the plaintiff.

The Utah Supreme Court has expressly held that administrative exhaustion applies in cases of constitutional claims. *See Utah Stream Access Coalition v. VR Acquisitions, LLC*, 2019 UT ¶ 47, 439 P.3d 593 ("Our courts may mandate exhaustion of administrative claims that are viewed as necessary predicates to litigation of constitutional claims.") (citing *Patterson v. Am. Fork City*, 2003 UT 7, ¶ 17, 67 P.3d 466). In *Patterson*, the plaintiff asserted multiple claims under federal and state constitutions and other state-law theories. *See Patterson* at ¶ 3. Patterson, like AWBM, "bald[ly] assert[ed] that the exhaustion requirement does not apply to state constitutional claims." *Id.* at ¶ 18. The Utah Supreme Court found that "not persuasive." *Id.*[10]

Here, Plaintiff's challenges to the ROEs are a necessary predicate to AWBM's constitutional claims. AWBM expressly acknowledges their relevance. *See* Doc. 326 at 88 ("the events preceding May 1, 2009, are relevant to the constitutional claims, including the faulty ROEs and improper examination process"). It is irrelevant that "those preceding events are not claims for which Plaintiff seeks redress." *Id.* Because Plaintiff relies upon them as a basis for liability, AWBM was obliged to exhaust their administrative remedies pertaining to those issues.

---

[10] While *Patterson* observes that administrative exhaustion did not apply to *that* plaintiff's federal constitutional claims, *id.*, that case turned on a state land-use decision with no federal correlate administrative process. Where present, federal claims too are subject to administrative exhaustion. *See Summerhaze Co., L.C. v. FDIC*, 2014 UT 28, ¶ 10, 332 P.3d 908.

In the alternative, AWBM argues that it *did* exhaust its administrative remedies because "Plaintiff zealously disputed the results of the 2008 and 2009 ROEs and provided a written request for review of the findings on multiple occasions." Doc. 326 at 89. Defendants will address each asserted instance in order.

First, AWBM cites a June 27, 2008, letter (Doc. 332-5). Assuming for the sake of argument that the June 2008 letter constitutes a written request for the informal administrative proceeding provided by Utah Code § 7-1-302, it relates solely to the 2008 ROE. AWBM does not show that the 2008 ROE was presented to the state court in the receivership proceeding or was in any way a basis for the receivership. Further, the June 27th letter asserts only unidentified "factual errors," *see* Doc. 332-5 at 1-2, which does not fulfill the requirements of a request to "state the grounds for review and the relief requested." Utah Code § 63G-4-301(b)(ii).

Second, AWBM cites an August 8, 2008, email allegedly transmitting a June 30, 2008, internal memorandum from Brent Savage to Greg Haws (Doc. 332-6). This document fails because AWBM nowhere submits that transmittal email to show that it meets the requirements of Utah Code § 63G-4-301(b). Even if it did, it would suffer from the same failings as the June letter: it relates only to the 2008 ROE, which was not a factor in the receivership proceeding.

Third, AWBM cites a February 26, 2009, email (Doc. 332-7 at 1-3). The referenced email, however, is internal, from "Doug's Assistant" to "AWB Chairman." *See* Doc. 332-7 at 1. It references a discussion with Tyson Sill but no communication, written or otherwise, to Commissioner Leary. *Id.* It also pre-dates finalization of the 2009 ROE, so it cannot constitute a challenge to the final report. *See* Doc. 280-26 at 75 (noting March 26, 2009, as the date final exam results were discussed with the Bank's board).

Fourth AWBM cites an April 15, 2009, email (Doc. 332-7 at 4-5). This is an email from Brent Wilde to Tom Bay and Tyson Sill. *Id.* at 4. Again, this fails the requirement that a request for agency review be directed to Commissioner Leary. *See* Utah Code § 7-1-302.

Fifth, AWBM cites an April 2009[11] email chain between Tom Bay and Brent Wilde (Doc. 332-7 at 6-8). This likewise fails to constitute a request for review to Commissioner Leary.

Further, assuming for the sake of argument that AWBM actually invoked the administrative process with *any* of these documents or others, AWBM had thirty days to petition for judicial review if dissatisfied: "A party shall file a petition for judicial review of final agency action within 30 days after the date that the order constituting the final agency action is issued or is considered to have been issued under Subsection 63G-4-302(3)(b)." Utah Code § 63G-4-401(3)(a). Subsection 63G-4-302(3)(b) provides for a tacit denial of an administrative claim if no response is received within 20 days, thus mooting any argument that there was no administrative decision. In other words, the limitations period for any claim predicated on a challenge to an ROE expired within 50 days of AWBM's alleged request. For all of these documents, this was well before the filing of AWBM's original complaint in state court on June 28, 2011. *See* Doc. 280-44 at 11. In sum, none of the examples cited by AWBM constitute a request for administrative review meeting the requirements of the Utah Code. *See* Utah Code §§ 7-1-302, 63G-4-301(b). Nor is this surprising given the unrebutted fact that AWBM was ignorant of the administrative review process. *See* Doc. 280-27 at 24 (lines 84:24-85:24).

---

[11] The top-most date is April 14, 2015. This is not the actual date of the emails but appears to be a relic of a date code that was activated when the pdf was created. An internal dateline for the second email of April 21, 2009, gives the correct timing of the exchange. *Id.* at 6.

Finally, AWBM argues that it should be excused from administrative exhaustion because exhaustion would have been futile, because any administrative appeal was to Commissioner Leary, and "Commissioner Leary himself behaved in an unreasonable, arbitrary, and capricious manner by manipulating the ROEs and examination process as cover for an improper motive to seize the Bank." *See* Doc. 326 at 88. Plaintiff's argument is devoid of any evidentiary citation to support this assertion. The Commissioner is not involved in the examination process. As detailed in the Motion and unrebutted by AWBM, each examination has two Examiners in Charge ("EIC"), one appointed by the FDIC and the other by UDFI. *See* Doc. 280-13 at 7 (lines 17:14-22); Doc. 280-14 at 7 (lines 17:7-10). The EICs decide the assignments of the other examiners. *See* Doc. 280-13 at 7 (lines 17:23-18:13); Doc. 280-14 at 28 (lines 98:10-18). An Assets Manager below the EICs oversees the review of the bank's loan portfolio. Doc. 280-14 at 7 (lines 17:14-17); Doc. 280-15 at 7-9 (lines 16:6-18, 21:16-23:14); Doc. 280-13 at 15 (lines 46:17-22). An examiner assigned to review loans will review the selected loan files and determine a classification for each loan. Doc. 280-13 at 10, 12-14 (lines 28:1-16, 34:19-35:12, 41:20-42:19); Doc. 280-14 at 17-19, 26 (lines 54:4-9, 60:10-18, 61:14-62:22, 90:1-10, 19-25). If an examiner downgrades a loan below how the bank classified it, that determination is reviewed with the Asset Manager, the bank loan officer, and ultimately the bank's management team. Doc. 280-13 at 17 (lines 56:7-57:14). After the EICs have received the data from the managers and examiners, they draft the initial ROE. Doc. 280-13 at 8, 15 (lines 19:1-6, 47:21-48:15); Doc. 280-15 at 10 (lines 27:22-28:13). UDFI's Supervisor of Banks will review the draft ROE for completeness and accuracy. Doc. 280-16 at 8, 19 (lines 20:13-18, 64:19-65:2); Doc. 280-15 at 10 (lines 28:11-13). In collaboration with their counterpart at the FDIC (called a case manager), the Supervisor of Banks will then finalize any edits to the ROE.

34

Doc. 280-16 at 10, 19 (lines 28:25-29:20, 64:25-65:7); Doc. 280-15 at 10 (lines 28:11-21). Only at that very late stage, after the conclusion of the examination itself, are the findings reported to the Chief Examiner and sometimes to the Commissioner and Deputy Commissioner. Doc. 280-16 at 7-8, 12 (lines 16:17-24, 17:24-18:3, 34:2-6). That is after all the adverse loan classifications that damned America West Bank had already been made – by individuals several steps removed from Commissioner Leary, individuals that AWBM presents no evidence were influenced by the Commissioner nor were in any way biased against the Bank.

AWBM presents no evidence that Commissioner Leary interjected himself in this process or influenced the result. Plaintiff relies on nothing more than innuendo and insinuation. That is not sufficient to survive summary judgment. *Cypert v. Independent School Dist. No. I-050*, 661 F.3d 477, 481 (10th Cir. 2011) ("'Unsubstantiated allegations carry no probative weight in summary judgment proceedings. To defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise.'") (quoting *Bones v. Honeywell Int'l, Inc*., 366 F.3d 869, 875 (10th Cir.2004)).

Moreover, AWBM fails to make out a case for irreparable harm from being required to exhaust its administrative remedies. As Plaintiff's own argument points out, the actual harm was not consummated until over a year after the 2008 ROE and several weeks after the 2009 ROE, when the Bank was placed into receivership on May 1, 2009. *See* Doc. 326 at 88. A meritorious challenge to the ROEs prior to that would have derailed that series of events. The fact that Plaintiff then delayed *years* in pursuing this litigation negates any other inference of irreparable harm from first being required to pursue its administrative remedies.

Further, Plaintiff never addresses what it means to sustain "irreparable harm": "Courts apply the same irreparable harm standard in the failure-to-exhaust context as in the preliminary injunction context. . . . A plaintiff shows it will suffer irreparable harm if it demonstrates there is 'a significant risk that [it] will experience harm that cannot be compensated after the fact by monetary damages.'" *Kansas ex rel. Kansas Dep't for Children and Families v. SourceAmerica*, 874 F.3d 1226, 1250 (10th Cir. 2017) (citing *Randolph-Sheppard Vendors of Am. v. Weinberger*, 795 F.2d 90, 110 (D.C. Cir. 1986); *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009); *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001)).[12]

In sum, Plaintiff never attempted, much less exhausted, their available administrative remedies to challenge the 2009 ROE.[13] The time has long since passed to do so, and the failure to pursue an administrative remedy is a bar to litigation regarding alleged errors in the ROE. Therefore, Defendants are entitled to summary judgment on this issue, as well.

## IV.   COMMISSIONER LEARY IS ENTITLED TO QUALIFIED IMMUNITY.

Commissioner Leary is entitled to qualified immunity on AWBM's § 1983 claim. AWBM has the burden to show that both (1) Commissioner Leary "violated a federal constitutional or statutory right," and (2) that right "was clearly established at the time of the [alleged] unlawful conduct." *Medina v. Cram*, 252 F.3d 1124, 1128–30 (10th Cir. 2001); *see also Saucier v. Katz*, 533 U.S. 194 (2001); *Mick v. Brewer*, 76 F.3d 1127, 1134 (10th Cir. 1996). Plaintiff's Opposition fails both elements.

---

[12] Plaintiff's citation to *Free the Nipple v. City of Fort Collins*, 916 F.2d 792, 807 (10th Cir. 2019), is inapposite. *See* Doc. 326 at 90. That case concerned a preliminary injunction, and while the courts may apply the same standard in that context for determining what constitutes "irreparable harm," the difference in context here is determinative: AWBM is seeking to be excused from pursuing its administrative remedies having never attempted them and waiting until years after the fact to seek relief.

[13] The same is true regarding the 2008 ROE, but as to that report, a further issue is its irrelevance, as AWBM cannot show it was a factor in the receivership proceeding.

### A.   AWBM Fails to Show Commissioner Leary Violated a Federal Constitutional or Statutory Right.

Most of Plaintiff's Opposition – 78 of 110 pages – is consumed with a lengthy factual diatribe. When it comes to the argument, however, Plaintiff makes virtually no effort to tie any factual citations to its assertions, as required by local rule. *See* DUCivR 56-1(c)(5) ("Argument. . . . Any factual citations must cite to the appropriate party's Statement of Undisputed Material Facts."). The burden is not upon the Court nor Defendants to discern which particular facts or evidence Plaintiff intends by its vague references. It is incumbent upon the Plaintiff to make specific references. The only evidence referenced in AWBM's due process argument are two emails and certain deposition testimony by Douglas Durbano.

The first email is from Commissioner Leary to Tom Bay on April 2, 2008:

> Thought you should know Doug [Durbano] has already gone to Sen Bennett about the overly aggressive regulator. He tied [sic] to tell Mike N. that it was the FDIC I said no it isn't, it's the state just as much if not more. He deserves the treatment.

*See* Doc. 326 at 92; Doc. 332-42 at 1. AWBM provides no context, but the email was during the 2008 examination when the Bank was being downgraded. In context, the email indicates nothing more than that the Commissioner believed the downgrade was warranted. The Bank (by Durbano and others) later consented to the Cease and Desist Orders, expressly waiving its opportunity to challenge those findings in an administrative proceeding. *See* Docs. 280-21, -22, -23, -24.

The second is an April 21, 2009, internal FDIC email from Darren Ewell to Tim Lackey and others, forwarding a Brent Wilde email to Tyson Sill and Tom Bay. Ewell makes a one-line comment: "FYI – Not that it matters, but just in case you are interested." *See* Doc. 326 at 94; Doc. 332-43 at 1. AWBM argues the Ewell email demonstrates "a caustic regulatory environment

against the Bank . . . such that by April 2009 [the Commissioner's] personnel were indifferent to the Bank's disagreement with the arbitrary and aggressive regulatory treatment." Doc. 326 at 94. One fatal failing of this argument: neither Ewell nor any of his recipients are "the Commissioner's personnel." As indicated by the Bates number on the email, this is an FDIC document, an email from one FDIC examiner (Darren Ewell) to three other FDIC examiners (Tim Lacke, Nathan Heizer, Robert Preite, and Robert Magee). *See* Paul Allred Dec. at ¶¶ 4-5, attached as Supp. Appx. 50. It has no connection to Defendants, and even if it did, the contents are inane. An "FYI" email is just that: a transmittal of the attached information, in this case without any substantive comment.

Durbano's deposition testimony is that an unspecified person at an unspecified time and place encouraged Durbano to "Keep raising capital" and "You have to trust us." Lacking any context or foundation, this is not admissible evidence. *See* Fed. R. Civ. P. 56(c)(4); *Brown v. Perez,* 835 F.3d 1223, 1232 (10th Cir. 2016). From 2008 until the receivership in May 2009, the Bank was experiencing a capital crisis and (from September 2008) was even under Cease and Desist Orders to raise its Tier 1 capital ratio to 10%. *See, e.g.,* Doc. 280-24 at 5. "Raise capital" is what any person would have recommended if the Bank wished to stay in business.

More importantly, these emails and deposition testimony provide no evidence that

> Commissioner Leary and UDFI disregarded the statutory perquisites by taking possession for reasons unrelated to the financial health of the Bank, having manipulated examinations, reports, and formal actions to manufacture a basis for taking possession, then preventing AWBM from raising additional capital, and all of this being motivated by personal bias or vendetta and a desire to clear the slate of the unique member banking structure.

*See* Doc. 326 at 92. Plaintiff's entire argument in this regard is nothing but bluster. AWBM acknowledges they obtained no supporting evidence in any of their multiple depositions of UDFI

employees, past and present. *See* Doc. 326 at 94 ("Defendants were unwilling in depositions to openly admit personal bias . . . ."). Yet again, AWBM relies upon nothing more than speculation and unsubstantiated innuendo to support its case, and this is insufficient to withstand summary judgment. *See Cypert*, 661 F.3d at 481.

Plaintiff submits nothing to controvert the fact that the Bank had been ordered, in the Cease and Desist Orders, to reach and maintain a Tier 1 capital ratio of 10%, and by the Bank's own records, the Bank never did so, a violation of the Cease and Desist Orders and a failure to maintain a minimum amount of capital, both of which are grounds for receivership. *See* Doc. 280-24 at 5; Doc. 280-32 at 3; Utah Code § 7-2-1(1)(f), (h). AWBM's own banking expert admits the Bank was in an unsafe and unsound condition, likewise grounds for receivership. Doc. 280-46 at 12 (lines 36:14-24); Utah Code § 7-2-1(1)(a), (k). According to the Bank's own external auditor, the Bank was insolvent, another ground for receivership. Doc. 280-30 at 9 (lines 24:19-25:9); Utah Code § 7-2-1(1)(g). Likewise, the Bank's own financials indicated the Bank had only $1.2 million in remaining capital and was losing over $100,000 a day as of March 31, 2009 – an indication of imminent insolvency. Doc. 280-31 at 3.

Furthermore, the Court has limited the procedural due process claim to evidence of false statements or material omissions in the Commissioner's presentation to Judge Morris. Doc. 64 at 22-24.[14] As Defendants have shown, Commissioner Leary presented the conclusions of the 2009

---

[14] Plaintiff denies that the Court did so, Doc. 326 at 96, but the Court made it clear that the information set forth in the ROE was sufficient grounds for closing the Bank, and held that, provided that Judge Morris relied on that information and not on false statements or material omissions, AWBM's due process claim failed. Doc. 64 at 32. AWBM has identified no false statements or material omissions at all in the presentation to Judge Morris, let alone that Judge Morris relied on such statements in closing the bank.

ROE to Judge Morris. Plaintiff's disagreement with those conclusions does not make the proffer of those conclusions as the basis for closing the Bank a false statement, and indeed it is evident that those conclusions were well grounded in fact, as noted in the preceding paragraph.

Even taking AWBM's unsubstantiated arguments at face value, they identify no fraud upon the state court nor any failure to follow the statutory procedures. AWBM argues "the Commissioner represented . . . to the court that an order of possession was required due to inadequate capital levels, the Commissioner knew that the reports upon which he was relying for that representation had been vigorously contested by the Bank." Doc. 326 at 97. Advocating a contested fact is not a misrepresentation. "[The Commissioner] took no steps to verify the accuracy of his examiners' work." *Id.* This also does not constitute a misrepresentation, neither can AWBM identify any requirement that the Commissioner doublecheck the work of his subordinates. Other than these assertions, AWBM argues only "strong inferences" that are nothing more than its own speculation. *See id.*

In sum, AWBM fails to demonstrate that the Commissioner did *not* follow the statutory requirements and have grounds for the receivership of America West Bank, and AWBM submits no evidence of any fraud upon the state court.

### B. AWBM Fails to Show Any Alleged Right Was Clearly Established.

A clearly established right is one set forth in a Supreme Court or Tenth Circuit decision on point or clearly established by the weight of authority from other circuit courts. *Cortez v. McCauley*, 478 F.3d 1108, 1114–15 (10th Cir. 2007) (en banc). In the absence of evidence of any constitutional violation, the Court need not reach the issue of whether such a right was clearly established. Nevertheless, AWBM's showing is deficient on its face. While a case need not be an exact repetition of the current situation to be "on point," general propositions of law are

insufficient. *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011); *Gomes v. Wood*, 451 F.3d 1122, 1128 (10th Cir. 2006). Most of AWBM's cases have no relation to the regulation of financial institutions and their receiverships, so they merit no discussion beyond that.[15]

*Browder v. City of Albuquerque*, 787 F.3d 1076 (10th Cir. 2015), is cited for the proposition that some conduct is so extreme that specific caselaw on point is unnecessary to clearly establish a constitutional right, but the facts in that case are decidedly extreme and bear no relationship to AWBM's claims, not even by analogy.[16] This also generally distinguishes Plaintiff's argument that this is a case of "flagrant violations" requiring a lesser burden of legal proof. *See* Doc. 326 at 100 & n.15. For example, while the *Jensen* decision relied upon by AWBM acknowledges this argument in principle, the Utah Supreme Court found no violations in that case. *See Jensen ex rel. Jensen v. Cunningham*, 2011 UT 17, ¶¶ 70-104, 250 P.3d 465. Like here, the Jensens' claims of wrongdoing were founded upon bare speculation and a lack of any evidence of wrongful motives or misrepresentations by the defendants. *See, e.g., id.* at ¶¶ 80-85.

---

[15] These inapposite cases include *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (punishment of an inmate); *Clark v. Edmunds*, 513 F.3d 1219, 1222 (10th Cir. 2008) (Sheriff's alleged use of excessive force when taking someone into custody); *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (claim against FBI for warrantless search); *Jensen ex rel. Jensen v. Cunningham*, 2011 UT 17, 250 P.3d 465 (dispute regarding medical care of a minor); *Walker v. State*, 624 P.2d 687 (Utah 1981)) (*habeas corpus* proceeding); *Bott v. DeLand*, 922 P.2d 732 (Utah 1996) (inmate action for negligent medical care); *Shroff v. Spellman*, 604 F.3d 1179 (10th Cir. 2010) (arrest and strip search); .

[16] "Adam Casaus was going nowhere fast. After finishing his shift at the Albuquerque police department and on no one's business but his own, he got into his police cruiser, flipped on the emergency lights, and drove off at an average of about 66 miles an hour on city surface streets through ten different intersections over a stretch of 8.8 miles. Then he reached an eleventh intersection. The light was red. He pressed the gas pedal, ignored the light, and the result was a terrible crash. Ashley Browder died. Her sister, Lindsay, suffered grave injuries. Sergeant Casaus eventually found himself criminally charged with reckless vehicular homicide in state court." *Id.* at 1077.

*Fuentes v. Shevin*, 407 U.S. 67 (1972), while at least involving a seizure of property, involved a sheriff seizing housewares under a writ of replevin. *Id.* at 69-70. That is not on point to clearly establish any rights in the highly-regulated field of financial institutions.

*Fahey v. Mallonee*, 332 U.S. 245 (1947), involving the receivership of a savings and loan, is at least in the ballpark of relevance. But *Fahey* contradicts AWBM's position rather than supporting it. In *Fahey*, the Supreme Court notes that, even though in other contexts an *ex parte* hearing may be "a drastic procedure," it is the "invariable custom" in the "history and customs of banking" and not unconstitutional. *Id.* at 253-54. Bank receiverships are the paradigmatic example of where this procedure is appropriate. Thus, *Fahey* certainly does not clearly establish any constitutional right that Defendants could have violated.

*Brown v. Weis*, 871 P.2d 552 (Utah App. 1994), involved receivership of a thrift institution – again, at least in the relevant ballpark. A Utah Court of Appeals decision is not "controlling authority" for purposes of the "clearly established" analysis. A state court decision below the level of the state supreme court is not even binding upon a federal court for questions of state law. *See Kokins v. Teleflex, Inc.*, 621 F.3d 1290, 1297 (10th Cir. 2010). As Defendants also find portions of the holding in *Brown* relevant and applicable, for purposes of this argument, Defendants assume it is at least persuasive authority. It still offers no support to AWBM.

In *Brown*, the court again found no constitutional violation. *Brown*, 871 P.2d at 567. To the contrary, *Brown* noted the weight of authority that due process does not require a pre-seizure hearing for a bank receivership. *Id.* at 566-67 (citing cases). Indeed, *Brown* holds that the public interest and the necessity of prompt action are necessarily present in the seizure of a failing financial institution. *Id.* at 567 ("The seizure of a failing thrift is in the public interest, and prompt

action is necessary."). The only outstanding consideration is whether the process complied with the applicable statute. *Id.* The state court already found that it did. *See* Doc. 280-40 at 2-5. This Court, considering the issue, concluded, "Judge Morris had the authority to deny the petition if Commissioner Leary's actions were arbitrary, capricious, fraudulent, or contrary to law. Instead, on May 1, 2009, the same day the petition was filed, Judge Morris entered an Order Approving Possession." Doc. 64 at 11 (footnote omitted).

### C. Commissioner Leary's Actions Were Objectively Reasonable Under the Circumstances.

Even if a plaintiff meets the "heavy two-pronged burden," a defendant is not liable if he shows that his actions were objectively reasonable under the circumstances, or that he was reasonably mistaken as to the legality of the actions. *Medina*, 252 F.3d at 1128-30. Commissioner Leary readily meets that standard. Consider that, at the time of the receivership, the Bank's own internal financial documents showed that the Bank was critically undercapitalized. *See* Doc. 280-31 at 3. This conclusion was echoed by the Bank's own external auditor, who concluded that the Bank was insolvent. *See* Doc. 280-30 at 9 (lines 24:19-25:9). This is grounds for receivership under Utah law, and the federal Prompt Corrective Action statute requires receivership in such cases. *See* Utah Code § 7-2-1(1)(g); 12 U.S.C. § 1831o(h)(3) (2009). A receivership is objectively reasonable on such information.

In sum, on all three independent grounds, Commissioner Leary is entitled to qualified immunity. This disposes of AWBM's § 1983 claim against him.

### V. AWBM's PROCEDURAL DUE PROCESS CLAIM FAILS.

For much the same reason, AWBM's procedural due process claim under the Utah Constitution also fails, because the state law analysis closely tracks the federal analysis. The Utah Supreme Court has adopted federal standards for determining whether a right is clearly established.

*See Spackman ex rel. Spackman v. Board of Educ.*, 2000 UT 87, ¶ 23, 16 P.3d 533 (relying upon *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) and *Anderson v. Creighton*, 483 U.S. 635, 639-40 (1987)). At a minimum, this requires at least one controlling decision holding that Defendants' conduct violated the Bank's rights. As discussed in detail in Section IV, above, AWBM cannot give the Court any.

The closest Plaintiff comes is their reliance on *America West Bank Members, L.C. v. State*, 2014 UT 49. AWBM first contends that "Defendants' arguments as to the three points of the Spackman test were rejected by the Utah Supreme Court in the original case." Doc. 326 at 101 (citing *America West* at ¶¶ 37-44). It is difficult to see how Plaintiff reaches this conclusion, when the very portions of the opinion cited hold that AWBM failed to allege a claim meeting the *Spackman* requirements. *See America West* at ¶¶ 38-39 (citing the *Spackman* elements and then concluding, "The complaint under review falls far short of alleging those elements."). The Court reiterates all three *Spackman* factors and concludes, "These essential elements are set forth nowhere in the complaint. Thus, this claim was properly dismissed for failure to state a claim."

The only qualification made by the Court was that, unlike the federal courts, which have adopted a *per se* rule that the federal due process clause allows for an *ex parte* hearing in bank receivership proceeding, Utah has not yet adopted a *per se* rule under the requirements of the Utah Constitution due process clause. *America West* at ¶ 43. The Court leaves open the possibility a plaintiff might "allege facts sustaining the conclusion that a pre-seizure hearing was required by due process." *Id.* This fails to establish a flagrant violation for at least two reasons. This holding establishes only that the Court cannot say there was no violation. Plaintiff must have a case holding that there *is* a violation. Further, that case – unlike *America West* – must predate the alleged wrongful conduct. *See Peak Alarm Co., Inc. v. Salt Lake City Corp.*, 2010 UT 22, ¶ 41, 243 P.3d 1221 ("[T]he plaintiff must . . . prove the right was clearly established *at the time of the purported violation*.").

As noted in Section IV.A, the Opposition does not refute the existence of statutory grounds for the receivership of America West Bank. It does not establish any misrepresentation to the state court. It does not establish any constitutional violation, much less a violation of a clearly established right. Section II, above, addresses the fallacy of AWBM's argument that, once the receivership was granted, there was nothing Plaintiff could do to challenge it in the state court. Consequently, Defendants are entitled to summary judgment on AWBM's procedural due process claim on this additional and independent basis.

## VI.    AWBM's SUBSTANTIVE DUE PROCESS CLAIM FAILS.

For the same reasons, AWBM's substantive due process claim fails. The conduct at issue must "shock the conscience." *Disability Law Ctr. v. Utah*, 180 F.Supp.3d 998, 1013 (D. Utah 2016). It cannot shock the conscience to place into receivership a bank that is operating in an unsafe and unsound condition, when the relevant statute expressly allows for that. Doc. 280-46 at 12 (lines 36:14-24); Utah Code § 7-2-1(1)(a), (k). It cannot shock the conscience to place into receivership a bank whose own external auditor – identified as an expert on this very subject – has declared insolvent. Doc. 280-30 at 9 (lines 24:19-25:9); Utah Code § 7-2-1(1)(g). It cannot shock the conscience to place into receivership a bank that is indisputably in violation of Cease and Desist Orders from both UDFI and the FDIC. *See* Doc. 280-24 at 5; Doc. 280-32 at 3; Utah Code § 7-2-1(1)(f), (h). It cannot shock the conscience to place into receivership a bank whose own financial records betray that it is critically undercapitalized, with a minimal $1.2 million and losing over $100,000 a day. Doc. 280-31 at 3.

That is for the substance of the receivership. As to the procedure of the receivership, it cannot shock the conscience to place a bank into receivership in an *ex parte* proceeding when no controlling judicial decision has ever held that a hearing in that situation is required. *See America West* at ¶ 43 (holding only that the Court cannot definitively say a hearing is never required).

AWBM argues their case is different because, "Commissioner Leary took possession while being driven by arbitrary and illegitimate motivations entirely unrelated to the health of the Bank while taking affirmative steps to ensure that the Bank would not survive." Doc. 326 at 104. As discussed above (Section IV.A), they present no viable evidence of this improper motive, just strained speculation and innuendo. Neither do they cite any authority to show that, if valid grounds for receivership are present – an unsafe and unsound bank, critically undercapitalized, in violation of cease and desist orders, insolvent or about to become insolvent – that it is somehow immune from receivership if the Commissioner is prejudiced against AWBM's business model. Such an argument would be absurd. Defendants are entitled to summary judgment on AWBM's substantive due process claim as well.

## VII.   AWBM'S TAKINGS CLAIMS FAIL.

As discussed in the Motion, takings claims are not viable in the highly-regulated context of financial institutions. AWBM seeks to distinguish this well-established law by arguing that their situation is an exception to the rule because they have also asserted due process claims – that the receivership was wrongful. Doc. 326 at 106. The caselaw refutes this argument. For example, in *Golden Pacific*, the Federal Circuit held, "Indeed, Golden Pacific's expectations could only have been that the FDIC would exert control over the Bank's assets if the Comptroller became satisfied that the Bank was insolvent and chose to place it in receivership," not "if the Comptroller became satisfied *correctly*." *See Golden Pacific Bancorp v. United States*, 15 F.3d 1066, 1074 (Fed. Cir. 1994). Similarly, in *California Housing*, "What neither Saratoga nor CHS could have expected was to be compensated for a regulatory possession by OTS and the RTC of its property if that possession were to occur following a determination that Saratoga's financial situation mandated federal conservatorship or receivership," not a "*correct* determination." *California Housing Securities, Inc. v. United States*, 959 F.2d 955, 959 (Fed. Cir. 1992).

In fact, the caselaw expressly contradicts AWBM's position. "[A] mistake may give rise to a due process claim, *but not a taking claim*." *Golden Pacific*, 15 F.3d at 1076 (emphasis added) (citing *Tabb Lakes Ltd. v. United States*, 10 F.3d 796, 803 (Fed.Cir.1993)). AWBM's argument is neither new nor novel, and the courts have consistently rejected takings claims in this highly-regulated field even when the claimants had other viable claims that, like Plaintiff argues, hypothetically gave rise to reasonable investment expectations. *See, e.g., Castle v. United States,* 301 F.3d 1328, 1342 (Fed. Cir. 2002) (dismissing takings claim while allowing contract claim); *Home Savings v. United States,* 51 Fed. Cl. 487, 496 (2002) (same).

*Branch*, relied upon by AWBM, does not help their argument. *See* Doc. 326 at 106 (citing *Branch v. United States*, 69 F.3d 1571 (Fed. Cir. 1995)). To the extent *Branch* evaluated "the government action which precipitated the loss . . . to determine whether a taking occurred," as AWBM argues, *id.*, it was in the context that, "The seizure and closure of the bank, once the bank became insolvent, did not constitute a taking. It is well established that it is not a taking for the government to close an insolvent bank and appoint a receiver to take control of the bank's assets." *Branch*, 69 F.3d at 1575.

Neither does *Strawberry Electric* help Plaintiff. *See* Doc. 326 at 107 (citing *Strawberry Elec. Serv. Dist. v. Spanish Fork City*, 918 P.2d 870 (Utah 1996)). *Strawberry Electric* is not a takings case. It concerns the application of a specific Utah statute – Utah Code § 10-2-424 – governing a situation where a municipality undertakes to provide electricity in an area already serviced by a utility. The court resorts to takings law to interpret and apply the statute. *See Strawberry Electric*, 918 P.2d at 878. It does not state a proposition for takings law, generally, and certainly not for the specific context of highly-regulated financial institutions.

On the question of physical takings, Plaintiff's argument fails because they identify no physical taking. "The evidence here shows a physical taking, as Commissioner Leary actually took possession of the Bank. How else could he have *transferred title* to the FDIC to act as receiver of all the Bank's assets without permanently invading the property?" Doc. 326 at 108-09 (emphasis added). The transfer of title is a reference to the intangible business of the Bank. As noted in the Motion, this is a regulatory taking, not a physical one. *See* Doc. 280 at 57-58. AWBM identifies no building, no desks, no computers, not even a pencil sharpener that was physically taken from them. It is the "business" AWBM contends was "taken," and that is essentially a regulatory taking.

In any case, the highly-regulated nature of Plaintiff's business precludes any takings claims, whether or not AWBM had any other viable claims. Defendants are entitled to summary judgment on these claims.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant their Motion in its entirety and enter summary judgment in favor of Defendants and against AWBM on all remaining claims for relief.

DATED: September 7, 2022

**OFFICE OF THE UTAH ATTORNEY GENERAL**

*/s/ Stephen W. Geary*
STEPHEN W. GEARY
Assistant Utah Solicitor General
CHRISTINE HASHIMOTO
Assistant Utah Attorney General
*Attorneys for the Utah Dept. of Financial Institutions and G. Edward Leary*